THE LAW FIRM OF RAVI BATRA, P.C.
*Attorneys for plaintiff*
142 Lexington Avenue
New York, N.Y. 10016
Ravi Batra (RB4299)
ravi@ravibatralaw.com
212-545-1993; Fax 212-545-1993; Cell: 914-882-6382

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

LAURA LEE JACOBSON,

        *Plaintiff*,

    -against-

KINGS COUNTY DEMOCRATIC COUNTY
COMMITTEE; JUDICIAL SCREENING
COMMITTEE FOR THE DEMOCRATIC PARTY IN
AND FOR KINGS COUNTY; FRANK R. SEDDIO
Individually and in His Official and Representative Capacity
as County Chair of the Kings County Democratic County
Committee; MARTIN W. EDELMAN Individually and in
His Official and Representative Capacity as
Chairperson of the Judicial Screening Committee for
the Democratic Party in and for Kings County;
STEVEN R. FINKELSTEIN; STEVE DECKER;
ABAYOMI O. AJAIYEOBA; and, JOHN AND JANE
DOES ## 1-20, so named as their identities are not
yet known, intended to represent persons who had
access to confidential records of and/or confidential
candidate-interview by, the Judicial Screening
Committee for the Democratic Party in and for Kings
County pertaining to plaintiff, who disclosed such
materials outside of the committee to defendant
Seddio, defendant Kings County Democratic County
Committee, defendant Kings County Democratic
County Committee's media consultant George Artz,
members of the public and/or the media,

        *Defendants*.

**CIVIL ACTION NO.  16-cv-4809**

**CIVIL COMPLAINT**

**JURY TRIAL DEMANDED**

PLAINTIFF LAURA LEE JACOBSON, by her attorneys THE LAW FIRM OF RAVI BATRA, P.C., as and for her complaint against the defendants alleges as follows:

**Preamble**

1.     This case seeks to protect and keep alive minimal judicial independence, necessary for the co-equal Third Branch of government to honor its constitutional mandate in our separated powers regime - despite the fact that every judge, be she politically appointed or publically elected, must upon assuming the duties of her office to defend and protect the Constitution, dispense justice independent of her necessary political birth. It is an age-old problem that existed prior to the founding of our Republic. Indeed, in or about 1163, Thomas Becket, a Saxon, appointed Archbishop of Canterbury by King Henry II, barred Henry II's Royal Courts for exercising jurisdiction over priests and church clerks accused of secular misconduct. Becket imposed a  separation of powers, preventing political influence from impairing fair and impartial treatment of the church and its people, and a separation of church and state.

2.     Present day, every lawyer who engages in politics has a duty, as an "officer of the court," to defend and protect judicial independence from political control that *de facto* chills and/or renders the courthouse to be merely an extension of party politics or a patronage mill - thereby undermining public confidence in the courts.

3.     More recently, the Supreme Court of United States, in the full throated decision  of *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008), with the clearest voice of the late great Justice Antonin Scalia, essentially saying that the Kings County

Democratic County Committee can play all the politics it wants as it holds judicial conventions to nominate justices of the Supreme Court of the state of New York and pick less qualified persons over more qualified persons - and by doing so - it does not offend the Constitution as there is ballot access. But, it's respectfully alleged that the *Lopez-Torres* Precedent does not permit to occur what has been done to Justice Laura Jacobson by these defendants.

4.      Lawyers who serve as judicial screeners, sitting on a judicial screening committee, are still required to honor their permanent and perpetual "officer of the court" status and may not act to undermine the system of justice or dishonor the Constitution without being held to account.

5.      The Kings County Democratic County Committee's judicial screening committee chaired by defendant Martin W. Edelman, the so-called Edelman Committee, by the Rules of the Kings County Democratic County Committee, is not an advisory committee, but a necessary legal predicate with binding effect - in that before anybody can be nominated at the judicial convention held by the Kings County Democratic County Committee that individual must have been approved by the Edelman Committee. Hence, the Edelman Committee cannot select the nominees at the judicial convention, but it has the absolute *sole* power to block any individual from becoming a nominee at the judicial nominating convention. It is this awesome power to block a qualified and an exceptional jurist, Justice Laura Jacobson, known by all to be very hard-working and apolitical - who treats the powerful or the weak, White or Black, straight or gay, young or old, the connected or the stranger - the same in her courtroom.

6.     Judge Jacobson has distinguished herself as a judge who takes large bags full of legal papers to continue working at home, as there is never enough time to fashion merit-based justice, one case at a time. Her reputation within her colleagues on the bench and her administrative judicial superiors is exemplary such that she has been honored to be repeatedly appointed as the Acting Surrogate for Kings County with a very large caseload. As a Supreme Court justice, she has distinguished herself such that nearly 60% of her docket is to try complicated medical malpractice cases. Her service as a Supreme Court Justice hearing foreclosure cases, honors New York state's strong public policy of dis-incentivizing foreclosures, even before the predatory lending that devastated neighborhoods across the country and evaporated huge amounts of equity theretofore owned by the American family resulted in additional safeguards imposed by statute or regulation in New York.

7.     That Judge Jacobson properly issued a Temporary Restraining Order, over politically powerful objection by Frank V. Carone, as attorney for the State University of New York ("SUNY"), or repeatedly reduced the maximum attorney's fee demands of defendant Steven R. Finkelstein, as counsel to the Kings County Public Administrator, when he had done little work, or refused to grant residential foreclosure when the legal and equitable requirements had not been met - is both judicially proper and unworthy of punishment by judicial screeners.

## Introduction

5.      This lawsuit seeks compensatory and injunctive relief for violations of the plaintiff's federal and state constitutional and common law rights by the defendants, and conspiracy by the defendants amongst themselves, and others, to violate the plaintiff's civil rights.

6.      The plaintiff, a sitting New York State Supreme Court Justice sought to be nominated for candidacy for another fourteen year term as a Supreme Court Justice. The defendants, as the Kings County Democratic Party Committee (Kings County Democratic County Committee) and its judicial screening committee (Judicial Screening Committee for the Democratic Party in and for Kings County), acting under color of law, violated their own rules concerning committee participation and confidentiality and deprived the plaintiff of equal protection and due process so as to vindictively harm the plaintiff personally and professionally. This all despite the fact that during plaintiff's most recent judicial screening defendant Steve Decker, who was sitting as a member of the subcommittee which ostensibly "investigated" Judge Jacobson for re-nomination and re-endorsement, and who was appointed by defendant Frank Seddio, who is the County Chair of the Kings County Democratic County Committee, told Judge Jacobson, amongst other things, that she is "probably the smartest judge on the bench."

**The Parties**

7.       Plaintiff Laura Lee Jacobson is currently a resident of Kings County and Queens County, each within the Eastern District of New York, and is presently a Justice of the Supreme Court of the State of New York, in and for Kings County, a judicial position she was elected to in 2002.

8.       Judge Jacobson brings this action solely in her individual capacity. This action is ***not*** brought in Judge Jacobson's judicial capacity. In bringing this action, Judge Jacobson is ***not*** acting as a jurist or as a representative or agent of any court, judicial body, or administrative agency, including but not limited to the New York State Office of Court Administration.

9.       Prior to her election to Supreme Court, Judge Jacobson had been elected as a Judge of the Civil Court of the City of New York, in and for Kings County. Judge Jacobson was initially elected to Civil Court in 1991.

10.       Before beginning judicial service, Judge Jacobson practiced law since her admission to practice in 1975, after having graduated from Brooklyn Law School in 1974. Judge Jacobson's legal experience included the private practice of law and service as a Court Attorney to Hon. Elliot Wilk in Manhattan. A true copy of Judge Jacobson's *curriculum vitae* is appended hereto and made a part hereof as **<u>Exhibit 1</u>**.

11.     Judge Jacobson has consistently established herself as a hard-working judge, dedicated to determinations made fairly and on the law and merits, without concern for political or social pressure. Speaking to Judge Jacobson's reputation and qualifications, the Hon. Betty Weinberg Ellerin, who had served more than two decades on the Appellate Division of the New York State Supreme Court, First Judicial Department and had been  Deputy Chief Administrative Judge of the State of New York for the New York City Courts, issued a sterling endorsement. A true copy of Justice Weinberg Ellerin's letter dated August 3, 2016 is appended hereto and made a part hereof as **Exhibit 2**.

12.     Because of Judge Jacobson's laudatory personal and professional attributes, the Office of Court Administration has repeatedly appointed Judge Jacobson as Acting Surrogate in and for Kings County, ***in addition to*** her duties as a sitting Justice of the Supreme Court in and for Kings County. True copies of previously filed Orders of appointment are appended hereto and made a part hereof as **Exhibit 3**.

13.     Judge Jacobson's hard work and dedication are actually evidenced by a photograph published as part of an article in the *New York Post*, the sources of which are subjects this action. *See*, Rich Calder, Emily Saul and Laura Italiano, *City Judge Deemed Incompetent in 'Unheard Of' Move*, N.Y. Post, July 13, 2016, 11:23pm, *available at* http://nypost.com/2016/07/13/city-  judge-  deemed-incompetent-in-unheard-of-move, *last accessed* Aug. 23, 2016. A true copy of this article and photograph are appended hereto and made a part hereof as **Exhibit 4**. Also appended, and made a part hereof, is the print version of the article which appeared on page 9 of the July 14, 2016 edition of the *New York Post*.

7

Critically, the published photograph depicts Judge Jacobson carrying multiple "big" bags, one of which is slung over her left arm. Clearly visible in that bag on Judge Jacobson's left arm are motion papers from a pending action. This is because Judge Jacobson regularly takes work home with her and works on cases even when out of the courthouse during her personal time.

14.      Much of the content of the July 13, 2016 online/ July 14, 2016 print *New York Post* article (Ex. 4) is  false, misleading and damaging to Judge Jacobson. The sources of the false and damaging information are defendants Kings County Democratic County Committee and the  Edelman Committee. Such disclosures, and others delineated herein, were made in breach of an agreement of confidentiality.[1] Moreover, such disclosures, and others delineated herein, were made under color of law in vindictive action, in violation of party and committee Rules, to harm Judge Jacobson maliciously and permanently.

15.      On July 15, 2016, the *New York Post* published yet another article online, and in print, containing  false, misleading and damaging information about Judge Jacobson. Like the prior article (Ex. 4), the sources of the such false and damaging information were again

---

[1] The Rules of defendants Kings County Democratic County Committee and Edelman Committee governing the screening, selecting and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District, enacted under color of law, require candidates to execute a limited waiver of the statutory confidentiality of records maintained by the New York State attorney disciplinary and grievance committees (Judiciary Law § 90(10)) and the New York State Commission ("CJC") on Judicial Conduct (Judiciary Law § 45). That waiver permits the Edelman Committee to obtain records that they would otherwise be barred, by statutes, from accessing. The defendants' own confidentiality Rules, provisions and assurances, mandated that they keep and maintain confidential all information, including records of any candidate secured from state agencies. Due to Judge Jacobson's exemplary professional career, as attorney and as judge, she was never the subject of any reprimand or sanction by any attorney grievance committee or the CJC.

defendants Kings County Democratic County Committee and the Edelman Committee. The content of the July 15, 2016 article is also a subject of the instant action. *See*, Rich Calder, Emily Saul and Laura Italiano, *Brooklyn Judge Blows Off Work Amid Being Deemed "Unqualified"*, N.Y. Post, July 15, 2016, 12:37 a.m., *available at* http://nypost.com/2016 07/15/brooklyn-judge- blows-off-work-amid-being-deemed-unqualified, *last accessed* Aug. 23, 2016. A true copy of this online article is appended hereto and made a part hereof as **Exhibit 5**. Also appended, and made a part hereof, is the print version of the article which appeared on page 12 of the July 15, 2016 edition of the *New York Post*.

16.     While others applied for nominations by the Edelman Committee and endorsement by the Kings County Democratic County Committee, apart from Judge Jacobson, no other applicant had information about their application and the Edelman Committee's process disclosed to the public and the media.

17.     While others incumbent judges applied for nominations by the Edelman Committee and endorsement by the Kings County Democratic County Committee, apart from Judge Jacobson, no other incumbent applicant had information about their application and the Edelman Committee's process disclosed to the public and the media.

18.     Defendant Kings County Democratic County Committee ("KCDCC") is an unincorporated association serving as the Kings County Committee for the New York State Democratic Committee. Upon information and belief, the Kings County Democratic County Committee maintains its principal place of business within the Eastern District of New York at 16 Court Street, Suite 1207, Brooklyn, NY 11241.

9

19.   The Kings County Democratic County Committee is properly named as a party defendant pursuant to Fed. R. Civ. P. 17(b)(3)(A).

20.   At all relevant times, the Kings County Democratic County Committee acted under color of law.

21.   At all relevant times, defendant Hon. Frank R. Seddio was the County Chair of the Kings County Democratic County Committee. Upon information and belief, Mr. Seddio resides within the Eastern District of New York at 2333 East 69 Street, Brooklyn, NY 11234.

22.   Mr. Seddio is properly named as party defendant in his individual as well as official and representative capacity pursuant to Fed. R. Civ. P. 17(b)(3), (d) C.P.L.R. §§ 1023, 1025, and is sued individually, including as a conspirator in the violation of plaintiff's constitutional rights, and as an official and representative.

23.   At all times herein, Mr. Seddio acted under color of law.

24.   The Judicial Screening Committee for the Democratic Party in and for Kings County is an unincorporated association serving as the judicial screening panel for defendant Kings County Committee for the New York State Democratic Committee. Upon information and belief, the Judicial Screening Committee for the Democratic Party in and for Kings County maintains its principal place of business at the law offices of its chairperson, Defendant Martin W. Edelman,  within the Southern District of New York at 61 Broadway, New York, NY 10006.

25.   At all relevant times, the Edelman Committee acted under color of law.

10

26.     At all relevant times, defendant Martin W. Edelman was the Chairperson of

the Judicial Screening Committee for the Democratic Party in and for Kings County. Upon

information and belief, Mr. Edelman resides within the Southern District of New York within

New York County. Mr. Edelman's principal place of business is within the Southern District

of New York at 61 Broadway, New York, NY 10006.

27.     Mr. Edelman is properly named as party defendant in his individual as well

as official and representative capacity pursuant to  Fed. R. Civ. P. 17(b)(3), (d) C.P.L.R. §§

1023, 1025, and is sued individually, including as a conspirator in the violation of plaintiff's

constitutional rights, and as an official and representative.

28.     At all relevant times, Mr. Edelman acted under color of law.

29.     Upon information and belief, based upon publically accessible internet

postings of defendant Kings County Democratic County Committee, at all relevant times, the

Edelman Committee was comprised of the following individuals:

> Ethan Gerber, Esq.
> Michael V. Cibella, Esq.
> Lisa Schreibersdorf, Esq.
> Steven Bamundo, Esq.
> Kenneth J. Montgomery, Esq.
> Lisa Smith, Esq.
> Melissa E. Bonaldes, Esq.
> Carmen A. Pacheco, Esq.
> Scott Baron, Esq.
> Elaine Avery, Esq.
> Wayne C. Bodden, Esq.
> Gregory Cerchione, Esq.
> William T. Bellard, Esq.
> Defendant Martin W. Edelman, Esq.
> Defendant Steve Decker, Esq.

             Mark A. Longo, Esq.
             Helene E. Blank, Esq.
             <u>Defendant</u> Steven R. Finkelstein, Esq.
             E. Paul Stewart, Esq.
             Theodore Pavlounis, Esq.
             Kendra L. Hutchinson, Esq.
             Evan Goldberg, Esq.
             Anthony M. Deliso, Esq.
             <u>Defendant</u> Abayomi O. Ajaiyeoba, Esq..

*See*, Brooklyn Democratic Party, Judicial Screening, *available at*, http://www.brooklyn dems.com/judicial_screening, *last accessed* Aug. 24, 2016.

30.    At all relevant times, defendant Steven R. Finkelstein was an attorney admitted to practice law in the state of New York who served as counsel to the Kings County Public Administrator. Simultaneously, Mr. Finkelstein also served as a member of the Edelman Committee. In 2005, after the removal of Surrogate Michael Feinberg, Acting Surrogate Albert Tomei appointed Mr. Finkelstein as counsel to the Public Administrator. In 2006, defendant Seddio, who was then Surrogate, re-appointed Mr. Finkelstein as counsel to the Public Administrator. Mr. Finkelstein is sued individually, including as a conspirator in the violation of plaintiff's constitutional rights.

31.    At all relevant times, defendant Steve Decker was an attorney admitted to practice law in the state of New York. Mr. Decker served as a member of the Edelman Committee and was appointed to that position as a representative of defendant Seddio. Mr. Decker was a member of the subcommittee of the Edelman Committee assigned to the judicial screening of Judge Jacobson Mr. Decker is sued individually, including as a conspirator in the violation of plaintiff's constitutional rights.

32.     At all relevant times, defendant Abayomi O. Ajaiyeoba was an attorney admitted to practice law in the state of New York who served as a member of the Edelman Committee. Ms. Ajaiyeoba was a member of the subcommittee of the Edelman Committee assigned to the judicial screening of Judge Jacobson. Ms. Ajaiyeoba is sued individually, including as a conspirator in the violation of plaintiff's constitutional rights.

33.     Defendants John and Jane Does ## 1-20 are fictitiously named as their identities are not yet known. These John and Jane Does are intended to represent persons who had access to confidential records and//or the confidential process of defendant Judicial Screening Committee for the Democratic Party in and for Kings County, pertaining to plaintiff, who disclosed such materials outside of the committee to defendant Seddio, defendant Kings County Democratic County Committee, defendant Kings County Democratic County Committee's media consultant George Artz, members of the public and/or the media.

**Jurisdiction and Venue**

34.     The Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), (4), 1367(a), 2201, 2202; 42 U.S.C. §§ 1983, 1985, 1988; Fed. R. Civ. P. 65.

35.     Venue of this action is properly in this district, pursuant to 28 U.S.C. § 1391(b)(1), on the grounds that any defendant resides within the Eastern District of New York and all defendants are residents of the State of New York; 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in the Eastern District of New York.

**Allegations Pertinent to All Counts**

36.     The Supreme Court of the State of New York is the court of general original jurisdiction, in law and equity, in the New York court system. NY Const art. VI, § 7(a).

37.     The New York State Constitution provides that "justices of the supreme court shall be chosen by the electors of the judicial district in which they are to serve. The terms of justices of the supreme court shall be fourteen years from and including the first day of January next after their election." NY Const art. VI, § 6(c).

38.     New York State is divided into thirteen judicial districts. Judiciary Law § 140.

39.     Until in or about 2009, Kings County and Richmond County were collectively the Second Judicial District. By legislative amendment in or about 2007, effective January 1, 2009, the Thirteenth Judicial District was established, which consists of the County of Richmond. Judiciary Law § 140.  Kings County is the Second Judicial District. *Id.*.

40.     New York law provides that there shall be 49 justices of the Supreme Court in the second judicial district. Judiciary Law § 140-a(2).

41.     New York law does not provide for primary elections for candidates seeking to be elected justices of the Supreme Court. Instead, delegates are elected from Assembly Districts located within a judicial district. These judicial delegates nominate and vote for candidates to appear on the general election ballot as candidates for justice of the Supreme Court. *See, e.g.*, New York Election Law §§ 6-124, 6-136(3).

42.     Pursuant to New York Election Law § 6-106, "Party nominations for the office of justice of the supreme court shall be made by the judicial district convention."

14

43.     Such nominating conventions are also subject to the provisions of, *inter alia*, New York Election Law §§ 6-124, 6-126.

44.     New York state law provides broad and nearly unfettered power to political parties to control who can appear on the ballot for a vacancy on the Supreme Court in any judicial district. By virtue of such authority, when such a political party exercises such statutory power, it is acting under color of law.

45.     At all times herein mentioned, from Judge Jacobson's initial application for screening for re-appointment made on February 23, 2016, her May 18, 2016 subcommittee interview, her May 25, 2016 Edelman Committee interview, her June 7, 2016 Edelman Committee appeal, and thereafter, Judge Jacobson was entitled to have her candidacy before defendant Edelman Committee for its recommendation and nomination and endorsement by defendant Kings County Democratic County conducted in accordance with the Rules enacted under color of law governing the screening, selecting and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District by defendants Kings County Democratic County Committee and Edelman Committee.

46.     Defendant Kings County Committee for the New York State Democratic Committee maintains its own rules of government. A true copy of such rules, as reported adopted on September 17, 2014, is appended hereto and made a part hereof as **Exhibit 6**. ("Party Rules").

47.     The Party Rules include a Code of Ethics. This Code begins with a "Statement of Principles," which includes a provision that "It is essential that party leadership not be used for private gain." *Id*. at p. 19.

48.     Effective in or about 2003, defendant Kings County Committee for the New York State Democratic Committee established defendant Judicial Screening Committee for the Democratic Party in and for Kings County.

49.     The procedures to be followed by defendant Judicial Screening Committee for the Democratic Party in and for Kings County were instituted by defendants Kings County Committee for the New York State Democratic Committee and Judicial Screening Committee for the Democratic Party in and for Kings County. A true copy of these procedures, as reported amended on December 14, 2011, are appended hereto and made a part hereof as **Exhibit 7**. ("Screening Committee Procedures").

50.     The Screening Committee Procedures provide, in pertinent part:

i.     A newly-constituted screening panel shall be established, effective October 1, 2003. The panel shall review and interview all legally qualified candidates for Judicial Office who request such a review. They shall judge each candidate as either 'Qualified' or 'Not Qualified at this time'. The panel may, in its discretion, publish explanatory language in any determination finding a candidate 'Not Qualified at this time.' Prior to the publication of any list of Committee findings, candidates shall be permitted to withdraw their candidacies, unequivocally and with prejudice. Of the Qualified Candidates the Panel shall report out a limited pool of recommended candidates based on the total number of vacancies for that judicial office (i.e., civil, supreme). The total pool shall be 5 individuals per vacancy for each type of judicial office. For the purposes of determining the size of the Pool, incumbent's seats shall be included."

Id. at ¶ 1;

16

ii.      "The panel's <u>determination</u> for each and every person interviewed shall be shared with all members of the [KCDCC] Executive Committee prior to an endorsement vote . . . In the case of Supreme or Surrogates Court, these findings should be published sixty (60) days before the first day to convene the Judicial Convention or as soon as practical and made available to all Delegates and Alternate Delegates attending the Judicial Convention and to all members of the Executive Committee."

*Id*. at ¶ 2 (<u>emphasis added</u>);

iii.      "The [KCDCC] Executive Committee <u>may not</u> endorse any candidate for Judicial Office that is not recommended by the Screening Panel. The [KCDCC] Executive Committee <u>may not</u> endorse for nomination by the Judicial Convention any candidate for Supreme Court that is not found to be 'recommended' by the Screening Panel. Incumbent Judges seeking re-election to the same office shall be deemed Recommended unless seventy-five percent (75%) of the quorum determines that the Judge should not be reported out as Recommended. For the purposes of these rules Judges appointed to fill interim vacancies shall not be deemed Incumbent Judges."

*Id*. at ¶ 4 (<u>emphasis added</u>);

iv.      "The [screening] panel shall consist of the following: . . . **Three** members selected by the Chairperson of the Executive Committee of the Kings County Democratic Party, one of whom shall serve as the Chairperson of the Panel."

*Id*. at ¶ 6[L] (**<u>emphasis in original</u>**);

v.      "Every member of the Screening Panel [who is an attorney] must be an admitted member of the Bar of the State of New York in good standing and all members must maintain a residence or employment/practice in the Second Judicial District and be an enrolled member of the Democratic Party."

*Id*. at ¶ 7;

vi.      "No candidate or Member of the Executive Committee may communicate with a member of the Screening Committee regarding the candidacy of any individual proposed for screening."

*Id*. at ¶ 11;

17

vii.    "Before undertaking any candidate evaluations, the Screening Committee shall adopt formal written criteria, upon which all such evaluations shall be based."

*Id*. at ¶ 13;

viii.    "The Chairman of the Committee shall be a voting member of the Screening Committee, should be chosen by the Chairman of the Executive Committee and serve for a two-year renewable term. Notwithstanding this, the Chairman shall serve at the pleasure of the Chairman of the Executive Committee and may be dismissed by the Chairman of the Executive Committee at any time."

*Id*. at ¶ 16;

ix.    A quorum shall consist of at least two-thirds of the current members in good standing. A sixty percent (60%) vote of the quorum should be required for all decisions, except for the case of incumbent judges as stated heretofore **and further excepting that any candidate having been found "Qualified" in any year may only be found "Not Qualified at this time" in the following year upon a majority vote of a quorum**. . ."

*Id*. at ¶ 19 (**emphasis in original**).

51.    The Edelman Committee enacted its own "Committee Rules," which were reportedly amended January 23, 2012. According to defendant Edelman, despite the printed content of the Rules, they were actually last amended on March 29, 2016. A true copy of these Rules are appended hereto and made a part hereof as **Exhibit 8**. ("Edelman Committee Rules").

52.    The Edelman Committee Rules provide, in pertinent part, that:

i.    "The panel shall judge each candidate as either 'Qualified' or 'Not qualified at this time.' Of the Qualified Candidates the Panel shall report out a limited pool of recommended candidates based on the total number of vacancies for that judicial office (i.e ., Civil, Supreme). The total pool shall be five (5) individuals per vacancy for each type of judicial office. For the purposes of determining the size of the pool, incumbent's seats shall be included."

*Id*. at Rule 9;

ii.    "A quorum shall consist of at least two-thirds (66 2/3 %) of the current members in good standing. A sixty percent (60%) vote of the quorum is required for all decisions, except for the case of incumbent judges. Incumbent Judges seeking reelection to the same office shall be deemed qualified unless seventy-five (75%) of the quorum determines that the Judge should not be reported out as 'Recommended.' For the purposes of these rules Judges appointed to fill interim vacancies shall be deemed incumbent Judges. If a candidate is found qualified in any year, the candidate to be found qualified in any successive year need only be found qualified by a majority vote of the quorum."

*Id*. at Rule 10;

iii.    "**Except for the Report to the Executive Committee of the Democratic Party, all proceedings before the panel and all investigative reports shall be treated as strictly confidential**. Any inquiries concerning such proceedings or reports shall be referred to the Chair of this Committee. In the event that a member violates this provision, the Chair must discharge that member from any further deliberations of the panel."

*Id*. at Rule 13 (emphasis added) (**emphasis in original**);

iv.    A questionnaire and standard resume will be prepared for the use of the panel.

*Id*. at Rule 14;

v.    "The report of the panel shall be written, signed by the Chair, and shall name the candidates found to be 'Qualified'/ 'Not Qualified at this Time' as well as those found 'Recommended' for the judicial vacancy or vacancies to be filled."

*Id*. at Rule 16;

vi.    "In investigating the qualifications of a candidate, the Chair shall appoint a subcommittee of one or more members of the Committee (designating one such member as the Reporter for the subcommittee) to conduct the necessary investigation, and submit a pre-screening report and recommendation to the Committee. **The selection of the sub-committee shall be by lottery. The subcommittee shall conduct a personal interview of the candidate**. All pre-screening reports shall be circulated prior to the interview. *The confidentiality of the report is paramount*. Copies of the report shall be returned to the person or persons who conducted the interview after voting has occurred. In the event the candidate is asked to return for a

further interview, the copies of the pre-screening report shall be returned to the person or persons who prepared the pre-screening report and produced at the continuing interview and then returned to the person or persons who prepared the report. After final votes are taken all copies shall be returned to the person or persons who prepared the report. *One copy shall be kept by the Chair and one copy shall be kept by the person or persons who prepared the report. All other copies shall be destroyed. Any committee member who distributes a copy of a pre-screening report without the consent of the Committee shall be immediately suspended from the Committee.*"

*Id*. at Rule 17 (**emphasis in original**) (*emphasis added*);

       vii.    *Oral and Written Notice*: "**In the event that the sub-committee determines that there are particular areas of concern, the candidate will be orally apprised either by the Chair or a designated member of the sub-committee prior to being interviewed by the full Committee**. The candidate will be requested to be prepared to address before the full Committee the areas of concern detailed in the written communication. The candidate shall be informed that he or she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues. In the event, the candidate desires to provide additional written materials; the candidate must provide 24 copies of such materials to be distributed to the  Committee at the interview of the full Committee."

*Id*. at Rule 20 (**emphasis in original**) (emphasis added) (*text added*);

       viii.    "Candidates shall be rated as 'Qualified' or 'Not Qualified at this Time.' If conditions exist to trigger an evaluation as to whether a qualified candidate is deemed to be recommended, such rating will also be provided. In its rating, the Committee shall consider the candidate's possession of such special qualifications as may be necessary or desirable for the performance of the duties of the office for which he or she is being considered."

*Id*. at Rule 22;

       ix.    "The Committee shall evaluate candidates for judicial office based upon the following criteria:

            a. Judicial demeanor and temperament
            b. Judicial scholarship and knowledge of law
            c. Judicial industriousness and diligence
            d. Judicial experience

> e. Judicial integrity
> f. Judicial fairness"

*Id*. at Rule 25;

> x.      "At the end of the deliberative process, all applications of the candidates shall be retrieved by the Chair. The Chair shall make arrangements for the destruction of all copies with the exception of one copy or original to be kept in the possession of the Chair. The application shall remain confidential and shall not be disclosed without a vote of the Committee."

*Id*. at Rule 30.

53.     In March 2014, the New York City Bar Association Council on Judicial Administration published *Judicial Selection Methods in the State of New York: A Guide to Understanding and Getting Involved in the Selection Process*. A true copy of this publication is appended hereto and made a part hereof as **Exhibit 9**. The City Bar found that "In some counties historically dominated by a single political party (the Democratic Party in all counties except Richmond), the selection of candidates for nomination by that party has been tantamount to election in the general election." *Id.* at p. 16.

54.     As an inducement to candid participation in the judicial screening process by people seeking nomination and endorsement by the  Kings County Committee for the New York State Democratic Committee as judicial candidates, the defendants assure such applicants strict confidentiality.

55.     As such assurances are made by the defendants as part of the awesome powers they are given by the state of New York to control who appears on the ballot for judgeships, such assurances are made under color of law.

56. The questionnaire that any candidate for screening by the Edelman Committee and endorsement by the Kings County Committee for the New York State Democratic Committee specifically provides "Please be advised that all information provided will be kept strictly confidential." A true copy of the Edelman Committee "2016 Questionnaire for Justice of the Civil/Supreme Court" is appended hereto and made a part hereof as **Exhibit 10**.

57. The Edelman Committee questionnaire requires that an applicant who is a "sitting Judge" must, as part of the information provided that "will be kept strictly confidential," "list all decisions which have been reversed or modified by a higher Court." *Id*. at Q. 43. That inquiry further requires the sitting Judge to provide copies of the appealed orders and the Appellate Court decisions as part of the confidential provision of information. *Id*..

58. Judge Jacobson relied to her detriment on the defendants' published assurances of confidentiality.

59. The Rules of the Edelman Committee and the Kings County Committee for the New York State Democratic Committee provide that the Democratic party in Brooklyn cannot endorse a candidate for a judgship who has not been found "Qualified" by the Edelman Committee.

60. At all relevant times, the defendants' rules and procedures govern which candidates appear on the ballot for Justice of the Supreme Court and Judge of the Civil Court for elections held in Kings County.

22

61.     In order to have any legitimate chance at being elected to the Supreme Court within Kings County, the support and approval of the Kings County Democratic County Committee is necessary.

62.     The defendants' judicial screening process is conducted under color of law.

63.     As part of the defendants' judicial screening process, all candidates for nomination agree to provide a completed questionnaire and participate in a confidential screening interview.

64.     **The Chair of the Screening Committee is Ineligible to Serve**. The entire judicial screening process was tainted as the chairperson of defendant Edelman Committee was not authorized to be on the Committee. The defendants' rules require that, *inter alia*, all members of the Edelman Committee "must maintain a residence or employment/practice in the Second Judicial District. . ." Defendant Edelman resides and maintains his practice in New York County. New York County is the "first judicial district." New York Judiciary Law § 140. Indeed, even the Edelman Committee questionnaire provides contact information for defendants Edelman and the Edelman Committee as: "Martin Edelman, Chairman, Kings County Democratic Party Judicial Screening Committee, 61 Broadway, Suite 2220, New York, New York 10006, 212-943-1200." (Ex. 10, *supra*).

65.     Similarly, upon information and belief, defendant Decker who also served as a member of the screening committee and the subcommittee assigned to ostensibly "investigate" Judge Jacobson, also does not reside or maintain his practice in the second judicial district. Rather, defendant Decker maintains his practice in Richmond County as:

23

Decker & Decker, 3 Kermit Avenue, Staten Island, NY 10305. Richmond County is the "thirteenth judicial district." New York Judiciary Law § 140. Moreover, upon information and belief, defendant Decker resides in Queens County, which is the "eleventh judicial district." *Id.*.

66.     As part of the defendants' judicial screening process, the defendants agree to maintain the confidentiality of the application and the screening process.

67.     Pursuant to applicable Rules of the Edelman Committee, oral and written notice is required:

> **Except for the Report to the Executive Committee of the Democratic Party, all proceedings before the panel and all investigative reports shall be treated as strictly confidential**. Any inquiries concerning such proceedings or reports shall be referred to the Chair of this Committee. In the event that a member violates this provision, the Chair must discharge that member from any further deliberations of the panel.

(Ex. 8 at Rule 13) (**emphasis in original**);

> At the end of the deliberative process, all applications of the candidates shall be retrieved by the Chair. The Chair shall make arrangements for the destruction of all copies with the exception of one copy or original to be kept in the possession of the Chair. The application shall remain confidential and shall not be disclosed without a vote of the Committee.

(*Id*. at Rule 30).

68.     As part of her application for re-nomination, Judge Jacobson complied with the defendants' rules, submitted the required questionnaire and supporting materials and participated in the interview process.

69.     The subcommittee of the Edelman Committee that was appointed by defendant Edelman to conduct a putative "investigation" of Judge Jacobson consisted of defendants Decker and Ajaiyeoba. Like defendant Edelman, defendant Decker sat on the Edelman Committee by appointment of defendant Seddio.

70.     The Edelman Committee Rules, enacted under color of law, require that "The subcommittee shall conduct a personal interview of the candidate." (*Id*. at Rule 17). Despite this Rule, only one member of the subcommittee, defendant Ajaiyeoba, was present for a complete interview. Defendant Decker arrived very late and thus did not participate in a complete interview.

71.     Pursuant to applicable Rules of the Edelman Committee:

> **In the event that the sub-committee determines that there are particular areas of concern, the candidate will be orally apprised either by the Chair or a designated member of the sub-committee prior to being interviewed by the full Committee**. The candidate will be requested to be prepared to address before the full Committee the areas of concern detailed in the written communication. The candidate shall be informed that he or she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues. In the event, the candidate desires to provide additional written materials; the candidate must provide 24 copies of such materials to be distributed to the  Committee at the interview of the full Committee.

(*Id*. at Rule 20) (**emphasis in original**).

72.     The sub-committee, consisting of defendants Decker and Ajaiyeoba did not inform Judge Jacobson of all "particular areas of concern" as mandated by Edelman Committee Rule 20. Such notice was not given orally nor was it given in writing.

73. Defendant Edelman as chairperson of defendant Edelman Committee did not inform Judge Jacobson of all "particular areas of concern" as mandated by Edelman Committee Rule 20.

74. Judge Jacobson was not "requested to be prepared to address before the full Committee the areas of concern" as mandated by Edelman Committee Rule 20.

75. Judge Jacobson was not provided any "written communication" which "detailed" any "areas of concern" as mandated by Edelman Committee Rule 20.

76. Judge Jacobson was not "informed that [] she bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues" as mandated by Edelman Committee Rule 20.

77. The applicable Rules of the Edelman Committee permitted only two designations for applicants: "Qualified" or "Not qualified at this time." (Ex. 8 at Rule 9). The Rules further provide that 5 candidates found "Qualified" for each judicial office shall be reported on by the Committee. *Id*..

78. As an incumbent, Judge Jacobson was entitled to be deemed "Qualified" unless seventy-five percent of a quorum of the Edelman Committee determined not to report her as "Recommended." (*Id*. at Rule 10).

79. Unfortunately, Kings County has a sordid history of illegal and corrupt behavior, aided by members of the KCDCC. This misconduct has not abated despite prior legislative and law enforcement investigations, censures, arrests, indictments and convictions.

80.     Refusing to permit political or social pressures to impact her decision making, Judge Jacobson always remained staunchly independent in her capacity as a judge.

81.     Such judicial independence did not sit well with the Kings County Democratic political machine. Indeed, the *New York Post* in its first article publishing in print and on the internet the defendants' improper disclosures included within its article concerning Judge Jacobson that "She fell out of favor with the powers that be," said one court source. "It's a clubhouse, and she's not a member in good standing." (Ex. 4, *supra*).While that may doom Judge Jacobson's chance of being nominated, it is a badge of honor while she is being screened by honest screeners/lawyers.

82.     As "pay back" for Judge Jacobson's refusal to judicially act bending and bowing to the Brooklyn political machine, the defendants, while acting under color of law, broke their own rules and procedures and violated the confidentiality of the judicial screening process with the vindictive and malicious intent of harming Judge Jacobson personally and professionally.

83.     The only people who could have valid access to judicial screening materials concerning Judge Jacobson were the members of the Edelman Committee during the deliberative process. (Ex. 8 at Rule 13). Upon completion of the deliberative process, the defendants' rules only permit a single copy of the judicial screening materials to be maintained by the chairperson of the judicial screening committee. *Id*. at Rule 30.

84.     Upon information and belief, the Edelman Committee disregarded its own confidentiality rules mandating the collection and destruction of all confidential materials concerning screening candidates, including Judge Jacobson, and instead of only the chairperson

maintaining a single copy, all or many copies were permitted to stay unsecured. (Ex. 8 at Rule 30).

85.    At the time that the defendants disclosed confidential materials concerning the judicial screening of Judge Jacobson, under color of law, the "deliberative process" of the Edelman Committee had concluded.

86.    In accordance with the rules of the Edelman Committee, the only person who could lawfully have had access to the confidential materials concerning the judicial screening of Judge Jacobson at the time of their improper and unconstitutional disclosure to the *New York Post* was defendant Edelman as chairperson of the Edelman Committee. (*Id.* at Rule 30). However, even defendant Edelman could not disclose confidential material.

87.    Pursuant to the defendants' Rules, the only people who could lawfully ever have access to the determinations of defendant Edelman Committee were the members of that committee, including defendants Edelman, Finkelstein, Decker and Ajaiyeoba. As to the Executive Committee of defendant Kings County Democratic County Committee, including its chairperson defendant Seddio, they were entitled only to a written report of which candidates were found "Qualified," which were found "Not qualified at this time"and a list of candidates "recommended" for each judicial vacancy. (Ex. 7 at ¶ 2).

88.    The rules the Edelman Committee permit only two designations of a prospective judicial nominee: "Qualified" and "Not Qualified at this time." Of the candidates found "Qualified," the Edelman Committee is to "recommend" 5 for a vacancy.

89.     The rules of the Edelman Committee do not permit a prospective judicial nominee to be deemed "Unqualified."

90.     The defendants falsely told the *New York Post* that Judge Jacobson had been found "Unqualified" by the Edelman Committee - a designation that does not even exist.

91.     Based on the information supplied by the defendants, acting under color of law, the *New York Post* reported in print and on the internet that the defendants had found Judge Jacobson "Unqualified." (Exs. 4, 5, *supra*).

92.     The Administrative Judges overseeing the Courts of New York State have relied upon Judge Jacobson's judicial skills, knowledge and ability, and have therefore repeatedly appointed her as Acting Surrogate.

93.     Despite the defendants knowing that as a sitting jurist Judge Jacobson has such clear respect, they falsely informed personnel with the *New York Post* that "She's not the brightest bulb in the courthouse to begin with" and that she is "disliked," "has a poor reputation" and is "considered judicially mediocre."

94.     Based on the information supplied by the defendants, acting under color of law, the *New York Post* reported in print and on the internet that Judge Jacobson was "disliked." (Ex. 4, *supra*).

95.     Based on the information supplied by the defendants, acting under color of law, the *New York Post* reported in print and on the internet that Judge Jacobson "has a poor reputation" (Ex. 4, *supra*).

96.     Based on the information supplied by the defendants acting under color of law, the New York Post reported in print and on the internet that Judge Jacobson was considered "judicially mediocre." (Ex. 4, *supra*).

97.     The defendants, acting under color of law, falsely informed personnel with the New York Post that the Edelman Committee "looked at [plaintiff's] track record, and they found an abnormal percentage of cases were overturned by higher courts."

98.     Based on the information supplied by the defendants acting under color of law, the *New York Post* reported in print and on the internet, referring to the plaintiff, that "they looked at her track record, and they found an abnormal percentage of cases were overturned by higher courts." (Ex. 4, *supra*).

99.     Judge Jacobson did not have an "abnormal percentage of cases [that] were overturned by higher courts." Nor was Judge Jacobson "reversed on appeal at least 57 times in the past decade." On the contrary, of the many thousands of orders that Judge Jacobson has issued "in the past decade" (since 2006), in the range of approximately 4000, only an infinitesimal amount were appealed, and only a fraction of those appeals resulted in reversals!

100.    Despite Judge Jacobson's work ethic, that includes taking work home, including  reviewing pleadings and motion papers, performing legal research and writing decisions from outside the courthouse on personal time, the defendants falsely informed personnel with the *New York Post* that Judge Jacobson "lacked" a "work ethic."

101.   Based on the information supplied by the defendants, acting under color of law, the *New York Post* reported in print and on the internet that "It's that kind of work ethic — or lack thereof — that helped convince the county Democratic Party's Judicial Screening Committee last month that Jacobson is unqualified to run on the party line in November." (Ex. 5, *supra*).

102.   The defendants further falsely informed the *New York Post* that Judge Jacobson failed to come to work on July 14, 2016.

103.   Based on the information supplied by the defendants, acting under color of law, the New York Post reported in print and on the internet that and that she "only had three cases on her docket for the day but adjourned everything, sending out alerts to all the parties telling them not to bother showing up" (Ex. 5, *supra*).

104.   This report was similarly false. Judge Jacobson did come to work on July 14, 2016 and had a single case calendared for that day. *Savane, et. al. v. Osei, et. al.*, Index No. 23894/2006. One of three law firms, that represented parties on the case, did not timely appear in court that day. After Judge Jacobson, and the other attorneys who did appear, waited for the missing attorney and unsuccessfully tried to reach that lawyer by phone, a re-trial date was set with the attorney's present agreeing to check with the missing attorney if there were any problems with the chosen date. Indeed, in the exercise of compassionate judicial discretion, in the truest desire for justice and resolution of disputes on the merits, Judge Jacobson did not enter judgment against the party whose counsel failed to appear without excuse or explanation, despite being authorized to do so. *See*, 22 NYCRR 202.27.

31

105.   In addition to these false statements, the defendants also divulged confidential information about the Edelman Committee's processes with respect to Judge Jacobson to personnel with the *New York Post.*

106.   The defendants assured Judge Jacobson that the contents of and proceedings about the Edelman Committee questionnaire she completed were to remain completely and strictly confidential.

107.   Justice Jacobson relied to her detriment on such assurances of confidentiality.

108.   Despite their own rules requiring confidentiality in the judicial screening process, the Edelman Committee and its member defendants, including Edelman, Finkelstein, Decker and Ajaiyeoba, acting under color of law, disclosed to other defendants, Seddio and KCDCC, and others that Judge Jacobson had a "lackadaisical attitude in filling out a required questionnaire."

109.   The defendants falsely informed personnel with the *New York Post* that Judge Jacobson had a "lackadaisical attitude in filling out a required questionnaire."

110.   Judge Jacobson did not have a "lackadaisical attitude in filling out a required questionnaire" and that representation by the defendants to the New York Post was false when made - and known to be false - hence fraud upon the *New York Post* to obtain non-attribution for quotes - which releases the *New York Post* from its contract of non-disclosure of source identity.

111.    Even if the representation made by the defendants to the *New York Post* were true, which it is not, it is still a breach of the confidentiality of the process that the defendants assured Judge Jacobson and all other candidates for judicial screening.

112.    In violation of their own rules, while acting under color of law, the defendants provided confidential information pertaining to the screening of Judge Jacobson to one or more "sources" outside of the Edelman Committee and the Executive Committee of the Kings County Democratic County Committee, including personnel with the *New York Post*.

113.    Under color of law, the defendants provided confidential information pertaining to the screening of Judge Jacobson to personnel with the *New York Post* intending that it would be published.

114.    Under color of law, the defendants provided confidential information pertaining to the screening of Judge Jacobson to personnel with the *New York Post* with the intention of harming Judge Jacobson, in addition to defalcation of Judge Jacobson's right to be fairly and lawfully screened..

115.    Under color of law, the defendants provided confidential information pertaining to the screening of Judge Jacobson to personnel with the *New York Post* intending that the dissemination of such information would be harmful to Judge Jacobson's personal and professional reputation.

116.    In an effort to cause maximum exposure of the improperly disclosed confidential information and materials concerning Judge Jacobson and her judicial screening, the defendants, acting under color of law, individually and collectively released confidential information to the New York Post intending that it be published in print and on the internet.

117.    False, misleading and confidential information about Judge Jacobson that was obtained by the defendants under color of law as a result of the judicial screening process, and of which under color of law they assured Judge Jacobson of absolute confidentiality, was disseminated by the defendants to the *New York Post* so that they would publish same in print and on the internet. Such improper disclosures were made by the defendants acting under color of law.

118.    The *New York Post* did publish the false, misleading and confidential information about Judge Jacobson that the defendants disclosed to them (Exs. 4, 5, *supra*).

119.    The defendants treated Judge Jacobson differently than other similarly situated candidates for screening by the Edelman Committee for the nomination and endorsement of the Kings County Democratic Party Committee.

120.    The defendants treated Judge Jacobson differently than other similarly situated incumbent judges being screened by the Edelman Committee for the nomination and endorsement of the Kings County Democratic Party Committee.

121.    The defendants treated Judge Jacobson differently than other similarly situated incumbent elected justices of the Supreme Court being screened by the Edelman Committee for the nomination and endorsement of the Kings County Democratic Party Committee.

122.    Apart from Judge Jacobson, two other incumbent elected justices of the Supreme Court were being screened by the Edelman Committee for the nomination and endorsement of the Kings County Democratic Party Committee.

123.    The two other incumbent elected justices of the Supreme Court being screened by the Edelman Committee for the nomination and endorsement of the Kings County Democratic Party Committee were Hon. Mark Partnow and Hon. Leon Ruchelsman.

124.    Judge Jacobson is similarly situated to Hon. Mark Partnow as they have both served as elected Justices of the Supreme Court sitting in the Civil Term of Kings County since 2003 and they have similar experiences prior to serving as elected judges, including service as Court Attorneys to then sitting justices of the Supreme Court.

125.    Judge Jacobson is similarly situated to Hon. Leon Ruchelsman as they have both served as elected Justices of the Supreme Court sitting in the Civil Term of Kings County since 2003, they had both been elected to the Civil Court of the City of New York and they have similar experiences prior to serving as elected judges, including service as Court Attorneys to then sitting judges.

126.    Despite Judge Jacobson being similarly situated to Judges Partnow and Ruchelsman, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only released confidential information about Judge Jacobson to the public and the media.

127.    Despite being similarly situated to Judges Partnow and Ruchelsman, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only failed to inform Judge Jacobson of "particular areas of concern" orally and in writing.

128.    Despite being similarly situated to Judges Partnow and Ruchelsman, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only failed to provide Judge Jacobson with "written communication" that "detailed" any "areas of concern."

129.    Despite being similarly situated to Judges Partnow and Ruchelsman, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only failed to provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern."

130.    Despite being similarly situated to Judges Partnow and Ruchelsman, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only failed to "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues."

131.    The three Civil Court judges being screened by the Edelman Committee for the nomination and endorsement of the Kings County Democratic Party Committee for positions on the Supreme Court were Hon. Peter P. Sweeney, Hon. Shawndya L. Simpson and Hon. Reginald Boddie. Each of these judges had been appointed as an Acting Justice of the Supreme Court.

132.    Judge Jacobson is similarly situated to Hon. Peter P. Sweeney as they have both served on the bench of the Civil Term of the Supreme Court in Kings County, both had served as elected judges of the Civil Court and each of them practiced law privately prior to serving as judges.

133.    Judge Jacobson is similarly situated to Hon. Shawndya L. Simpson as they have both served on the bench of the Supreme Court in Kings County and each served as elected judges of the Civil Court.

134.    Judge Jacobson is similarly situated to Hon. Reginald Boddie as they have both served on the bench of the Civil Term of the Supreme Court in Kings County, both had served as elected judges of the Civil Court and each of them practiced law privately prior to serving as judges.

135.    Despite Judge Jacobson being similarly situated to Judges Sweeney, Simpson and Boddie, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only released confidential information about Judge Jacobson to the public and the media.

136.    Despite being similarly situated to Judges Sweeney, Simpson and Boddie, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only failed to inform Judge Jacobson of "particular areas of concern" orally and in writing.

137.    Despite being similarly situated to Judges Sweeney, Simpson and Boddie, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only failed to provide Judge Jacobson with "written communication" that "detailed" any "areas of concern."

138.    Despite being similarly situated to Judges Sweeney, Simpson and Boddie, while being screened for the same nominations and endorsements by the Edelman Committee, the defendants only failed to provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern."

139.    Despite being similarly situated to Judges Sweeney, Simpson and Boddie, while being screened for the same nominations and endorsements by the Edelman Committee, the  defendants only failed to "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues."

- • Counsel to the Kings County Public Administrator Who Sits on the Screening Committee and Had His Fee Demands Reduced by Judge Jacobson - Poisoned the Screening Process

140.    Amongst her many responsibilities as Acting Surrogate, Judge Jacobson has to review, assess and make determinations about applications for counsel fees associated with matters pending in the Kings County Surrogate's Court.

141.    Included amongst the parties who would apply to the Surrogate's Court for counsel fees was counsel for the Kings County Public Administrator. *See, e.g.*, New York Surrogate's Court Procedure Act Law §§ 1108, 1123(5), 2110, 2301, 2302; New York Estate Powers & Trust Law § 11-1.1; 22 NYCRR 207.45.

142.    Steven R. Finkelstein, Esq. serves as counsel to the Kings County Public Administrator and had been re-appointed to that position in 2006 by defendant Seddio who was then Surrogate.

143.    Steven R. Finkelstein, Esq. serves on the Edelman Committee as the designated representative of the 42nd, 58th and 60th Assembly Districts.

144.    In his capacity as counsel to the Public Administrator, Steven R. Finkelstein, Esq. frequently appeared before Judge Jacobson in her capacity as Acting Surrogate.

145.    In his capacity as counsel to the Public Administrator, Steven R. Finkelstein, Esq. proffered counsel fee demands that were determined to be excessive as he often sought the maximum fee when little or no work had been done. True copies of orders issued by Judge Jacobson, in her capacity as Acting Surrogate, wherein she reduced the counsel fees payable to Mr. Finkelstein in his capacity as counsel to the Public Administrator are appended hereto and made a part hereof as **Exhibit 11**. These Orders include a mandate to refund fees collected in advance by former counsel to the Public Administrator, Louis Rosenthal.

146.    In retaliatory, malicious and vindictive retribution for Judge Jacobson's proper exercise of judicial discretion and independence in protecting the beneficiaries of decedents, Steven R. Finkelstein, Esq. abused his position on the Edelman Committee and aided, abetted

and conspired with defendants Seddio, Edelman, members of the Kings County Democratic County Committee, members of the Edelman Committee, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants in an effort to deprive Judge Jacobson of equal protection of the law and due process, in an effort to maliciously and vindictively inflict maximum personal and professional retaliatory harm to Judge Jacobson - and chill judicial independence of all other serving judges who don't "obey" political demands or whims.

147.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" attorney's fee applications submitted by Mr. Finkelstein in his capacity as counsel to the Public Administrator, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including KCDCC's media consultant George Artz, agreed to maliciously and vindictively destroy Judge Jacobson personally and professionally. This conspiracy was carried out by performance of overt acts including:

       i.      violating the rules of the Kings County Democratic County Committee;

      ii.     violating the Rules and procedures of the Edelman Committee; and,

     iii.     breaching the confidentiality of the judicial screening process

concerning Judge Jacobson.

148.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" attorney's fee applications submitted by Mr. Finkelstein in his capacity as counsel to the Public Administrator, defendants Seddio, Edelman,

Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including KCDCC media consultant George Artz, did violate the ruls of the Kings County Democratic County Committee and the Edelman Committee.

149.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" attorney's fee applications submitted by Mr. Finkelstein in his capacity as counsel to the Public Administrator, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including KCDCC media consultant George Artz, did publically disseminate confidential information obtained from and about Judge Jacobson which information was obtained solely as a result of the judicial screening process.

150.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" attorney's fee applications submitted by Mr. Finkelstein in his capacity as counsel to the Public Administrator, defendants Edelman Committee, Edelman, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, failed to inform Judge Jacobson of "particular areas of concern."

151.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" attorney's fee applications submitted by Mr. Finkelstein in his capacity as counsel to the Public Administrator, defendants Edelman Committee, Edelman, Decker, Ajaiyeoba, John and Jane Does and others not named as

defendants, failed to provide Judge Jacobson with "written communication" that "detailed" any "areas of concern."

152.   Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" attorney's fee applications submitted by Mr. Finkelstein in his capacity as counsel to the Public Administrator, defendants Edelman Committee, Edelman, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, failed to provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern."

153.   Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" attorney's fee applications submitted by Mr. Finkelstein in his capacity as counsel to the Public Administrator, defendants Edelman Committee, Edelman, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, failed to "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues."

- Judge Jacobson Failed to Rule in Favor of a Party Represented by Defendant Seddio's Former Law Partner and Current Counsel to Defendant Seddio as County Chair of the Kings County Democratic County Committee (Long Island College Hospital ["LICH"]; Frank V. Carone, Esq.)

154.   On August 27, 2014, Judge Jacobson was assigned to hear emergency applications, Orders to Show Cause and *ex parte* applications in Kings County Supreme Court.

155.    One of the matters that was presented to Judge Jacobson was a proposed Order to Show Cause brought by The New York State Nurses Association seeking to, *inter alia*, enjoin the State University of New York ("SUNY") from taking actions inconsistent with a "Court-ordered Settlement Agreement entered on February 25, 2014."

156.    The underlying matter, captioned as *The New York State Nurses Association, et. al. v. New York State Department of Health, et. al.*, Index No. 5814/2013, involved, *inter alia*, contests to the sale of Long Island College Hospital ("LICH") and efforts to ensure continued employment of nurses then employed at LICH and the continued provision of emergency medicine services which were being provided by LICH.

157.    Appearing for SUNY, in opposition to the relief sought, was Frank V. Carone, Esq. of Abrams, Fensterman, Fensterman, Eiseman, Formato, Ferrara & Wolf, LLP ("Abrams Fensterman").

158.    Mr. Carone was previously the law partner of defendant Seddio in the Professional Service Limited Liability Company Seddio & Carone PLLC. Upon information and belief, based upon the records of the New York State Department of State, Division of Corporations, that law practice was formed on May 30, 2008 and functioned through its dissolution on December 10, 2014. A true copy of a printout of publically accessible records of the New York State Department of State, Division of Corporations is appended hereto and made a part hereof as **Exhibit 12**.

159.    Both Mr. Carone and defendant Seddio reportedly took their practices and joined them with partnerships at Abrams Fensterman.

160.    Defendant Seddio stopped practicing law with Abrams Fensterman.

161.    In addition to his partnership with Abrams Fensterman, Mr. Carone also serves as Counsel to the County Chair of the Kings County Democratic County Committee.

162.    Defendant Seddio is the County Chair of the Kings County Democratic County Committee. Accordingly, Mr. Carone is defendant Seddio's counsel.

163.    Mr. Carone has also been, and may still be, the chairperson of the "Law Committee" of defendant Kings County Democratic County Committee.

164.    After vigorous oral argument before Judge Jacobson on August 27, 2014, wherein Mr. Carone insited that Judge Jacobson not enjoin SUNY, Judge Jacobson issued an Order With Temporary Restraining Order solely to preserve the *status quo* for the brief period until September 12, 2014. A true copy of this Order, which Mr. Carone agreed to the form, though not the result, is appended hereto and made a part hereof as **Exhibit 13**.

165.    Subsequent to argument before Judge Jacobson, The New York State Nurses Association apparently changed its position and sought relief not contemplated by the papers considered by Judge Jacobson on August 27, 2014. Accordingly, on September 29, 2014, Hon. Johnny Lee Baynes, the justice of the Supreme Court assigned to matter, issued an Interim Order denying The New York State Nurses Association's application procedurally and substantively. A true copy of this Interim Order is also appended hereto and made a part hereof as Ex. 13, *supra*. Also included as part of appended Ex. 13, and made a part hereof, are electronic mail communications between Mr. Carone and counsel for The New York State

Nurses Association, which are part of the filings maintained by the Clerk of the Kings County Supreme Court.

166.    Retaliatory, Vindictive and Malicious Deprivation of Judge Jacobson's Right to "Equal Protection of Law" and "Due Process"! In retribution for Judge Jacobson's proper exercise of judicial discretion and independence which was inconsistent with the desires of Mr. Carone who is defendant Seddio's counsel and was Seddio's law partner, defendants Edelman and Decker abused their positions on the Edelman Committee and defendant Seddio abused his position as County Chair of the Kings County Democratic County Committee and aided, abetted and conspired with members of the Executive Committee of defendant Kings County Democratic County Committee, members of the Edelman Committee, defendant Ajaiyeoba, defendants John and Jane Does and others not named as defendants, including Mr. Carone, in an effort to deprive Judge Jacobson of "equal protection of the law" and "due process," in an effort to maliciously and vindictively inflict maximum personal and professional harm to Judge Jacobson.

167.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to judicially endorse Mr. Carone's opposition to maintaining the status quo of keeping a hospital emergency department open while keeping a discrete number of nurses employed, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, John and Jane Does, members of the Executive Committee  of defendant Kings County Democratic County Committee, members of defendant Edelman Committee  and others not named as

defendants agreed to maliciously and vindictively destroy Judge Jacobson personally and professionally. This conspiracy was carried out by performance of overt acts including:

> i.    violating the rules of the Kings County Democratic County Committee;
>
> ii.   violating the Rules and procedures of the Edelman Committee; and,
>
> iii.  breaching the confidentiality of the judicial screening process

concerning Judge Jacobson.

168.   Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to judicially endorse Mr. Carone's opposition to maintaining the *status quo* of keeping a hospital emergency department open while keeping a discrete number of nurses employed, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba ,John and Jane Does and others not named as defendants, including defendant KCDCC's media consultant George Artz, did violate the rules of the Kings County Democratic County Committee and the Edelman Committee.

169.   Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to judicially endorse Mr. Carone's opposition to maintaining the then *status quo* of keeping a hospital emergency department open while keeping a discrete number of nurses employed, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba ,John and Jane Does and others not named as defendants, including defendant KCDCC's media consultant George Artz,

did publically disseminate confidential information obtained from and about Judge Jacobson which information was obtained solely as a result of the judicial screening process.

170.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to judicially endorse Mr. Carone's opposition to maintaining the then *status quo* of keeping a hospital emergency department open while keeping a discrete number of nurses employed, defendants Edelman, Edelman Committee, Decker and Ajaiyeoba failed to inform Judge Jacobson of "particular areas of concern."

171.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to judicially endorse Mr. Carone's opposition to maintaining the status quo of keeping a hospital emergency department open while keeping a discrete number of nurses employed, defendants Edelman, Edelman Committee, Decker and Ajaiyeoba failed to provide Judge Jacobson with "written communication" that "detailed" any "areas of concern."

172.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to judicially endorse Mr. Carone's opposition to maintaining the status quo of keeping a hospital emergency department open while keeping a discrete number of nurses employed, defendants Edelman, Edelman Committee, Decker and Ajaiyeoba failed to provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern."

173.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to judicially endorse Mr. Carone's opposition to maintaining the *status quo* of keeping a hospital emergency department open while keeping a discrete number of nurses employed, defendants Edelman, Edelman Committee, Decker and Ajaiyeoba failed to "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues."

- Judge Jacobson's Determinations in Foreclosure Actions Did Not Defer To Kings County Democratic Party Supported/Favored Banks and Lenders

174.    As part of Judge Jacobson's duties as a Justice of the Supreme Court, she was assigned a docket of residential foreclosure actions.

175.    Since the mortgage foreclosure crisis, New York State and its Office of Court Administration have taken affirmative positions trying to keep homeowners within their residences.

176.    For example, in 2008, the New York State legislature amended the Civil Practice Law and Rules to include C.P.L.R. Rule 3408, entitled "Mandatory settlement conference in residential foreclosure actions." These Rules require good faith negotiations by the lender and homeowner in residential foreclosure actions with a stated

> purpose of holding settlement discussions pertaining to the relative rights and obligations of the parties under the mortgage loan documents, including, but not limited to determining whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home, and evaluating the potential for a resolution in which payment schedules or amounts may be

48

modified or other workout options may be agreed to, and for whatever other purposes the court deems appropriate.

C.P.L.R. Rule 3408(a). *See also*, 22 NYCRR 202.12-a.

177.    Additionally, New York State enacted other laws designed to protect homeowners in the mortgage foreclosure process. For instance, the Real Property Actions and Proceedings Law was amended in 2008 to add R.P.A.P.L. § 1404, which, in pertinent part, mandates certain specific notices that must be provided to a homeowner before the lender can take legal action against them. In 2006, the New York State legislature added  R.P.A.P.L. § 1403, which, in pertinent part also mandates specific notices be provided to a residential borrower in advance of foreclosure.

178.    Notably, as protection of homeowners has become paramount, New York State Appellate Courts have held that strict compliance with R.P.A.P.L. §§ 1403 and 1404 are conditions precedent to a lender bringing a residential foreclosure action.

179.    In addition to legislative action, the Rules of the Chief Judge of the state of New York require that attorneys prosecuting residential foreclosure actions file an affirmation as to the accuracy of the documents relied upon. *See, e,.g.*, 22 NYCRR 202.12-a(f); Chief Judge Admin. Ord. 584–10 (Oct. 20, 2010).

180.    Judge Jacobson's judicial service was always independent and apolitical, and honored the strong public policy against residential foreclosure.

181.    Mortgage lenders have provided significant financial support to the Kings County Democratic County Committee and its fundraising.

49

182.    Defendant Seddio has worked for and frequently represented lenders.

183.    In or about 2007, prior to forming Seddio & Carone PLLC with Mr. Carone, defendant Seddio was a Vice President at Wall Street Mortgage Bankers, Ltd. d/b/a Power Express.

184.    Power Express maintains its principal place of business at 1111 Marcus Avenue, Lake Success, New York - the same building where Abrams Fensterman's main offices are located.

185.    Defendant Seddio's counsel, Mr. Carone, is on the Advisory Board of the New York League of Independent Bankers and a member of the Board of Hanover Community Bank.

186.    Mr. Carone had also previously founded a mortgage lending bank which provided services in multiple states.

187.    Amongst the areas of practice that Abrams Fensterman holds Mr. Carone out as practicing is "Banking & Mortgage Compliance." Moreover, the profile on Mr. Carone published by Abrams Fensterman refers to his membership in "The American Association of Bank Directors." *See*, Abrams Fensterman, Frank V. Carone, Executive Partner, *available at* http://www.abramslaw.com/frank_carone_attorney_profile_id_1012, *last accessed* Aug. 25, 2016.

188.    Banks and lenders have significant influence over the Kings County Democratic County Committee - which is directly at odds with New York State public policy enacted as laws or regulations.

189.    Based on the facts and law presented to her, some of Judge Jacobson's decisions on residential foreclosure actions have been for the homeowner, procedurally, substantively or both - to the annoyance of the Kings County Democratic Party's favored lenders. Upon information and belief, defendant Seddio has "appointed" one, or more, attorneys who specialized in bringing  foreclosure actions by banks and lenders to become "Law Clerk" or "Law Secretary" to Justices of the Supreme Court in Kings County Supreme Court dealing with foreclosure actions.

190.    In retribution for Judge Jacobson's proper exercise of judicial discretion and independence which was inconsistent with the desires of Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Edelman and Decker abused their positions on the Edelman Committee and defendant Seddio abused his position as County Chair of the Kings County Democratic County Committee and aided, abetted and conspired with Finkelstein, Ajaiyeoba, John and Jane Does and others not named as defendants, including members of the Executive Committee of defendant Kings County Democratic County Committee, members of the Edelman Committee and  Mr. Carone, in an effort to deprive Judge Jacobson of "equal protection of the law" and "due process," in an malicious and vindictive effort to  inflict maximum personal and professional harm to Judge Jacobson - so as to chill every other judge serving in Kings County and elsewhere in New York to not exercise judicial independence.

191.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures,

as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including members of the Executive Committee of the KCDCC and members of the Edelman Committee agreed to violate the rules of the Kings County Democratic County Committee.

192.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including members of the Executive Committee of the KCDCC and members of the Edelman Committee agreed to violate the rules of the Edelman Committee.

193.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including members of the Executive Committee of the KCDCC and members of the Edelman Committee agreed to

breach the confidentiality of the judicial screening process concerning Judge Jacobson's application.

194.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including members of the Executive Committee of the KCDCC and members of the Edelman Committee, did violate the rules of the Kings County Democratic County Committee and the Edelman Committee.

195.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Seddio, Edelman, Kings County Democratic County Committee, the Edelman Committee, Finkelstein, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, including members of the Executive Committee of the KCDCC, members of the Edelman Committee and KCDCC media consultant George Artz, did publically disseminate confidential information obtained from and about Judge Jacobson which information was obtained solely as a result of the confidential judicial screening process.

196.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Edelman, Edelman Committee, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, failed to inform Judge Jacobson of "particular areas of concern."

197.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Edelman, Edelman Committee,  Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, failed to provide Judge Jacobson with "written communication" that "detailed" any "areas of concern."

198.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Edelman, Edelman Committee, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, failed to provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern."

199.    Because of Judge Jacobson's proper exercise of judicial discretion and independence, and refusal to "rubber stamp" approvals of residential mortgage foreclosures, as desired by Mr. Seddio, Mr. Carone and mortgage lenders who are favored by and exercise influence over the Kings County Democratic County Committee, defendants Edelman, Edelman Committee, Decker, Ajaiyeoba, John and Jane Does and others not named as defendants, failed to "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues."

**First Count**

**Violation of Equal Protection of the Law**
(Against All Defendants)

200.    Plaintiff repeats and re-alleges all of the allegations contained in the preceding paragraphs as though they have been restated in full herein.

201.    Plaintiff constituted and constitutes a "class of one" within the meaning of the Equal Protection Clause of the United States Constitution.

202.    By releasing confidential information pertaining to the judicial screening process concerning Judge Jacobson, defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, treated Judge Jacobson differently than other similarly situated incumbent elected Justices of the Supreme Court who were simultaneously candidates

for the nomination of and endorsement by defendant Kings County Democratic County Committee for Justice of the Supreme Court, namely:

     i.     Hon. Mark Partnow;

     ii.     Hon. Leon Ruchelsman.

203.    No rational person could regard the circumstances of plaintiff to differ from those of Justices Partnow and Ruchelsman to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

204.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Justices Partnow and Ruchelsman, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

205.    By releasing confidential information pertaining to the judicial screening process concerning Judge Jacobson, defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, treated Judge Jacobson differently than other similarly situated individuals who were simultaneously candidates for the nomination of and endorsement by  Kings County Democratic County Committee for Justice of the Supreme Court, namely:

     i.     Hon. Peter P. Sweeney;

     ii.     Hon. Shawndya L. Simpson; and,

     iii.     Hon. Reginald Boddie.

206.    No rational person could regard the circumstances of plaintiff to differ from those of Judges Sweeney, Simpson and Boddie to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

207.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Judges Sweeney, Simpson and Boddie, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

208.    The actions of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, individually and collectively, were highly discriminatory, unfair, and improper.

209.    The  treatment of the plaintiff by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does was outrageous and shocking to the conscience.

210.    The conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba  and John/Jane Does, violated plaintiff's right to equal protection in violation of 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution.

211.    As a proximate result of the conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does and the violation of her constitutional rights, plaintiff has been damaged.

212.    The amount of plaintiff's damages is to be determined after trial, and should be in an amount not less than $5,000,000.00 in compensatory damages, along with nominal damages of not less than $1.00.

213.    The outrageous and malicious conduct by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, specifically intending to harm the plaintiff by a deprivation of her constitutional rights, further justifies an award of punitive damages to the plaintiff in the highest amount constitutionally permissible, as found by a fair, just and impartial jury.

214.    Plaintiff is also entitled to recover her attorneys' fees in this proceeding pursuant to 42 U.S.C. §1988.

## Second Count

### Violation of Equal Protection of the Law
(Against All Defendants Except Finkelstein)

215.    Plaintiff repeats and re-alleges all of the allegations contained in the preceding paragraphs as though they have been restated in full herein.

216.    Plaintiff constituted and constitutes a "class of one" within the meaning of the equal protection clause of the United States Constitution.

217.    Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, treated Judge Jacobson differently than other similarly situated incumbent elected Justices of the Supreme Court who were simultaneously candidates for the nomination of and

endorsement by Kings County Democratic County Committee for Justice of the Supreme Court, in selectively violating the Edelman Committee Rules by failing to:

i.      inform Judge Jacobson of "particular areas of concern";

ii.     provide Judge Jacobson with "written communication" that "detailed" any "areas of concern";

iii.    provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern";

iv.    "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues."

218.    Judge Jacobson was treated differently by Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, than other similarly situated incumbent elected Justices of the Supreme Court who were simultaneously candidates for the nomination of and endorsement by Kings County Democratic County Committee for Justice of the Supreme Court, namely:

i.      Hon. Mark Partnow;

ii.     Hon. Leon Ruchelsman.

219.    No rational person could regard the circumstances of plaintiff to differ from those of Justices Partnow and Ruchelsman to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

220.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Justices Partnow and Ruchelsman, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

221.    Judge Jacobson was treated differently by Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, than other similarly situated individuals who were simultaneously candidates for the nomination of and endorsement by  Kings County Democratic County Committee for Justice of the Supreme Court, namely:

      i.     Hon. Peter P. Sweeney;

      ii.    Hon. Shawndya L. Simpson; and,

      iii.   Hon. Reginald Boddie.

222.    No rational person could regard the circumstances of plaintiff to differ from those of Judges Sweeney, Simpson and Boddie to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

223.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Judges Sweeney, Simpson and Boddie, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

224.    The actions of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, individually and collectively, were highly discriminatory, unfair, and improper.

225.    The treatment of the plaintiff by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does was outrageous and shocking to the conscience.

226.    The conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does violated plaintiff's right to equal protection in violation of 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution.

227.    As a proximate result of the conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does and the violation of her constitutional rights, plaintiff has been damaged.

228.    The amount of plaintiff's damages is to be determined after trial, and should be in an amount not less than $5,000,000.00 in compensatory damages, along with nominal damages of not less than $1.00.

229.    The outrageous and malicious conduct by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, specifically intending to harm the plaintiff by a deprivation of her constitutional rights, further justifies an award of punitive damages to the plaintiff in the highest amount constitutionally permissible, as found by a fair, just and impartial jury.

230.    Plaintiff is also entitled to recover her attorneys' fees in this proceeding pursuant to 42 U.S.C. §1988.

## Third Count

### Conspiracy to Violate Plaintiff's Equal Protection Rights
(Against All Defendants Except Kings County Democratic County Committee
and Edelman Committee )

231.    Plaintiff repeats and re-alleges all of the allegations contained in the preceding paragraphs as though they have been restated in full herein.

232.    Plaintiff constituted and constitutes a "class of one" within the meaning of the equal protection clause of the United States Constitution.

233.    The Rules enacted by defendants Kings County Democratic County Committee and Edelman Committee governing the screening, selecting and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District are enacted under color of law.

234.    Based upon the Rules enacted, under color of law, by defendants Kings County Democratic County Committee and Edelman Committee governing the screening, selecting and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District, without the "Qualified" and "Recommended" labels of the Edelman Committee, the  Kings County Democratic County Committee cannot nominate or endorse a candidate seeking election as a Justice of the Supreme Court in New York's Second Judicial District.

235.    Without the nomination of the Kings County Democratic County Committee, a candidate seeking election as a Justice of the Supreme Court in New York's Second Judicial District  cannot appear as a candidate of the Democratic party on a general election ballot.

236.     Nomination and endorsement of a candidate seeking election as a Justice of the Supreme Court in New York's Second Judicial District by the Kings County Democratic County Committee is tantamount to being elected to that judgeship.

237.     Not being nominated and endorsed by the Kings County Democratic County Committee as a candidate for election as a Justice of the Supreme Court in New York's Second Judicial District  is tantamount to not getting on the ballot.

238.     Without the nomination and endorsement by the Kings County Democratic County Committee, it is essentially impossible for  a candidate to secure election as a Justice of the Supreme Court in New York's Second Judicial District.

239.     At all times herein mentioned, Judge Jacobson was entitled to have her candidacy before defendant Edelman Committee for its recommendation and nomination and endorsement by defendant Kings County Democratic County conducted in accordance with the Rules enacted under color of law governing the screening, selecting and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District by defendants Kings County Democratic County Committee and Edelman Committee.

240.     At all times herein mentioned, Judge Jacobson was entitled to have her candidacy before defendant Edelman Committee for its recommendation and nomination and endorsement by defendant Kings County Democratic County conducted without unlawful and arbitrary interference and deprivation from the defendants.

241.     In accordance with the Rules enacted by defendants Kings County Democratic County Committee and Edelman Committee governing the screening, selection and nomination

63

of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District, on or about February 23, 2016, Judge Jacobson submitted her confidential questionnaire in support of her candidacy as an incumbent elected Justice of the Supreme Court.

242. On or about and between February 23, 2016 and Judge Jacobson's May 18, 2016 interview with defendant Ajaiyeoba, later joined by defendant Decker, sitting as a subcommittee of the Edelman Committee, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to deny Judge Jacobson fair consideration for recommendation and re-nomination as an already sitting incumbent elected Justice of the Supreme Court in New York's Second Judicial District.

243. On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to act in concert in order to deprive Judge Jacobson of her right to equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution.

244. On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among

themselves and with other individuals to treat Judge Jacobson differently than all other similarly situated candidates for upcoming judicial vacancies on the Supreme Court in New York's Second Judicial District.

245.    On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to treat Judge Jacobson differently than all other similarly situated candidates for upcoming judicial vacancies on the Supreme Court in New York's Second Judicial District.

246.    On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to violate and disregard the Rules enacted by defendants Kings County Democratic County Committee and Edelman Committee governing the screening, selection and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District, only with respect to their handling, processing and consideration of the application of Judge Jacobson.

247.    On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among

themselves and with other individuals to fabricate "particular areas of concern" about Judge Jacobson's application.

248.    On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to not inform Judge Jacobson of "particular areas of concern" about her application.

249.    On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to not provide Judge Jacobson with "written communication" that "detailed" any "areas of concern" about her application.

250.    On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to not provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern" about her application.

251.    On or about and between February 23, 2016 and May 25, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to not "inform" Judge Jacobson that "she may bring to

66

the interview of the full committee any materials that the candidate believes may be relevant to the issues" of concern about her application.

252.    On or about and between February 23, 2016 and July 13, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to release confidential information pertaining to the judicial screening process concerning Judge Jacobson to the public and the media.

253.    On or about and between February 23, 2016 and July 13, 2016, defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, along with Mr. Carone, and others whose identities are as yet unknown, agreed among themselves and with other individuals to release confidential information pertaining to the judicial screening process concerning Judge Jacobson to personnel with the *New York Post*.

254.    In furtherance of the conspiracy defendants Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba, and John/Jane Does, acting under color of law, engaged in and facilitated numerous overt acts, including, without limitation, the following:

i.      On or about and between February 23, 2016 and May 25, 2016, selectively violating the Edelman Committee Rules by failing to inform Judge Jacobson of "particular areas of concern";

ii.     On or about and between February 23, 2016 and May 25, 2016, selectively violating the Edelman Committee Rules by failing to provide Judge Jacobson with "written communication" that "detailed" any "areas of concern";

67

iii.     On or about and between February 23, 2016 and May 25, 2016, selectively violating the Edelman Committee Rules by failing to provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern";

iv.     On or about and between February 23, 2016 and May 25, 2016, selectively violating the Edelman Committee Rules by failing to "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues";

v.     on or about and between June 7, 2016 and July 13, 2016, disclosing confidential information pertaining to the judicial screening process concerning Judge Jacobson to personnel with the *New York Post*.

255.   Judge Jacobson was treated differently by Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, than other similarly situated incumbent elected Justices of the Supreme Court who were simultaneously candidates for the nomination of and endorsement by  Kings County Democratic County Committee for Justice of the Supreme Court, namely:

i.     Hon. Mark Partnow;

ii.     Hon. Leon Ruchelsman.

256.   No rational person could regard the circumstances of plaintiff to differ from those of Justices Partnow and Ruchelsman to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

257.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Justices Partnow and Ruchelsman, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

258.    Judge Jacobson was treated differently by Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, than other similarly situated individuals who were simultaneously candidates for the nomination of and endorsement by  Kings County Democratic County Committee for Justice of the Supreme Court, namely:

      i.    Hon. Peter P. Sweeney;

      ii.    Hon. Shawndya L. Simpson; and,

      iii.    Hon. Reginald Boddie.

259.    No rational person could regard the circumstances of plaintiff to differ from those of Judges Sweeney, Simpson and Boddie to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

260.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Judges Sweeney, Simpson and Boddie, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

261.    The actions of defendants Kings County Democratic County Committee Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, individually and collectively, were highly discriminatory, unfair, and improper.

262.    The treatment of the plaintiff by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does was outrageous and shocking to the conscience.

263.    The agreement to deprive Judge Jacobson of equal protection was for the personal benefit of defendants Seddio, Edelman, Decker and Finkelstein, as well as for the personal benefit of Mr. Carone, his law firm, mortgage lenders supporting and exercising influence over the Kings County Democratic County Committee, and others whose identities are as yet unknown.

264.    The agreement to deprive Judge Jacobson of equal protection was intended to maliciously harm Judge Jacobson.

265.    The defendants acted in their individual, official  and representative capacities when agreeing to deprive Judge Jacobson of equal protection.

266.    The defendants acted in their individual, official  and representative capacities when depriving Judge Jacobson of equal protection.

267.    The conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does violated plaintiff's right to equal protection in violation of 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution.

268.    As a proximate result of the agreements and conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, along with Mr. Carone, his law firm, mortgage lenders

supporting and exercising influence over the Kings County Democratic County Committee, members of the Executive Committee of the KCDCC, members of the Edelman Committee and others whose identities are as yet unknown, Judge Jacobson's constitutional rights to equal protection of the laws were violated and she was deprived of same.

269.    As a proximate result of the agreements and conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, along with Mr. Carone, his law firm, mortgage lenders supporting and exercising influence over the Kings County Democratic County Committee, and others whose identities are as yet unknown, leading to the violations and deprivations of Judge Jacobson's constitutional rights, plaintiff has been damaged.

270.    The amount of plaintiff's damages is to be determined after trial, and should be in an amount not less than  $5,000,000.00 in compensatory damages, along with nominal damages of not less than $1.00.

271.    The outrageous and malicious conduct by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, specifically intending to harm the plaintiff by a deprivation of her constitutional rights, further justifies an award of punitive damages to the plaintiff in the highest amount constitutionally permissible, as found by a fair, just and impartial jury.

272.    Plaintiff is also entitled to recover her attorneys' fees in this proceeding pursuant to 42 U.S.C. §1988.

## Fourth Count

## Injunctive Relief
(Against All Defendants)

273.    The Plaintiff repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

274.    The defendants have and continue to disclose confidential information about the judicial screening of Judge Jacobson, in violation of their own Rules and procedures.

275.    The defendants have used and continue to use their disclosure of confidential information concerning the judicial screening of Judge Jacobson to violate and deprive Judge Jacobson of rights afforded to her under the Constitutions of the United States and the State of New York.

276.    Additionally, defendant Edelman Committee, by virtue of its essential predicate approval-label nexus with defendant Kings County Democratic County Committee, is empowered by the laws of the state of New York to screen candidates that will be nominated by defendant Kings County Democratic County Committee to be on the general election ballot for election to the Supreme Court of the State of New York for the Second Judicial District.

277.    Without the nomination and endorsement of defendant Kings County Democratic County Committee a candidate for Justice of the Supreme Court is essentially unable to get on the ballot for consideration by the voters in the Second Judicial District.

278.   Without the nomination and endorsement by the Kings County Democratic County Committee, it is essentially impossible for  a candidate to secure election as a Justice of the Supreme Court in New York's Second Judicial District.

279.   The defendants' failure to comply with their own stated Rules and procedures thwarted a fair screening of Judge Jacobson.

280.   The Edelman Committee includes people that, as a matter of Rule enacted under color of law, may not sit as voting members of the Edelman Committee.

281.   Defendant Edelman is not a resident of Kings County, nor is his law practice located in Kings County.

282.   Defendant Decker is not a resident of Kings County, nor is his law practice located in Kings County.

283.   The Edelman Committee Rules, enacted under color of law, require all members of the Committee to live and/or maintain their business in Kings County.

284.   The defendants have shown that they view compliance with their own Rules and regulations arbitrarily.

285.   The defendants used their arbitrary disregard of their own Rules and regulations to harm Judge Jacobson.

286.   The defendants have and undoubtably will continue to use the arbitrary compliance and enforcement of their own Rules and regulations, enacted under color of law, to deprive candidates their state and federal constitutional rights.

287.    This is an ongoing controversy which affects not merely the current plaintiff, but has likely affected third parties in the past, and will undoubtedly affect third parties in the future.

288.    As such there is an actual controversy over which this Court possesses jurisdiction.

289.    In view of the forgoing, the plaintiff seeks permanent injunctive relief:

i.    disbanding the illegally comprised defendant Judicial Screening Committee for the Democratic Party in and for Kings County ("Edelman Committee");

ii.    Enjoining defendants Kings County Democratic County Committee Judicial Screening Committee for the Democratic Party in and for Kings County and County from continuing to carry out the constitutionally infirm practices described herein; and,

iii.    For such other and further relief as this court may deem just and proper to prevent unlawful destruction or chilling of necessary judicial independence within our separated powers regime.

**State Law Based Counts**

**Fifth Count**

**Violation of Equal Protection Under the New York State Constitution**
(Against All Defendants)

290.    The Plaintiff repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

74

291.     By releasing confidential information pertaining to the judicial screening process concerning Judge Jacobson, defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker,  Ajaiyeoba and John/Jane Does, while acting under color of law, treated Judge Jacobson differently than other similarly situated incumbent elected Justices of the Supreme Court who were simultaneously candidates for the nomination of and endorsement by defendant Kings County Democratic County Committee for Justice of the Supreme Court, namely:

      i.        Hon. Mark Partnow;

      ii.       Hon. Leon Ruchelsman.

292.     No rational person could regard the circumstances of plaintiff to differ from those of Justices Partnow and Ruchelsman to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

293.     The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Justices Partnow and Ruchelsman, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

294.     By releasing confidential information pertaining to the judicial screening process concerning Judge Jacobson, defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, treated Judge Jacobson differently than other similarly situated individuals who were simultaneously candidates for the nomination of and

endorsement by  Kings County Democratic County Committee for Justice of the Supreme Court, namely:

     i.     Hon. Peter P. Sweeney;

     ii.    Hon. Shawndya L. Simpson; and,

     iii.   Hon. Reginald Boddie.

295.    No rational person could regard the circumstances of plaintiff to differ from those of Judges Sweeney, Simpson and Boddie to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

296.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Judges Sweeney, Simpson and Boddie, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

297.    The actions of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, individually and collectively, were highly discriminatory, unfair, and improper.

298.    The  treatment of the plaintiff by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does was outrageous and shocking to the conscience.

299.    The conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba  and John/Jane Does, deprived Judge Jacobson of equal protection of the law in violation of Article I, § 11 of the New York Constitution, and the defendants are thereby liable to Judge Jacobson.

300.    As a proximate result of the conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does and the violation of her constitutional rights, plaintiff has been damaged.

301.    The amount of plaintiff's damages is to be determined after trial, and should be in an amount not less than  $5,000,000.00 in compensatory damages, along with nominal damages of not less than $1.00.

302.    The outrageous and malicious conduct by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, specifically intending to harm the plaintiff by a deprivation of her constitutional rights, further justifies an award of punitive damages to the plaintiff in the highest amount constitutionally permissible, as found by a fair, just and impartial jury.

## Sixth Count

### Violation of Equal Protection Under the New York State Constitution
(Against All Defendants Except Finkelstein)

303.    The Plaintiff repeats, reiterates, and  re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

304.    Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, treated Judge Jacobson differently than other similarly situated incumbent elected Justices of the Supreme Court who were simultaneously candidates for the nomination of and

endorsement by Kings County Democratic County Committee for Justice of the Supreme Court, in selectively violating the Edelman Committee Rules by failing to:

     i.     inform Judge Jacobson of "particular areas of concern";

     ii.     provide Judge Jacobson with "written communication" that "detailed" any "areas of concern";

     iii.     provide Judge Jacobson with an opportunity "to be prepared to address before the full Committee the areas of concern";

     iv.     "inform" Judge Jacobson that "she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues."

305.     Judge Jacobson was treated differently by Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, than other similarly situated incumbent elected Justices of the Supreme Court who were simultaneously candidates for the nomination of and endorsement by Kings County Democratic County Committee for Justice of the Supreme Court, namely:

     i.     Hon. Mark Partnow;

     ii.     Hon. Leon Ruchelsman.

306.     No rational person could regard the circumstances of plaintiff to differ from those of Justices Partnow and Ruchelsman to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

307.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Justices Partnow and Ruchelsman, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

308.    Judge Jacobson was treated differently by Defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, while acting under color of law, than other similarly situated individuals who were simultaneously candidates for the nomination of and endorsement by Kings County Democratic County Committee for Justice of the Supreme Court, namely:

   i.  Hon. Peter P. Sweeney;

   ii.  Hon. Shawndya L. Simpson; and,

   iii.  Hon. Reginald Boddie.

309.    No rational person could regard the circumstances of plaintiff to differ from those of Judges Sweeney, Simpson and Boddie to justify the differential treatment of plaintiff on the basis of a legitimate policy exercised under color of law.

310.    The similarity in circumstances and difference in treatment among plaintiff, on the one hand, and Judges Sweeney, Simpson and Boddie, on the other hand, are sufficient to exclude the possibility that the defendants acted on the basis of mistake.

311.    The actions of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, individually and collectively, were highly discriminatory, unfair, and improper.

312.     The treatment of the plaintiff by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does was outrageous and shocking to the conscience.

313.     The conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does deprived Judge Jacobson of equal protection of the law in violation of Article I, § 11 of the New York Constitution, and the defendants are thereby liable to Judge Jacobson.

314.     As a proximate result of the conduct of defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does and the violation of her constitutional rights, plaintiff has been damaged.

315.     The amount of plaintiff's damages is to be determined after trial, and should be in an amount not less than  $5,000,000.00 in compensatory damages, along with nominal damages of not less than $1.00.

316.     The outrageous and malicious conduct by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Decker, Ajaiyeoba and John/Jane Does, specifically intending to harm the plaintiff by a deprivation of her constitutional rights, further justifies an award of punitive damages to the plaintiff in the highest amount constitutionally permissible, as found by a fair, just and impartial jury.

**Seventh Count**

**Breach of Contract/Implied Contract**
(Against All Defendants)

317.    The Plaintiff repeats, reiterates, and re-alleges each and every allegation stated in the preceding paragraphs as if set forth in full herein.

318.    The defendants' individually and collectively offered to screen Judge Jacobson for potential recommendation by the Edelman Committee and nomination and endorsement by the Kings County Democratic County Committee.

319.    In accordance with the Rules enacted by defendants Kings County Democratic County Committee and Edelman Committee governing the screening, selection and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District, on or about February 23, 2016, Judge Jacobson submitted her confidential questionnaire in support of her candidacy as an incumbent elected Justice of the Supreme Court.

320.    The very first page of the questionnaire specifically provides "Please be advised that <u>all</u> information provided will be kept strictly confidential." (Ex. 10, *supra*) (<u>emphasis in original</u>).

321.    The Rules enacted by defendants Kings County Democratic County Committee and Edelman Committee governing the screening, selection and nomination of candidates seeking election as Justices of the Supreme Court in New York's Second Judicial District provide, in pertinent part, that:

81

i.    "**Except for the Report to the Executive Committee of the Democratic Party, all proceedings before the panel and all investigative reports shall be treated as strictly confidential**. Any inquiries concerning such proceedings or reports shall be referred to the Chair of this Committee. In the event that a member violates this provision, the Chair must discharge that member from any further deliberations of the panel."

Ex. 8 at Rule 13 (**emphasis in original**);

ii.    "In investigating the qualifications of a candidate, the Chair shall appoint a subcommittee of one or more members of the Committee (designating one such member as the Reporter for the subcommittee) to conduct the necessary investigation, and submit a pre-screening report and recommendation to the Committee. **The selection of the sub-committee shall be by lottery. The subcommittee shall conduct a personal interview of the candidate**. All pre-screening reports shall be circulated prior to the interview. *The confidentiality of the report is paramount.* Copies of the report shall be returned to the person or persons who conducted the interview after voting has occurred. In the event the candidate is asked to return for a further interview, the copies of the pre-screening report shall be returned to the person or persons who prepared the pre-screening report and produced at the continuing interview and then returned to the person or persons who prepared the report. After final votes are taken all copies shall be returned to the person or persons who prepared the report. *One copy shall be kept by the Chair and one copy shall be kept by the person or persons who prepared the report. All other copies shall be destroyed. Any committee member who distributes a copy of a pre-screening report without the consent of the Committee shall be immediately suspended from the Committee.*"

*Id*. at Rule 17 (**emphasis in original**) (*emphasis added*);

iii.    "At the end of the deliberative process, all applications of the candidates shall be retrieved by the Chair. The Chair shall make arrangements for the destruction of all copies with the exception of one copy or original to be kept in the possession of the Chair. The application shall remain confidential and shall not be disclosed without a vote of the Committee."

*Id*. at Rule 30.

322. The defendants assured all candidates for screening for potential recommendation by the Edelman Committee and nomination and endorsement by the Kings County Democratic County Committee, including Judge Jacobson, that all information about their candidacy and the screening process would be kept confidential.

323. Judge Jacobson relied on the defendants' written and regulatory assurances of confidentiality.

324. Judge Jacobson was in compliance with all of the Rules and procedures of the Edelman Committee and Kings County Democratic County Committee as pertained to her as a candidate for screening.

325. The defendants were obligated by their assurances to keep confidential all information they obtained concerning Judge Jacobson's candidacy for potential recommendation by the Edelman Committee and nomination and endorsement by the Kings County Democratic County Committee.

326. The defendants were obligated by the Rules of the Edelman Committee and the Kings County Democratic County Committee to keep confidential all information they obtained concerning the screening of Judge Jacobson.

327. The defendants failed to maintain all information they obtained concerning the screening of Judge Jacobson as confidential.

328. The defendants intentionally disclosed information about the screening of Judge Jacobson that they were obliged to keep confidential.

329.   The defendants intentionally disclosed information about the screening of Judge Jacobson that they assured Judge Jacobson would be kept confidential.

330.   As a proximate result of the unauthorized disclosure by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Ajaiyeoba, Finkelstein and John/Jane Does of confidential information pertaining to her judicial screening, Judge Jacobson has been damaged.

331.   The amount of plaintiff's damages is to be determined after trial, and should be in an amount not less than  $5,000,000.00 in compensatory damages, along with nominal damages of not less than $1.00.

332.   The outrageous and malicious conduct by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, specifically intending to harm the plaintiff by a deprivation of her constitutional rights, further justifies an award of punitive damages to the plaintiff in the highest amount constitutionally permissible, as found by a fair, just and impartial jury.

**Eighth Count**

**Libel and Slander**
(Against All Defendants)

333.   The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that Judge Jacobson had been found "Unqualified" by the Edelman Committee - a designation that does not even exist.

84

334.    Based on the statements of the defendants, the *New York Post* reported in print and on the internet that the defendants had found Judge Jacobson "Unqualified." (Exs. 4, 5, *supra*).

335.    The defendants falsely told or conveyed to personnel with the *New York Post* that Judge Jacobson is "not the brightest bulb in the courthouse to begin with."

336.    Based on the statements of the defendants, the *New York Post* reported in print and on the internet, of and concerning Judge Jacobson, that "She's not the brightest bulb in the courthouse to begin with" (Exs. 4, *supra*).

337.    Defendant Decker had personally told Judge Jacobson that she is probably the brightest Judge in the Kings County Supreme Courthouse.

338.    The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that Judge Jacobson was "disliked."

339.    Based on the statements of the defendants, the *New York Post* reported in print and on the internet that Judge Jacobson was "disliked." (Exs. 4, *supra*).

340.    The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that Judge Jacobson "has a poor reputation."

341.    Based on the statements of the defendants, the *New York Post* reported in print and on the internet that Judge Jacobson was "has a poor reputation."  (Exs. 4, *supra*).

342.    The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that Judge Jacobson "is "considered judicially mediocre."

343.    Based on the statements of the defendants, the *New York Post* reported in print and on the internet that Judge Jacobson was "is "considered judicially mediocre."  (Exs. 4, *supra*).

344.    Because of Judge Jacobson's intellect, legal acumen and judicial abilities, the Administrative Judges overseeing the Courts of New York State have relied upon Judge Jacobson's judicial skills, knowledge and ability, and have therefore appointed her as Acting Surrogate.

345.    The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that, of and concerning Judge Jacobson, "an abnormal percentage of cases were overturned by higher courts."

346.    Based on the statements of the defendants, the *New York Post* reported in print and on the internet that , of and concerning Judge Jacobson,"they looked at her track record, and they found an abnormal percentage of cases were overturned by higher courts."(Ex. 4, *supra*).

347.    Judge Jacobson did not have an "abnormal percentage of cases [that] were overturned by higher courts." On the contrary, of the many thousands of orders that Judge Jacobson has issued" in the past decade" (since 2006), only small amount were even appealed, and only a fraction of those appeals resulted in reversals.

348.    The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that Judge Jacobson "lacked" a "work ethic."

86

349.     Based on the statements of the defendants, the *New York Post* reported in print and on the internet that "It's that kind of work ethic — or lack thereof — that helped convince the county Democratic Party's Judicial Screening Committee last month that Jacobson is unqualified to run on the party line in November." (Ex. 5, *supra*).

350.     Judge Jacobson's work ethic is so strong that she takes work home where she, *inter alia*, reviews pleadings and motion papers, performs legal research and writes decisions from outside the courthouse on personal time.

351.     The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that "Judge Jacobson failed to come to work on July 14, 2016."

352.     Based on the statements of the defendants, the *New York Post* reported in print and on the internet, of and concerning Judge Jacobson, that she "only had three cases on her docket for the day but adjourned everything, sending out alerts to all the parties telling them not to bother showing up." (Ex. 5, *supra*).

353.     Judge Jacobson did come to work on July 14, 2016 and had a single case calendared for that day. *Savane, et. al. v. Osei, et. al.*, Index No. 23894/2006. One of three law firms that represented parties on the case did not appear in court by counsel that day. After Judge Jacobson, and the other attorneys who did appear, waited for the missing attorney and unsuccessfully tried to reach that lawyer by phone, the case was adjourned. Indeed, in the exercise of judicial discretion, in the truest desire for justice and resolution of disputes on the merits, Judge Jacobson did not enter judgment against the party whose counsel failed to appear without excuse or explanation, despite being authorized to do so. *See*, 22 NYCRR 202.27.

354.    The defendants falsely told or caused to be conveyed to personnel with the *New York Post* that Judge Jacobson had a "lackadaisical attitude in filling out a required questionnaire."

355.    Based on the statements of the defendants, the *New York Post* reported in print and on the internet that Judge Jacobson had a "lackadaisical attitude in filling out a required questionnaire." (Ex. 5, *supra*).

356.    Judge Jacobson did not have "lackadaisical attitude" about completing the Edelman Committee questionnaire, or about any part of the screening process.

357.    Judge Jacobson made efforts to ensure that the information provided to the Edelman Committee was accurate and supplemented her submissions when necessary.

358.    The defendants' statements to the *New York Post*, were individually and collectively  false when made and the defendants knew that they were false at the time of their publication to the *New York Post* and re-publication by the *New York Post*.

359.    The defendants made these false statements about Judge Jacobson to the *New York Post* intending that they would be published in print and on the internet.

360.    The defendants made these false statements about Judge Jacobson to the *New York Post* intending that they would be widely disseminated.

361.    The defendants made these false statements about Judge Jacobson to the *New York Post* with the intention of harming Judge Jacobson.

362.    The defendants made these false statements about Judge Jacobson to the *New York Post* intending that the dissemination of such information would be harmful to Judge Jacobson's personal and professional reputation.

363.    The *New York Post* published and re-published the false, misleading and confidential information about Judge Jacobson that the defendants disclosed to them (Exs. 4, 5, *supra*).

364.    The Rules and procedures of defendants Edelman Committee and Kings County Democratic Party Committee even prohibited the disclosure of information of and concerning Judge Jacobson outside of the Edelman Committee.

365.    The false statements of and concerning Judge Jacobson that were made by the defendants to the *New York Post* were made with actual malice.

366.    The false statements of and concerning Judge Jacobson that were made by the defendants to the *New York Post* were made recklessly

367.    The false statements of and concerning Judge Jacobson that were made by the defendants to the *New York Post* were made with gross negligence.

368.    The false statements of and concerning Judge Jacobson that were made by the defendants to the *New York Post* were made with negligence.

369.    As a result of the false statements published by the defendants, Judge Jacobson's personal reputation has been damaged.

370.    As a result of the false statements published by the defendants, Judge Jacobson's professional reputation has been damaged.

371.    As a result of the false statements published by the defendants, Judge Jacobson now has fewer job opportunities after completion of her judicial service.

372.     As a result of the false statements published by the defendants, Judge Jacobson now has lower income potential after completion of her judicial service.

373.    As a proximate result of the false statements made by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Ajaiyeoba, Finkelstein and John/Jane Does to the *New York Post*, of and concerning Judge Jacobson, Judge Jacobson has been damaged.

374.    The amount of plaintiff's damages is to be determined after trial, and should be in an amount not less than  $5,000,000.00 in compensatory damages, along with nominal damages of not less than $1.00.

375.    The outrageous and malicious conduct by defendants Kings County Democratic County Committee, Edelman Committee, Seddio, Edelman, Finkelstein, Decker, Ajaiyeoba and John/Jane Does, specifically intending to harm the plaintiff by a deprivation of her constitutional rights, further justifies an award of punitive damages to the plaintiff in the highest amount constitutionally permissible, as found by a fair, just and impartial jury.

## Prayer for Relief

**WHEREFORE**, Plaintiff Laura Jacobson prays for judgment in her favor on each of the counts the following:

      A.    a fair and reasonable amount of compensatory damages of not less than $5,000,000.00;

      B.    punitive damages in the maximum amount constitutionally permissible;

      C.    permanent injunctive relief;

      D.    attorneys fees as and for prosecuting the instant case;

      E.    costs and disbursements;

      F.    interest in the greatest amount permitted by governing law; and,

      G.    all additional relief as may appear just and proper to the Court to protect judicial independence from being destroyed or chilled, such that the separated powers regime remains operational in fact.

Dated: New York, New York
       August 26, 2016

                Respectfully submitted,
                **THE LAW FIRM OF RAVI BATRA, P.C.**
                *Attorneys for Plaintiff Laura Jacobson*

                Ravi Batra, Esq. (RB 4299)
                142 Lexington Avenue
                New York, NY 10016
                (212) 545-1993
                Cell: (914) 882-6382
                E-Mail: ravibatralaw@aol.com
                      ravi@ravibatralaw.com

Jacobson.844\082616EDNYComplaint

# EXHIBIT 1

HON. LAURA L. JACOBSON
Supreme Court, Kings County
360 Adams Street
Brooklyn, New York 11201

*EDUCATION:*

| | |
|---|---|
| June, 1968 | Graduated Brooklyn College, City University of New York |
| June, 1974 | Graduated Brooklyn Law School, J.D. Degree |
| March, 1975 | Admitted to the Bar, New York State |
| 1976 | Admitted to the Federal Bar - Eastern District |
| 1977 | Southern District |
| 2003 | Admitted to the Supreme Court, Washington, D.C. |

*JUDICIAL EXPERIENCE:*

| | |
|---|---|
| November 1990 | Elected to the Bench of the Civil Court of the City of New York, Kings County for a Term of ten years (January, 1991 through December 2000) |
| November 2000 | Re-elected to the Bench of the Civil Court |
| November 2002 | Elected to the Bench of the Supreme Court of the State of New York, Kings County for a term of 14 years (January 2003 through December 2016) |

*LEGAL EXPERIENCE:*

| | |
|---|---|
| September 1970 through December 1970 | Law Clerk for the Port Authority of New York |
| 1971-1972 | Law Clerk for Bedford-Stuyvesant Community Legal Services, 1368 Fulton Street, Brooklyn, New York, |

|  | pursuant to an Appellate Division order |
|---|---|
| 1972-1977 | Law Clerk and, after admission to the Bar, an Associate with the firm of Cammer & Karlsson, 50 Court Street, Brooklyn, New York |
| 1974-1975 | Staff Attorney with Harlem Assertion of Rights, Legal Services Office, 23 West 125th Street, New York City |
| 1977 | Senior Attorney with the Public Utility Law Project, Albany, New York |
| 1978-1981 | Law Assistant for the Hon. Elliott Wilk, Civil Court of the City of New York, New York County |
| 1981-1989 | Partner in Law Firm, Rinsler & Jacobson, 26 Court Street, Brooklyn, New York |
| 1989-1990 | Partner in Law Firm, Weiss & Jacobson, 90 John Street, Brooklyn, New York |

*PROFESSIONAL EXPERIENCE:*

| 1977-1982 | Adjunct Professor, Marymount Manhattan College, 371 East 78th Street, New York, New York |
|---|---|

*PROFESSIONAL ASSOCIATIONS:*

American Judges Association

Brooklyn Bar Association

Brooklyn Women's Bar Association

Brandeis Society

Columbian Lawyers Association

National Association of Women Judges:
Treasurer of National Branch, Washington, D.C. -2008
Program Co-ordinator of National Branch,
Washington, D.C. - 2009-2010
President, New York State Chapter - 2012

National Lawyers Guild

Community Activities

Summer Justice Academy, Lecturer to High School
Students on Legal Issues. Chaperone to Washington,
D.C. - White House, Congress, Howard University and
George Washington University

Co-Chair of Women in Prison Holiday Activity - Collect
toiletries and sundries and prepare 400 gift bags for
Women in Taconic Prison.

Board of Judges, Kings County Association

Board of Judges, City of New York Association -
Board of Directors

Board of Judges, State of New York

Visiting various schools & community organizations to
talk about the Courts and the choices of legal
occupations.

*COURT COMMITTEES:*

Employee of the Year Committee - Chairperson
Four times a year, this committee selects and honors a
Court employee who has provided service to the Courts
above and beyond that required.

Board of Judges - Nomination Committee - Chairperson

This committee meets and selects a slate of officers to present to the Board of Judges.  This slate is then voted on to fill the executive committee positions of the Board of Judges of Kings County.

Foreclosure Committee - Prepare and submit rules governing the handing of foreclosure cases.

*COURT ASSIGNMENTS:*

IAS Part - Handle motion calendar of forty plus motions every other Tuesday.

Trial Assignments - Medical Malpractice panel, and general Civil Term trials including car accidents, contract cases, fraud cases, labor law cases, slip and fall cases, infant compromise cases, death compromise cases, foreclosure cases.

Acting Surrogate of Kings County

# EXHIBIT 2

# BETTY WEINBERG ELLERIN

90 Park Avenue
New York, NY 10016
212-210-9424
betty.ellerin@alston.com

August 3, 2016

To Whom It May Concern:

I write with respect to Supreme Court Justice Laura Jacobson, who sits in Kings County, Civil Term, whom I have known upwards of 20 years.

I first met Justice Jacobson by virtue of our mutual involvement in various judicial associations, particularly the National Association of Women Judges (NAWJ) of which I am a past president and she a former treasurer, Finance Chair and Program Chair and its affiliate the New York State Association of Women Judges of which she served as President and of which I have served as Chair of the Nominating Committee for many years. Justice Jacobson's performance in each of these positions was extraordinary and her efforts both enriched and enhanced both groups and she remains a mainstay of the New York Chapter.

It was because of her sincere and outspoken commitment to equal rights for all that she was nominated as President of the New York Chapter where she served for the maximum term permissible. Indeed, her tenure was marked by growth and innovative activities and she was held in great affection by the membership who would have re-elected her for life, if the rules permitted. While she is very candid and outspoken for what she believes is right, she is also a warm and caring person who is sensitive to the problems of others.

As for Judge Jacobson's qualifications as a judge, I have heard from many practitioners in the legal community that she is an excellent judge who is very knowledgeable in the law and exercises sound judgment. Since most of my career has been spent as a Trial and Appellate Division Justice in the First Department, I obviously never had the opportunity to appear before her or assess her judicial performance first hand in the courtroom. In more recent years, however, while as a private practitioner I have never had a case before her I have in the course of preparing briefs for appeals in the Second Department come across various decisions by her that I have had occasion to review carefully and have been very impressed with how well-written, fair and legally sound they are.

In sum, in my opinion Judge Jacobson is highly qualified by virtue of superior intellect and unswerving commitment to doing "the right thing" to warrant her re-designation to the bench.

Sincerely,

Betty Weinberg Ellerin

# EXHIBIT 3



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
111 CENTRE STREET
NEW YORK, N.Y. 10013
(646)386-4200

**A. GAIL PRUDENTI**
Chief Administrative Judge

**FERN A. FISHER**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER   106

Pursuant to the authority vested in me, I hereby temporarily assign, effective immediately,

the HONORABLE LAURA L. JACOBSON, Justice of the Supreme Court, Kings County, as Acting

Surrogate, Kings County, to hear and determine all proceedings in or related to the following

matters:

| Estate of | File No. |
|-----------|----------|
| 2003-3229 | Lillian L Allen |
| 2007-2639 | Carol Anderson |
| 2006-2474 | Glen Mora Anderson |
| 2004-1326 | Eula Armstrong |
| 2005-2997 | William Blume |
| 2005-3541 | Cassia Brooks |
| 2008-1134 | Josephine Cardiello |
| 2005-4503 | Peter J. Carras |
| 2007-2983 | Marvin F. Chapman |
| 2005-2510 | Su- Chang Chen |
| 2001-3758 | David Daskal |
| 2007-658 | Jack Didia |
| 2006-2063 | Mary DiGeorge |
| 2006-1235 | Shirley Dragten |
| 2005- 3899 | Ralph Duke |
| 2006-1168 | Sandra Wilen Farber |
| 2007-4106 | Antonino Ferlita |
| 2007-4982 | Teresa Filberto |
| 1999-1663 | Morris Friedman |
| 2003-4138 | Tigee Gaines |
| 2007-521 | Charlotte Gross |
| 2005-450 | Jorge Guzman |
| 2007-3293 | James Harris |
| 2006-3534 | Madalyne O'Neal  Holland |

| **Estate of** | **File No.** |
|---|---|
| 1999-152 | Helen O'Neill |
| 2001-290 | Ramon Emilio Munoz Jimenez |
| 2007-395 | Susan Jones |
| 2007-453 | Richard Joseph |
| 2004-3148 | Allan Julien |
| 2000-3824 | Sylvia Kaplan |
| 2009-89 | Shirley Kassman |
| 2005-2030 | Pat Kramen |
| 2005-14 | Herbert Leischgold |
| 2010-219 | Antonio Lopez |
| 2011-2305 | Beth Gail Martin |
| 2004-1166 | Lea Masiello |
| 2011-4416 | George Meyers |
| 1997-4845 | James Morrison |
| 2007-1139 | David Moss |
| 1995-2279 | Richard Robert Moss |
| 2005-3735 | Giuseppe Murolo |
| 2002-3961 | Abira Nadeem |
| 2002-3963 | Bisma Nadeem |
| 2002-3959 | Mohammad Nadeem |
| 2002-3964 | Nimra Nadeem |
| 2002-3962 | Romaisa Nadeem |
| 2002-3960 | Yasmin Nadeem |
| 2002-3965 | Zainab Nadeem |
| 2010-3860 | Steve B. Nemeh |
| 1999-152 | Helen O'Neill |
| 2003-4688 | Rosina Paolicelli |
| 2009-3506 | Ina Pelkonen |
| 2009-1411 | Paul Planel |
| 2007-3090 | Lucille Posner |
| 2007-746 | Selbert Providence |
| 2007-1846 | Crawfod Raynor |
| 2004-4233 | Clara Reiman |
| 2003-3354 | Victor Robles |
| 2004-2716 | Lizzette Rodriguez |
| 2006-4125 | Qerim Rosa |
| 2012-2007 | Edna Rozof |
| 2006-1539 | Angelo Dos Santos |
| 2007-5022 | Susan Secunda |
| 1998-1062 | Melbourne Smith |
| 2005-354 | Gilbert Soto |
| 2004-4497 | Veronica Tessier |
| 2001-2043 | Rogelio Villanueva |

| Estate of | File No. |
|-----------|---------|
| 2005-5309 | Harold Wagner |
| 1997-2695 | Irene Winton |
| 2011-1184 | Jeffrey S. Winton |
| 2004-4161 | Winston Norman York |
| 2011-2963 | Joseph Yotovich |
| 2007-3059 | Tova E. Zifzider |
| 2011-2305 | Beth Gail Martin |
| 2004-1166 | Lea Masiello |
| 2011-4416 | George Meyers |
| 1997-4845 | James Morrison |
| 2007-1139 | David Moss |
| 1995-2279 | Richard Robert Moss |
| 2005-3735 | Giuseppe Murolo |
| 2002-3961 | Abira Nadeem |
| 2002-3963 | Bisma Nadeem |
| 2002-3959 | Mohammad Nadeem |
| 2002-3964 | Nimra Nadeem |
| 2002-3962 | Romaisa Nadeem |
| 2002-3960 | Yasmin Nadeem |
| 2002-3965 | Zainab Nadeem |
| 2010-3860 | Steve B. Nemeh |
| 1999-152 | Helen O'Neill |
| 2003-4688 | Rosina Paolicelli |
| 2009-3506 | Ina Pelkonen |
| 2009-1411 | Paul Planel |
| 2007-3090 | Lucille Posner |
| 2007-746 | Selbert Providence |
| 2007-1846 | Crawfod Raynor |
| 2004-4233 | Clara Reiman |
| 2003-3354 | Victor Robles |
| 2004-2716 | Lizzette Rodriguez |
| 2006-4125 | Qerim Rosa |
| 2012-2007 | Edna Rozof |
| 2006-1539 | Angelo Dos Santos |
| 2007-5022 | Susan Secunda |
| 1998-1062 | Melbourne Smith |
| 2005-354 | Gilbert Soto |
| 2004-4497 | Veronica Tessier |
| 2001-2043 | Rogelio Villanueva |
| 2005-5309 | Harold Wagner |
| 1997-2695 | Irene Winton |
| 2011-1184 | Jeffrey S. Winton |
| 2004-4161 | Winston Norman York |
| 2011-2963 | Joseph Yotovich |
| 2007-3059 | Tova E. Zifzider |

This assignment shall become effective immediately and shall remain in effect until completion of the above matters.

Dated:      New York, New York
             August 16, 2012

Fern A. Fisher
Deputy Chief Administrative Judge
New York City Courts



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
100 CENTRE STREET
NEW YORK, NEW YORK 10013
(646) 386-4200
FAX: (212) 374-3003

**ANN PFAU**
Chief Administrative Judge

**JOAN B. CAREY**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER   49

Pursuant to the authority vested in me, I hereby temporarily assign, effective immediately,

the HONORABLE LAURA L. JACOBSON, Justice of the Supreme Court, Kings County, as Acting

Surrogate, Kings County, to hear and determine all proceedings in or related to the following

matters:

| Matter: | File No.: |
|---|---|
| Estate of Anderson Alexander | 2293/03 |
| Estate of Charles Alston | 0174/07 |
| Estate of Seon Andrews | 0342/05 |
| Estate of Anna Antonow | 3760/89 |
| Estate of Fay Barnwell | 5031/05 |
| Estate of John Bijur | 1634/00 |
| Estate of Abel Bomberault | 1978/06 |
| Estate of Cuthbert Bona Partre | 3083/04 |
| Estate of Cassia Brooks | 3541/05 |
| Estate of Marcella Byrd | 1254/01 |
| Estate of Edwin Camargo | 3371/05 |
| Estate of Henry Carter | 2696/99 |
| Estate of Richard Chase | 4728/01 |
| Estate of Emma Chubbs | 1625/03 |
| Estate of Muriel Cohen | 1454/04 |
| Estate of Alice C. Cooke | 3344/99 |
| Estate of Nathaniel Cooper | 0015/99 |
| Estate of Paul Crooms | 1490/05 |
| Estate of Florentino Cuautle | 2515/99 |
| Estate of William Davis | 2974/05 |
| Estate of Florence Dawson | 0873/05 |
| Estate of Fransisca Deleon | 0101/04 |

2

| Matter: | File No.: |
|---|---|
| Estate of Madho Dhillpaul | 0589/05 |
| Estate of Abe Diamond | 5424/86 |
| Estate of Mary Di George | 2063/06 |
| Estate of James E. Dove | 1307/02 |
| Estate of Julius Drecketts | 3956/04 |
| Estate of Tiffany Droughn | 3548/02 |
| Estate of Kate Ellison | 1983/03 |
| Estate of Rudolph Erickson | 0937/03 |
| Estate of Morris Friedman | 1663/99 |
| Estate of Michael Galpine | 1695/04 |
| Estate of Aaron Garrick | 0296/82 |
| Estate of Geraldine George | 3008/06 |
| Estate of Russell Gibson | 0141/01 |
| Estate of Alice P. Gordon | 0132/89 |
| ✓Estate of Raphael Govan | 4819/01 |
| ✓Estate of Phillip Greenberg | 3872/03 |
| Estate of Morris C. Greene | 0232/05 |
| Estate of William Gruber | 5287/96 |
| Estate of Archie Guthartz | 1579/93 |
| Estate of Jorge Guzman | 0450/05 |
| ✓Estate of Abdul Hai | 1545/03 |
| Estate of Sarah Hardy | 3182/04 |
| Estate of Hanoch Heitzin | 0243/98 |
| Estate of Lorraine Hendrickson | 5146/04 |
| Estate of Herman Pascarella | 0068/06 |
| Estate of Robert Holley | 3865/01 |
| Estate of Joan F. Hutton | 3619/98 |
| ✓ Estate of Ramon Jimenez | 0290/01 |
| Estate of Beulah Jones | 3961/04 |
| ✓ Estate of Ethel Jones | 3915/01 |
| Estate of James Jordan | 4091/03 |
| ✓Estate of Natalya Khegay | 3218/00 |
| Estate of Susan Khuzam | 0622/05 |
| Estate of Lorraine Kolar | 0035/04 |
| Estate of Carol Kossman | 4053/05 |
| Estate of Abraham Kramer | 4828/92 |
| Estate of Lillian Kreitz | 3017/02 |
| Estate of Maria Luczyk | 0086/06 |
| Estate of Elizabeth Macolins | 0336/47 |
| Estate of Josephine Marcordes | 1744/02 |
| Estate of Ellen Marie | 4066/03 |
| Estate of Paul Marks | 1222/94 |

3

| Matter: | File No.: |
|---------|-----------|
| Estate of Barbara McCarthy | 1726/06 |
| Estate of Mae McPhillips | 1876/05 |
| Estate of Ruth McTyson | 4122/01 |
| ✓Estate of Thomas Melton | 1336/04 |
| Estate of Mildred Miller | 1834/05 |
| Estate of William C. Mitchell | 2169/02 |
| Estate of Rosario Morrongiello | 1579/04 |
| Estate of Richard Moss | 2279/95 |
| Estate of Abira Nadeem | 3961/02 |
| Estate of Bisma Nadeem | 3963/02 |
| Estate of Muhammad Nadeem | 3959/02 |
| Estate of Nimra Nadeem | 3964/02 |
| Estate of Romaisa Nadeeem | 3962/02 |
| Estate of Yasmin Nadeem | 3960/02 |
| Estate of Zainab Nadeem | 3965/02 |
| Estate of Christopher R Naimo | 4040/99 |
| Estate of Vera Ndregjioni | 0753/02 |
| Estate of Miquel Nesbitt | 2914/03 |
| Estate of Tanya Olton | 4320/01 |
| Estate of Isidoro Pacheo | 5065/98 |
| Estate of Raul Palomo | 3121/06 |
| Estate of Anthony Pannone | 4868/04 |
| Estate of Rosina Paolicelli | 4688/03 |
| Estate of Ramon Perez | 0939/01 |
| Estate of Jean Louis Philomena | 2514/03 |
| Estate of Regina Podos | 4346/02 |
| Estate of Leon Port | 2220/00 |
| Estate of William Riethmuller | 2571/05 |
| Estate of Mary Roberts | 5119/04 |
| Estate of Victor Robles | 3354/03 |
| ✓Estate of Walter Schmand | 4936/04 |
| Estate of Alexander Schwartz | 2206/04 |
| Estate of Irene Sciamerelli | 2651/06 |
| Estate of Charles Senior | 3787/98 |
| Estate of Florence Shain | 1338/01 |
| Estate of Joseph Shammas | 4376/01 |
| Estate of Harry Sherez | 5358/96 |
| Estate of Ernest Simpson | 1190/03 |
| Estate of Damaduth Sing | 2565/02 |
| Estate of Anna Slattery | 2209/02 |
| Estate of Stanislaw Sloma | 2153/04 |
| Estate of Melbourne Smith | 1062/98 |

4

| Matter: | File No.: |
|---------|-----------|
| Estate of Willie Mae Smith | 1346/98 |
| Estate of Robert Smolinski | 4690/03 |
| Estate of Andrei Solovieu | 4421/02 |
| Estate of Michael Stattman | 0661/02 |
| Estate of Charles Steiner | 5013/03 |
| Estate of Ira Sterling | 0860/04 |
| Estate of Elise Stiles | 1084/04 |
| Estate of Carl Stolz | 1505/03 |
| Estate of Tsitsino Tsignadze | 3053/02 |
| Estate of Robert Tobin | 0894/99 |
| Estate of Guido Valasquez | 4964/04 |
| Estate of Gagik Vahanyan | 2020/04 |
| Estate of Angelina Vinto | 4172/01 |
| Estate of Harold Wagner | 5309/00 |
| Estate of Andrew Waselle | 1804/05 |
| Estate of Calvin Washington | 4011/03 |
| Estate of Herbert Weiner | 2709/04 |
| Estate of Joyce Williams | 2205/04 |
| Estate of Willie Williams | 1927/04 |
| Estate of Archie Wilson | 3554/01 |
| Estate of Irene Winton | 2695/97 |
| Estate of John Wojcison | 0588/04 |
| Estate of Ellen Marie Wright | 4066/03 |
| Estate of Yao-Zu Yang | 3779/00 |
| Estate of Diego Zapata | 1200/99 |

This assignment shall become effective immediately and shall remain in effect until completion of the above matters.

Dated:      New York, New York
            April 2 7, 2008

Joan B. Carey
Deputy Chief Administrative Judge
New York City Courts



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
100 CENTRE STREET
NEW YORK, NEW YORK 10013
(646) 386-4200
FAX: (212) 374-3003

**ANN PFAU**
Chief Administrative Judge

**JOAN B. CAREY**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER   85

Pursuant to the authority vested in me, I hereby temporarily assign, effective immediately, the HONORABLE LAURA I. JACOBSON, Justice of the Supreme Court, Kings County, as Acting Surrogate, Kings County, to hear and determine all proceedings in or related to the following matters:

| | |
|---|---|
| Matter of the Estate of Madalyn Holland | File No. 3534/06 |
| Matter of the Estate of Marie Sgrizzi | File No. 2827/07 |
| Matter of the Estate of David Malar | File No. 3972/05 |
| Matter of the Estate of Eva Rochman | File No. 4177/07 |

This assignment shall become effective immediately and shall remain in effect until completion of the above matters.

Dated:     New York, New York
           June  23 , 2008

Joan B. Carey
Deputy Chief Administrative Judge
New York City Courts

07/03/2008  12:18   2127480023           DCAJ JUSTICE J CAREY            PAGE  03



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
100 CENTRE STREET
NEW YORK, NEW YORK 10013
(646) 386-4200
FAX: (212) 374-3003

**ANN PFAU**
Chief Administrative Judge

**JOAN B. CAREY**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER  89

Pursuant to the authority vested in me, I hereby temporarily assign, effective immediately,

the HONORABLE LAURA L. JACOBSON, Justice of the Supreme Court, Kings County, as Acting

Surrogate, Kings County, to hear and determine all proceedings in or related to the following

matters:

| Matter: | File No.: |
| --- | --- |
| Estate of Millie Basile | 4362/06 |
| Estate of Shirley Ettinger | 1365/95 |
| Estate of Isidore Siegler | 4317/05 |
| Estate of James J. Counihan | 4767/05 |
| Estate of Mowbray Barnes | 3076/07 |
| Estate of Omari Hakim | 0117/06 |
| Estate of Clara Rierman | 4233/04 |
| Estate of Lola Schwartz | 4034/06 |
| Estate of Susan Secunda | 5022/07 |
| Estate of Leonard Jacobs | 4786/06 |
| Estate of Mary Moskowitz | 3391/05 |
| Estate of Fannie Becker | 3430/87 |
| Estate of Hugh Hankyu | 2299/07 |

This assignment shall become effective immediately and shall remain in effect until

completion of the above matters.

Dated:      New York, New York
            July 2 , 2008

Joan B. Carey
Deputy Chief Administrative Judge
New York City Courts



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
100 CENTRE STREET
NEW YORK, NEW YORK 10013
(646) 386-4200
FAX: (212) 374-3003

ANN PFAU
Chief Administrative Judge

JOAN B. CAREY
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER   119

Pursuant to the authority vested in me, I hereby temporarily assign, effective immediately, the HONORABLE LAURA L. JACOBSON, Justice of the Supreme Court, Kings County, as Acting Surrogate, Kings County, to hear and determine all proceedings in or related to the following matters:

| Estate of | File No. |
| --- | --- |
| Glenn Anderson | 2474/06 |
| Eula Armstrong | 1326/04 |
| Frank Benedetti | 0824/07 |
| Edith M. Braun | 0821/06 |
| Blanche Brzozowski | 1131/05 |
| Llewellyn Campbell | 2075/93 |
| Peter J. Carras | 4503/05 |
| Dolores Chitaro | 2636/01 |
| Jean Cienciva | 4839/06 |
| Helen Dawson | 2162/05 |
| Mildred Decoteau | 4753/07 |
| Elaine DiNaples | 5034/99 |
| Zeno Domasiewicz | 3520/07 |
| Maryann Eckhart | 0040/07 |
| Katherine Edwards | 2281/99 |
| Estelle Eisenstat | 2137/05 |
| Evelyn Engel | 1285/05 |
| Leo Fliegel | 3581/91 |
| Raymond Fossaner | 0263/06 |
| Joseph Eule | 3805/03 |
| Charlotte Gross | 0521/07 |
| Iris Haas | 4162/06 |
| Alva Jeffires | 2287/03 |
| Richard Johnson | 0146/06 |
| Richard Krawzak | 3174/07 |
| Rosa Linares | 1388/07 |

08/11/2008   12:45       2127490023                    DCAJ JUSTICE J CAREY                         PAGE   03/03

| Anthony Marshall | |
|---|---|
| Zora Mack | 2812/04 |
| James Morrison | 2173/02 |
| Yvonne O'Neil | 4845/97 |
| Howard Rice | 3879/05 |
| Rafael Rivera | 4092/06 |
| Moses Rivers | 3485/01 |
| Catherine Rizzuto | 2367/05 |
| Agatha Roberts | 4618/05 |
| Wilford Rock | 1646/05 |
| Myrtle Rushton | 0370/07 |
| Samuel Schwartzman | 1286/06 |
| David Shulman | 0371/07 |
| Geraldine Simon | 4462/04 |
| Gilberto Soto | 3567/04 |
| Esther Springer | 0354/05 |
| Violet Statler | 2615/04 |
| Frances Szczygielski | 3606/06 |
| Lillian Steinberg | 1880/04 |
| Anne Sweeney | 1883/03 |
| Joeaar Vassili | 2756/04 |
| Willaim Vlado | 1194/85 |
| Sarah Weiner | 2754/05 |
| Elsie Williams | 2138/05 |
| Winston N. York | 4766/06 |
| Judith Zucker | 4161/00 |
| | 4894/00 |

This assignment shall become effective immediately and shall remain in effect until completion of the above matters.

Dated:        New York, New York
              August 8 , 2008

                                        Joan B. Carey
                              Deputy Chief Administrative Judge
                                  New York City Courts



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
111 CENTRE STREET
NEW YORK, N.Y. 10013
(646)386-4200

**A. GAIL PRUDENTI**
Chief Administrative Judge

**FERN A. FISHER**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER   106

Pursuant to the authority vested in me, I hereby temporarily assign, effective immediately,

the HONORABLE LAURA L. JACOBSON, Justice of the Supreme Court, Kings County, as Acting

Surrogate, Kings County, to hear and determine all proceedings in or related to the following

matters:

| Estate of | File No. |
|---|---|
| 2003-3229 | Lillian L Allen |
| 2007-2639 | Carol Anderson |
| 2006-2474 | Glen Mora Anderson |
| 2004-1326 | Eula Armstrong |
| 2005-2997 | William Blume |
| 2005-3541 | Cassia Brooks |
| 2008-1134 | Josephine Cardiello |
| 2005-4503 | Peter J. Carras |
| 2007-2983 | Marvin F. Chapman |
| 2005-2510 | Su- Chang Chen |
| 2001-3758 | David Daskal |
| 2007-658 | Jack Didia |
| 2006-2063 | Mary DiGeorge |
| 2006-1235 | Shirley Dragten |
| 2005- 3899 | Ralph Duke |
| 2006-1168 | Sandra Wilen Farber |
| 2007-4106 | Antonino Ferlita |
| 2007-4982 | Teresa Filberto |
| 1999-1663 | Morris Friedman |
| 2003-4138 | Tigee Gaines |
| 2007-521 | Charlotte Gross |
| 2005-450 | Jorge Guzman |
| 2007-3293 | James Harris |
| 2006-3534 | Madalyne O'Neal  Holland |

| Estate of | File No. |
| --- | --- |
| 1999-152 | Helen O'Neill |
| 2001-290 | Ramon Emilio Munoz Jimenez |
| 2007-395 | Susan Jones |
| 2007-453 | Richard Joseph |
| 2004-3148 | Allan Julien |
| 2000-3824 | Sylvia Kaplan |
| 2009-89 | Shirley Kassman |
| 2005-2030 | Pat Kramen |
| 2005-14 | Herbert Leischgold |
| 2010-219 | Antonio Lopez |
| 2011-2305 | Beth Gail Martin |
| 2004-1166 | Lea Masiello |
| 2011-4416 | George Meyers |
| 1997-4845 | James Morrison |
| 2007-1139 | David Moss |
| 1995-2279 | Richard Robert Moss |
| 2005-3735 | Giuseppe Murolo |
| 2002-3961 | Abira Nadeem |
| 2002-3963 | Bisma Nadeem |
| 2002-3959 | Mohammad Nadeem |
| 2002-3964 | Nimra Nadeem |
| 2002-3962 | Romaisa Nadeem |
| 2002-3960 | Yasmin Nadeem |
| 2002-3965 | Zainab Nadeem |
| 2010-3860 | Steve B. Nemeh |
| 1999-152 | Helen O'Neill |
| 2003-4688 | Rosina Paolicelli |
| 2009-3506 | Ina Pelkonen |
| 2009-1411 | Paul Planel |
| 2007-3090 | Lucille Posner |
| 2007-746 | Selbert Providence |
| 2007-1846 | Crawfod Raynor |
| 2004-4233 | Clara Reiman |
| 2003-3354 | Victor Robles |
| 2004-2716 | Lizzette Rodriguez |
| 2006-4125 | Qerim Rosa |
| 2012-2007 | Edna Rozof |
| 2006-1539 | Angelo Dos Santos |
| 2007-5022 | Susan Secunda |
| 1998-1062 | Melbourne Smith |
| 2005-354 | Gilbert Soto |
| 2004-4497 | Veronica Tessier |
| 2001-2043 | Rogelio Villanueva |

| **Estate of** | **File No.** |
|---|---|
| 2005-5309 | Harold Wagner |
| 1997-2695 | Irene Winton |
| 2011-1184 | Jeffrey S. Winton |
| 2004-4161 | Winston Norman York |
| 2011-2963 | Joseph Yotovich |
| 2007-3059 | Tova E. Zifzider |
| 2011-2305 | Beth Gail Martin |
| 2004-1166 | Lea Masiello |
| 2011-4416 | George Meyers |
| 1997-4845 | James Morrison |
| 2007-1139 | David Moss |
| 1995-2279 | Richard Robert Moss |
| 2005-3735 | Giuseppe Murolo |
| 2002-3961 | Abira Nadeem |
| 2002-3963 | Bisma Nadeem |
| 2002-3959 | Mohammad Nadeem |
| 2002-3964 | Nimra Nadeem |
| 2002-3962 | Romaisa Nadeem |
| 2002-3960 | Yasmin Nadeem |
| 2002-3965 | Zainab Nadeem |
| 2010-3860 | Steve B. Nemeh |
| 1999-152 | Helen O'Neill |
| 2003-4688 | Rosina Paolicelli |
| 2009-3506 | Ina Pelkonen |
| 2009-1411 | Paul Planel |
| 2007-3090 | Lucille Posner |
| 2007-746 | Selbert Providence |
| 2007-1846 | Crawfod Raynor |
| 2004-4233 | Clara Reiman |
| 2003-3354 | Victor Robles |
| 2004-2716 | Lizzette Rodriguez |
| 2006-4125 | Qerim Rosa |
| 2012-2007 | Edna Rozof |
| 2006-1539 | Angelo Dos Santos |
| 2007-5022 | Susan Secunda |
| 1998-1062 | Melbourne Smith |
| 2005-354 | Gilbert Soto |
| 2004-4497 | Veronica Tessler |
| 2001-2043 | Rogelio Villanueva |
| 2005-5309 | Harold Wagner |
| 1997-2695 | Irene Winton |
| 2011-1184 | Jeffrey S. Winton |
| 2004-4161 | Winston Norman York |
| 2011-2963 | Joseph Yotovich |
| 2007-3059 | Tova E. Zifzider |

This assignment shall become effective immediately and shall remain in effect until completion of the above matters.

Dated:          New York, New York
                August 16, 2012

                                        _Fern A. Fisher_
                                        _____

                                        Fern A. Fisher
                                        Deputy Chief Administrative Judge
                                        New York City Courts



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
100 CENTRE STREET
NEW YORK, NEW YORK 10013
(646) 386-4200
FAX (212) 374-3003

ANN PFAU
Chief Administrative Judge

JOAN B. CAREY
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER 268

Pursuant to the authority vested in me, I hereby temporarily assign, effective immediately, the HONORABLE LAURA L. JACOBSON, Justice of the Supreme Court, Kings County, as Acting Surrogate, Kings County, to hear and determine all proceedings in or related to the following matters:

| Matters | File No.: |
|---|---|
| Estate of Olga Sfouggatakis | 4372/04 |
| Estate of Andrew Sfouggatakis | 1447/08 |
| Estate of Wayne Penfinfield | 2588/06 |

This assignment shall become effective immediately and shall remain in effect until completion of the above matters.

Dated:     New York, New York
          December 23, 2008

                                        Joan B. Carey
                                        Deputy Chief Administrative Judge
                                        New York City Courts



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
100 CENTRE STREET
NEW YORK, NEW YORK 10013
(646) 386-4200
FAX: (212) 374-3003

**ANN PFAU**
Chief Administrative Judge

**JOAN B. CAREY**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE TRANSFER ORDER   24

Pursuant to the authority vested in me, I hereby relieve, effective February 15, 2009,  the HONORABLE LAURA L. JACOBSON, Justice of the Supreme Court, Kings County, of her assignment as Acting Surrogate, Kings County, to hear and determine proceedings related to matters listed in Administrative Transfer Orders:

| Number | Date |
|--------|------|
| 49 | April 24, 2008 |
| 85 | June 23, 2008 |
| 89 | July 2, 2008 |
| 119 | August 8, 2008 |
| 208 | December 23, 2008 |

Said orders shall be of no further force or effect.

Dated:     New York, New York
           February 5, 2009

JOAN B. CAREY
Deputy Chief Administrative Judge
New York City Courts

# EXHIBIT 4

METRO

# City judge deemed incompetent in 'unheard of' move

By Rich Calder, Emily Saul and Laura Italiano

July 13, 2016  |  11:23pm



Judge Laura Jacobson
Photo: Ellis Kaplan

This is a precedent no judge wants to set.

In a first-of-its-kind rebuke, a Brooklyn Supreme Court judge with 25 years experience on the bench has been found unqualified by a Democratic Party screening panel — a move that will likely doom her chances for re-election this fall.

"She's not the brightest bulb in the courthouse to begin with," said one party source, explaining the Brooklyn Democratic Party Judicial Screening Committee's decision last month to find Justice Laura Jacobson unqualified to run on the party line.

"They looked at her track record, and they found an abnormal percentage of cases were overturned by higher courts," said the party source. "And when also factoring in she has a poor reputation, she was found unqualified."

Said another party official, who like the others asked not to be named, "As far as we know, this is the first time in Brooklyn's history the committee did not reappoint a sitting Supreme Court judge — it's unheard of."

Approval by the 25-member committee, comprising members of the county Bar Association and other lawyers, is usually a routine a rubber stamp for sitting judges such as Jacobson, who has spent the past 13 years handling civil cases.

But Jacobson is so disliked and considered so judicially mediocre that the committee found her unqualified, and then rejected her subsequent appeal.

Records show Jacobson's decisions from the bench in her ninth-floor courtroom at 350 Adams St. have been reversed on appeal at least 57 times in the past decade.

Most recently, the Appellate Division took her to task for not granting a default judgment in a foreclosure case against AWOL tenants and for improperly holding a company responsible for a construction accident although it completed its work four months earlier.

Jacobson's husband, Peter Weiss — suspended from practicing law in 1994 after mishandling a medical-malpractice suit — is a political consultant who has locked horns with Democratic leaders, sources said.

Lawyers and litigants also find Jacobson brusque and rude, according to multiple lawyers and court sources.

"She fell out of favor with the powers that be," said one court source. "It's a clubhouse, and she's not a member in good standing."

Said one lawyer who has appeared before her: "She's not a hard worker; she wastes everybody's time."

Jacobson does have fans — among them former NYCLU head Norman Siegel, who was on the losing side of her most prominent case, a 2008 battle for the FDNY pension of a firefighter who died on 9/11.

"I thought she was smart," Siegel said. "She really tried to resolve the case . . . and then when we finally went to trial, she was steadfast, measured and fair."

Brooklyn Democratic judicial delegates will meet in September to select their candidates for the November ballot. The rules say they can't vote for anyone found disqualified by the screening panel.

Jacobson declined to comment.

FILED UNDER   **BROOKLYN SUPREME COURT**, **JUDGES**

Recommended by



# Dems nix sitting jurist in first for B'klyn



**BENCHED:** Judge Laura Jacobson, on the bench for 25 years, has been found by a Brooklyn Democratic committee to be unqualified to run.

Ellis Kaplan

# MEET THE CITY'S DOPIEST JUDGE — *EVER*

New York Post, Thursday, July 14, 2016    nypost.com

By RICH CALDER, EMILY SAUL and LAURA ITALIANO

This is a precedent no judge wants to set.

In a first-of-its-kind rebuke, a Brooklyn Supreme Court judge with 25 years experience on the bench has been found unqualified by a Democratic Party screening panel — a move that will likely doom her chances for re-election this fall.

"She's not the brightest bulb in the courthouse to begin with," said one party source, explaining the Brooklyn Democratic Party Judicial Screening Committee's decision last month to find Justice Laura Jacobson unqualified to run on the party line.

"They looked at her track record, and they found an abnormal percentage of cases were overturned by higher courts," said the party source. "And when also factoring in she has a poor reputation, she was found unqualified."

Said another party official, who like the others asked not to be named, "As far as we know, this is the first time in Brooklyn's history the committee did not reappoint a sitting Supreme Court judge — it's unheard of."

Approval by the 25-member committee, comprising members of the county Bar Association and other lawyers, is usually a routine rubber stamp for sitting judges such as Jacobson, who has spent the past 13 years handling civil cases.

But Jacobson is so disliked and considered so judicially mediocre that the committee found her unqualified, and then rejected her subsequent appeal.

Records show Jacobson's decisions from the bench in her ninth-floor courtroom at 350 Adams St. have been reversed on appeal at least 57 times in the past decade.

Most recently, the Appellate Division took her to task for not granting a default judgment in a foreclosure case against AWOL tenants and for improperly holding a company responsible for a construction accident although it completed its work four months earlier.

Jacobson's husband, Peter Weiss — suspended from practicing law in 1994 after mishandling a medical-malpractice suit — is a political consultant who has locked horns with Democratic leaders, sources said.

Lawyers and litigants also find Jacobson brusque and rude, according to multiple lawyers and court sources.

"She fell out of favor with the powers that be," said one court source. "It's a clubhouse, and she's not a member in good standing."

Said one lawyer who has appeared before her: "She's not a hard worker; she wastes everybody's time."

Jacobson does have fans — among them former NYCLU head Norman Siegel, who was on the losing side of her most prominent case, a 2008 battle for the FDNY pension of a firefighter who died on 9/11.

"I thought she was smart," Siegel said. "She really tried to resolve the case . . . and then when we finally went to trial, she was steadfast, measured and fair."

Brooklyn Democratic judicial delegates will meet in September to select their candidates for the November ballot. The rules say they can't vote for anyone found disqualified by the screening panel.

Jacobson declined to comment.

# EXHIBIT 5

METRO

# Brooklyn judge blows off work amid being deemed 'unqualified'

By Rich Calder, Emily Saul and Laura Italiano

July 15, 2016 | 12:37am



Supreme Court Judge Laura Jacobson leaves her home Thursday in Whitestone, NY.
Photo: Dennis A. Clark

She's lazy, too.

Brooklyn Supreme Court Justice Laura Jacobson shut down her courtroom and kept out of the public eye Thursday — the day that The Post revealed she'd been deemed "unqualified" by a panel of Democratic Party lawyers considering whether to back her for re-election.

Jacobson only had three cases on her docket for the day but adjourned everything, sending out alerts to all the parties telling them not to bother showing up.

**SEE ALSO**



**City judge deemed incompetent in 'unheard of' move**

Her courtroom won't reopen until Monday. "Zero explanation," complained one of the lawyers who was to appear before her.

It's that kind of work ethic — or lack thereof — that helped convince the county Democratic Party's Judicial Screening Committee last month that Jacobson is unqualified to run on the party line in November, two sources told The Post on Thursday.

12

New York Post, Friday, July 15, 2016

nypost.com

# Docket? Duck it!

## Dem-dump judge now blows off work

By RICH CALDER, EMILY SAUL and LAURA ITALIANO

She's lazy, too.

Brooklyn Supreme Court Justice Laura Jacobson shut down her courtroom and kept out of the public eye Thursday — the day that The Post revealed she'd been deemed "unqualified" by a panel of Democratic Party lawyers considering whether to back her for re-election.

Jacobson only had three cases on her docket for the day but adjourned everything, sending out alerts to all the parties telling them not to bother showing up.

Her courtroom won't re-open until Monday. "Zero explanation," complained one of the lawyers who was to appear before her.

It's that kind of work ethic — or lack thereof — that helped convince the county Democratic Party's Judicial Screening Committee last month that Jacobson is unqualified to run on the party line in November, two sources told The Post on Thursday.

The rare rebuke — court veterans said they'd never heard of the committee finding a sitting judge unqualified — will likely doom her chances for re-election.

As reported in The Post, committee members gave Jacobson the thumbs-down after determining that she had an inordinately high number of cases reversed on appeal — at least 57 in the past 10 years, according to court records. But the committee was also turned off by her lackadaisical attitude in filling out a required questionnaire and during an in-person interview, sources said Thursday.

The 39-page questionnaire asks for detailed lists of previous trials, written opinions and cases reversed or modified.

But Jacobson's was filled with vague answers, one court source said.

The judge was also "very cocky" when she met with committee members, as if she assumed that her judgeship was a done deal, sources said.

And indeed, the committee does typically rubber stamp sitting judges — just not in her case.

"She figured that since she was a judge for so long, she did not have to spend a lot of time completing a lot of the questions," said another source.

Jacobson declined for a second day to comment on the committee's finding.

**SKIPPING OUT:** Brooklyn Justice Laura Jacobson, outside her home Thursday, canceled the cases on her docket amid embarrassing revelations.

The rare rebuke — court veterans said they'd never heard of the committee finding a sitting judge unqualified — will likely doom her chances for re-election.

As reported in The Post, committee members gave Jacobson the thumbs-down after determining that she had an inordinately high number of cases reversed on appeal — at least 57 in the past 10 years, according to court records. But the committee was also turned off by her lackadaisical attitude in filling out a required questionnaire and during an in-person interview, sources said Thursday.

The 39-page questionnaire asks for detailed lists of previous trials, written opinions and cases reversed or modified.

But Jacobson's was filled with vague answers, one court source said.

The judge was also "very cocky" when she met with committee members, as if she assumed that her judgeship was a done deal, sources said.

And indeed, the committee does typically "rubber stamp" sitting judges — just not in her case.

"She figured that since she was a judge for so long, she did not have to spend a lot of time completing a lot of the questions," said another source.

Jacobson declined for a second day to comment on the committee's finding.

FILED UNDER   **BROOKLYN SUPREME COURT**, **JUDGES**

Recommended by

# EXHIBIT 6

# RULES FOR THE GOVERNMENT
## OF THE
# KINGS COUNTY DEMOCRATIC COUNTY COMMITTEE
*As Adopted on September 17, 2014*

## ARTICLE I
General Provisions

§1.    The County Committee shall be constituted of members elected from each Election District within Kings County by the greatest number of votes of the duly enrolled electors thereof voting in the Democratic primaries.

§2.    The County Committee shall conduct all affairs of the Democratic Party organization of Kings County and exercise general authority over all committees within its jurisdiction, except as otherwise provided by these Rules.

§3.    The County Committee shall call all official primary elections and in its discretion may, by resolution duly adopted, call unofficial primary elections of the Democratic Party of Kings County, designating in said call the unit of representation and the time and place at which said unofficial primary election shall be held in accordance with the Election Law.

## ARTICLE II
The County Committee: Membership

§1.    The members of the County Committee shall be elected biennially in each even number year at the same time that members of the State Committee are elected.

§2.    The County Committee shall consist of not less than two members from each Election District, and two additional members in each district which shall qualify by having an "average number" of voters ascertained in the manner hereinafter set forth:

(a)    The party vote in each district for Governor at the last preceding gubernatorial election, or in case the boundaries of such district have been changed or a new district has been created since the last preceding gubernatorial election the party vote cast for Member of the Assembly, or in the event there was no election for Member of the Assembly, then the party enrollment in such district at the last preceding general election shall be determined, and the total of such party vote or enrollment in the entire county of Kings, hereinafter referred to as

Page 1

the "County Total" shall be ascertained.

(b)     The "County Total" shall then be divided by the total number of used election districts in the county, the quotient hereinafter referred to as the "average number".

(c)     In each election district, wherein the party vote or enrollment, as the case may be, so included in the "County Total" shall be not less than the "average number" (fractions being disregarded), such election districts shall be entitled to two additional members. All other election districts shall not be entitled to any additional members. Accordingly, each election district shall be entitled to either two or four members.

(d)     Each member of the County Committee shall be an enrolled member of the Party residing in the Assembly District containing the Election District in which such member is elected, and the representation of each Election District shall be equally divided between men and women.

§3.     Vacancies in the membership of the County Committee existing at the time of the organizational meeting shall be filled for the unexpired term by the County Committee. Nominations to fill such vacancies shall be made upon a majority vote of the members of the County Committee from the Assembly District in which such vacancy occurs, or in the event that the Assembly District Committee has not yet organized, upon the nomination of five members thereof. Vacancies occurring in the membership of the County Committee after the organizational meeting shall be filled by the Assembly District Committee. A person chosen to fill such vacancy shall be an enrolled Democrat qualified for election from the Assembly District in which such vacancy shall have occurred.

§4.     Voting in the County Committee shall be regulated by the following rules:

(a)     Each member shall be entitled to one vote, except as hereinafter provided.

(b)     Except as otherwise provided by law, a vote by roll call or by ayes and noes in the County Committee shall be taken by a call of Assembly Districts in numerical order. When the Chairperson of such district delegation has ascertained the vote of its individual members, he shall announce the result, which shall be recorded by the Secretary as the vote of the members from said district. However, if objection is made by any member of the County Committee, the membership roll of the Assembly District from which he is a member shall be called, and the vote as so ascertained shall be recorded.

(c)     A member of the County Committee may authorize as his proxy another member of the Committee. Such proxy may be general or limited and must be in writing, signed by the

member so authorizing it, and filed with the Secretary of the Committee before action is taken thereunder. A proxy is authorized to act notwithstanding the presence of the person authorizing him to act as such proxy, but said person may, before action is taken thereunder, declare to the Chairperson that said proxy is revoked.

## ARTICLE III
The County Committee: Organization and Procedure

§1.     The County Committee shall meet within twenty days after holding of the official primary election at which its members have been elected, at such time and place as shall be designated by the Chairperson of the outgoing County Committee or if he shall neglect, fail or refuse to call said meeting, by the Chairman of the last preceding Executive Committee, and at such meeting shall organize and adopt rules for the government of the Democratic Party of Kings County. The Chairperson is elected by the new County Committee.

At the organizational meeting, the order of business shall be as follows:
1.     Call of the Roll
2.     Adoption of Rules
3.     Filling of Vacancies
4.     Election of Officers
5.     Reports of Standing and Special Committees
6.     Unfinished Business
7.     New Business
8.     Adjournment

§2.     (A) After the organizational meeting, there shall be such regular meetings held at such time and place as may be designated by the Chairperson of the County Committee.

(B) Notice of the time and place of all regular meetings of the County Committee must be sent by mail or telegram to each member at least five days before such meetings, and similar notice of all adjournments of such meeting shall be resolution issue a call for said meeting.

(C) In addition thereto, there shall be meetings of the County Committee for the sole purpose of discussing issues of public policy, and for the purpose of voting upon any previously submitted resolutions, upon 5 days notice to the members thereof, if any, in July of each year, and in a year in which there is no Organizational Meeting, in January of the following year as well.

Page 3

§3.     Special meetings of the County Committee may be called by the Chairperson thereof to be held at such time and place as he may designate. A special meeting of the County Committee shall be called by the Chairperson within ten days after receipt by him/her of a petition signed by 750 duly elected County Committee Members. Special meetings shall be held not less than five nor more than ten days after such call. Notice of such meetings and adjournments thereof shall be given in the same manner as provided for regular meetings. The call for a special meetings issued by the Chairperson on his/her own motion shall specify the items to be considered. If the meeting is called in response to a petition, it shall specify the items to be considered. If the meeting is called in response to a petition, it shall specify the items set forth in such petition. In either event, no other matter shall be considered at a special meeting.

§4.     A quorum at all meetings of the County Committee for the purpose of transacting any business shall consist of 450 members present in person or by proxy. All action by the County Committee shall require the affirmative vote of a majority of votes cast. In the event a quorum is not present at any meeting, no action other than to adjourn said meeting may be taken.

§5.     The Chairperson of the Executive Committee shall, together with the Notice of the Organizational Meeting, send out Proxy forms in the following manner:

a.     For (prospective) members of the County Committee who are designated on a petition for office which names candidates for the State Committee from their District:

i.     Provided that within two weeks of the filing of said designating Petitions, the candidate(s) for State Committee tender funds in the amount of $1.00 per County Committee candidate (on their petitions), and such funds shall clear, to the Kings County Democratic County Committee, such Proxy form shall list as the proposed Proxy Holder the candidate(s) for the State Committee on such designating petition(s);

ii.     In the event that more than one candidate for the State Committee is designated on such a designating petition, then, together with the tendered funds, the two candidates shall designate in writing one person as proposed Proxy Holder.

b.     In all other cases, the proposed Proxy Holder shall be the Chairperson of the Executive Committee or his or her designee.

Page 4

§6.    All meetings of the entire County Committee shall be open to the public.  The Chairperson of the Executive Committee shall make such arrangements as are reasonable to accommodate the public and to seat them in an area that is segregated from voting members of the County Committee.  Participation at the County Committee meeting shall be open only to duly elected members of the County Committee.

## ARTICLE IV
### Officers of the County Committee

§1.    The County Committee shall elect the following officers: A Chairperson, First Vice-Chairperson, Second Vice-Chairperson, Third Vice-Chairperson, Fourth Vice-Chairperson, Fifth Vice-Chairperson, Sixth Vice-Chairperson, Secretary, First Assistant Secretary, Second Assistant Secretary, Treasurer, Assistant Treasurer and a Sergeant-at-Arms. The Chairperson may be of either sex; the First Vice-Chairperson shall be of the opposite sex. A vacancy in any office of the County Committee shall be filled at the next meeting of the County Committee. Pending a meeting of the County Committee, vacancies may be filled by the Executive Committee.

§2.    It shall be the duty of the Chairperson of the County Committee to preside at all meetings of that body. In the absence of the Chairperson, The First, Second, Third, Fourth, Fifth or Sixth Vice-Chairperson, Secretary, First Assistant Secretary, Second Assistant Secretary, Treasurer or Assistant Treasurer of the County Committee shall in that order preside at meetings of the Committee.

§3. (A)    It shall be the duty of the Secretary to keep full and accurate minutes of all proceedings of the County Committee, to prepare a roll of the members with their respective places of residence and to notify the members of the time and place of all meetings. In addition he shall perform such duties pertaining to his/her office as may be assigned by the Chairperson.

(B)    The First Assistant Secretary and the Second Assistant Secretary shall perform such duties as may be assigned to them by the Secretary, and in his/her absence the ranking Assistant shall exercise all the duties, powers and authority of the Secretary.

§4. (A)    The treasurer shall receive and hold in trust funds of the Committee, giving a receipt for same; keep a correct account thereof in book or books provided for that purpose, pay all bills that have been attested by the Secretary or directed to be paid by the Executive Committee except that checks in payment therefore shall be signed by two of the following six officers; The Chairperson of the County Committee, the Vice-Chair of the Executive Committee, the Third Vice-Chairperson of the County Committee, Treasurer, Assistant Treasurer and Secretary of the County Committee; file all bills as vouchers for money paid by

Page 5

that person, render an account of the funds whenever called upon to do so by the County Committee; and at the expiration of his/her term of office, or in his/her removal or inability to act, deliver all books, papers and vouchers, or other property in his/her possession belonging to the County Committee, and pay over all balances in his/her hands to his/her successors, or to the Committee on Finance or to the County Committee, and deposit all moneys in such bank or banks as may be selected by the Executive Committee.

(1) Notwithstanding the foregoing, Committee funds may be expended through electronic bill payment, electronic funds transfer and, in the case of wages, single signatory payroll check, by Treasurer, Assistant Treasurer or by any accountant retained by the Committee on their behalf (who shall be deemed a signatory), by any one of them, provided that no such transaction(s) shall cause any individual payee to receive an aggregate sum exceeding Ten Thousand Dollars ($10,000.00) within a thirty (30) day period and that each transaction shall be disclosed and reported as if it had been made by check.

(B)    Within 60 days after the end of each calendar quarter the Treasurer shall make to the Executive Committee a written report of income and expenses for such quarter.

(C)    The Assistant Treasurer shall perform such duties as may be assigned to him by the Treasurer or the County Committee and in the absence of the Treasurer shall exercise all the duties, powers and authority of the Treasurer.

§5.    It shall be the duty of the Sergeant-at-Arms to assist the Chairperson in preserving and maintain order, .and when any member of the Committee shall present himself for admission for the calling of the roll, to announce his name and Assembly District to the Secretary.


**ARTICLE V**
The Executive Committee

§1.    The Executive Committee shall be a standing committee of the County Committee. It shall be composed of the members of the State Committee from the County of Kings and the duly elected officers of the county committee, which officers who are not members of the State Committee shall be deemed At-Large members of the Executive Committee.

§2. (A)    The members of the Executive Committee shall meet for the purpose of organization pursuant to the resolution of the County Committee adopted at the organization meeting of the County Committee, and elect as officers a Chairperson, a Vice-Chairperson and

a Secretary. The Chairperson and the Vice-Chairperson of the Executive Committee shall be members of the State Committee and must be of the opposite sex, except that a person who has served as Chairperson of the Executive Committee of that or any prior Executive Committee shall be eligible to be or hold the office of Chairperson, although not a member of the State Committee. The entitlement to the office of the Chairperson of the Executive Committee shall not be affected by his or her failure to remain a member of the State Committee.

(B)   In the event of vacancy in any office of the Executive Committee, a majority of the Executive Committee may fill such vacancy.

§3. (A)      During each year, except the months of July and August, there shall be regular bi-monthly meetings of the Executive Committee, on such dates and at such times as may be designated by the Chairperson of the Executive Committee.

(B)   Special meetings of the Executive Committee may be called at any time by the Chairperson upon not less than twelve hours notice by telegram or telephone. Upon a written request for a special meeting signed by a majority of members of the Executive Committee, the Chairperson, or in his/her absence, the Secretary shall call such special meeting to be held on a date nor more than ten days after receipt of such written request.

(C)   Notice of the time and place of all regular meetings of the Executive Committee and all special meetings called at the request of a majority of members, and an agenda of matters to be considered thereat, must be sent by mail or telegram to each member at least five days before such meetings. Similar notice of all adjournments of such meetings must be sent at least two days prior to such adjourned meetings.

§4.   A quorum at all meetings of the Executive Committee for the purpose of transacting any business shall consist of a majority of the members, present in person or by proxy. All action by the Executive Committee shall require the affirmative vote of a majority of votes cast. In the event a quorum is not present at any meeting, no action other than to adjourn said meeting may be taken. Any member of the Executive Committee may place an item on the agenda of any regular meeting by written notice served upon the Chairperson of the Executive Committee at least three days prior to such meeting.

§5.   A member of the Executive Committee may authorize as his proxy only another member of the Executive Committee. Such proxy may be general or limited and must be in writing, signed by the member so authorizing it, and filed with the Chairperson of the Committee before action is taken thereunder. A proxy is authorized to act notwithstanding the presence of the person authorizing him to act as such proxy, but said person may, before action

Page 7

is taken thereunder, declare to the Chairperson that said proxy is revoked.

§6. In the event of the resignation, death or removal of a member of the State Committee, the vacancy in the Executive Committee caused thereby shall be filled by the meeting called for such purpose, by electing to the Executive Committee any duly enrolled Democratic voter residing in the Assembly District who need not be a member of the County Committee. The person so elected shall serve for the unexpired term of the vacancy. The Chairperson of the Executive Committee shall, thereafter, pursuant to the Rules of the State Committee, recommend to the State Committee the election to said committee of the person elected to the Executive Committee. If the State Committee shall elect a person other than the person so recommended, such other person shall not be a member of the Executive Committee nor shall he be entitled to vote or participate in the deliberations of the Executive Committee by reason of his membership on the State Committee.

§7. The Executive Committee, at all times when the County Committee is not in actual session, shall have, possess, exercise and enjoy, without any limitation whatsoever, all the rights, privileges, powers and duties which are not by statute vested in or imposed upon said County Committee exclusively and may not be delegated to the Executive Committee.

§8. For the purposes of this section, the members of the Executive Committee shall constitute a party Committee.

§9. The Chairperson of the Executive Committee is hereby authorized and empowered to direct the Treasurer, Assistant Treasurer or any accountant retained by the Committee on their behalf, of the County Committee, upon a voucher duly signed by him/her, to expend for any lawful purpose any of the political funds of the County Committee whenever in his/her judgment it is considered for the best interests of the Democratic Party of Kings County. (Amended on November 27, 2012)

§10. Every voting member of the Executive Committee, notwithstanding any dual membership, shall possess one vote.

§11. Members of the State Committee shall possess the duties, powers and functions of an Assembly District Leader or an Associate Assembly District Leader.

§12. Meetings of the Executive Committee shall be conducted in Public Session, except upon a vote of the majority of the voting members present to proceed in Executive Session, which may be limited to a specific item or items. Proxies may not be used on such a motion unless they specifically so authorize.

§13.   The Executive Committee shall cause to be maintained a functioning website that includes, at least, an up to date list of County Committee members and State Committee members, the governing rules of the County Party, instructions on how to run for the County Committee, all party endorsements of political and judicial candidates and all financial reporting as is required by Article IV, Section 4 (b) of these Rules.

## ARTICLE VI
### Committees of the County Committee

§1.   The Executive Committee shall have the following standing committees:

(1)   Committee on Rules
(2)   Committee on Resolutions
(3)   Committee on Law
(4)   Committee on Finance
(5)   Committee on Organization
(6)   Committee on Campaigns and Elections
(7)   Committee on Public Affairs and Legislation
(8)   Committee on Community Services
(9)   Committee on Inter-Group Relations
(10)   Committee on Legislative Reapportionment
(11)   Committee on Labor and Industry
(12)   Committee on Public Education
(13)   Committee on Public Meetings
(14)   Committee on Public Relations
(15)   Advisory Committee

§2.   The Chairperson and Vice-Chairperson of each such standing committee shall be appointed by the Chairperson of the Executive Committee, the members of each such standing committee shall be selected by the Chairperson thereof and the Chairperson of the Executive Committee shall be ex-officio a member of all such standing committees. The Chairperson shall be a member of the County Committee.

§3.   The members of the Advisory Committee shall be the Chairpersons of all of the other standing committees set forth in Section 1 of this Article. The members of all other committees need not be members of either the Executive Committee or of County Committee, but all such members shall be duly enrolled Democratic electors.

§4. The Committees on Finance and Public Relations shall each consist of fifteen

members. There shall be no limitation on the size of all other committees.

§5.     The standing committees shall have the following duties:

(1)     The Committee on Rules shall have the duty to construe these Rules whenever a question as to their interpretation shall be referred to it by the Executive Committee to insure that the intent and purpose of these Rules shall be fully achieved. it shall consider and report on all proposed amendments referred to it by the County or Executive Committees. The Committee shall meet no less than ten days before the organization meeting of the County Committee to study and recommend the adoption of the Rules for the County Committee.

(2)     The Committee on Resolutions shall have the duty to prepare such resolutions as may be directed by the County or Executive Committees. The Committee shall consider and report on such resolutions as may be referred to it by either of said committees.

(3)     The Committee on Law shall have the duty to advise the County Committee, the Executive Committee, or any committee or any officer of either of them, on any question of law relating to the discharge of its or his duty. The Committee shall consider and report on any matters that may be referred to it by the County or Executive Committee, it shall investigate all reports of violations of duty by election officials, or by officers of the County Committee, the Executive Committee or any committee of either of them.

(4)     The Committee on Finance shall have the duty to procure the necessary funds to defray the expenses of the County Committee. The Committee shall keep an accurate account of all monies received by it and pay the same to the Treasurer of the County Committee.

(5)     The Committee on Organization shall have the duty to assist the proper officers of the County Committee and Executive Committee to prepare and file as authorized and required by law, original, supplemental and additional lists of Democratic electors duly qualified to serve as election officials. The Committee shall perform such other duties as may be referred to it from time to time.

(6)     The Committee on Campaigns and Elections shall have the duty to plan and recommend all activities of the Executive Committee in all general elections, including the preparation and distribution of campaign material and literature. The Committee shall perform such other duties pertaining to elections as may be referred to it from time to time.

(7)     The Committee on Public Affairs and Legislation shall have the duty to

Page 10

consider and report to the Executive Committee on National, State and Municipal affairs affecting the political, social and economic interests of the community. When directed by the Executive Committee, the Committee shall sponsor and promote legislation regarding such matters. The Committee shall confer with duly elected Democratic members of the City, State and Federal legislatures for the purpose of determining policy and exchanging views on problems of current interest and need. The Committee shall seek to arrange not less than two such conferences annually with each group of legislators.

(8)    The Committee on Community Services shall have the duty to study and, when appropriate, to recommend action on such matters as: rent control, housing, education, human relations, senior citizens, law enforcement and such other matters as the Executive Committee shall from time to time direct. The Committee shall develop, carry out and coordinate programs and facilities to enable the Democratic Party to better serve the people of Kings County. The Chairperson, Vice—Chairperson, or any other member of the Committee, when designated by the Chairperson of the Executive Committee, shall attend public hearings held by City, State and Federal agencies concerning matters within the purview of the Committee.

(9)    The Committee on Inter-Group Relations shall have the duty to study and recommend programs for the advancement of social and political integration. All communications and recommendations from groups and individuals for the implementation of such programs shall be referred to it. The Committee shall also consider and report to the Executive Committee on matters affecting the relations of groups within the community with suggestions as to how more harmonious relations may be fostered.

(10)    The Committee on Legislative Reapportionment shall have the duty to study and compile information regarding the apportionment of Legislative Districts on the National, State and Local levels and shall make such findings and recommendations as are necessary to assure the proper and legal representation of all citizens.

(11)    The Committee on Labor and Industry shall have the duty to study and recommend programs to advance the economic growth of Kings County. It shall also consider the problems of employment, workmen's compensation, minimum wages, working conditions and other related matters. The committee shall confer with representatives of industry and organized labor and shall recommend to the Executive Committee programs concerning the economic future of the County of Kings. This committee is authorized to conduct such hearings as are necessary to properly study and make findings concerning the matters within its jurisdiction.

(12)    The Committee on Public Education shall have the duty to study and

recommend such activity as is necessary to promote the educational programs in the County of Kings. The committee shall consider all levels of education including higher education. It shall have the power to make recommendations concerning the capital construction program for educational facilities on a City and State level and all matters of State and Federal aid to education including the related formulas upon which such aid is based.

(13)   The Committee on Public Meetings shall have the duty to prepare a list of persons who will be available to speak at district and other meetings. The Committee shall also ascertain the names of all civic educational and philanthropic organizations within the County of Kings and communicate with each such organization to offer without charge speakers to attend meetings of said organizations.

(14)   The Committee on Public Relations shall have the duty to publicize the activities of the Democratic Party, its officers and committees in such manner as shall be directed by the County Committee or the Executive Committee.

(15)   The Advisory Committee shall have the duty to consider matters of current political, economic and social interest affecting the County of Kings) and to recommend to the Executive Committee programs implementing the policy of the Executive Committee and of the standing committees thereof, in regard to matters within its jurisdiction. It shall meet periodically. The Chairperson of the Executive Committee, or in his absence, the Vice — Chairperson, shall preside at all meetings of the Advisory Committee.

## ARTICLE VII
### The Assembly District Committees

§1.   There is hereby established in each Assembly District an Assembly District Committee which shall be a standing committee of the County Committee.

§2.   Each Assembly District Committee shall have the general care and supervision of the affairs of the Democratic Party within such district, under the direction and cooperation with the County Committee, and shall have the charge of the campaign within its district. Each Assembly District Committee shall at all times maintain a headquarters.

§3.   Each Assembly District Committee shall meet and organize prior to or within 30 days after the organization meeting of the County Committee. It shall meet. at such time and place as shall be designated jointly by the members of 'the State Committee from the Assembly District. In the event that no such joint notice of meeting is issued, the meeting shall be called by the Chairperson of the Executive Committee who shall also designate the person to call the

meeting to order and preside thereat until the election of a Chairperson.

§4. (A)        Regular meetings of the Assembly District Committee shall be held, as the business of the Committee may require, at a time and place designated by the Chairperson. There shall be, however, not less than two regular meetings of the Committee each year, including the organization meeting.

(B)    Notice of the time and place of all regular meetings of the Assembly District Committee must be sent by mail or telegram to each member at least five days before such meetings, and similar notice of all adjournments of such meetings must be sent at least two days prior to such adjourned meetings.

§5.    Special meetings of the Assembly District Committee may be called by the Chairperson thereof to be held at such time and place as he may designate. A special meeting must be called by the Chairperson within ten days after receipt by him/her of a petition signed by one-fourth of the whole number of the members of the County Committee to which the Assembly District is entitled. Special meetings shall be held not less than five nor more than ten days after such call. Notice of such meetings and adjournments thereof shall be given in the same manner as provided for regular meetings. The call for a special meeting used by the Chairperson on his/her own motion shall specify the items set forth in such petition. In either event, no other matter shall be considered at a special meeting. If the Chairperson is absent or he refuses to call a special meeting, such meeting shall be called jointly by the members of the Executive Committee from the Assembly District. In the event that no such joint notice of meeting is issued, the meeting shall be called by the Chairperson of the Executive Committee who shall also designate the person to call the meeting to order and preside thereat until the election of a Chairperson.

§6.    A quorum at all meetings of the Assembly District Committee for the purpose of transacting any business shall consist of one-third of the membership of said Committee present in person or by proxy. All action by the Assembly District Committee shall require the affirmative vote of a majority of votes cast. In the event a quorum is not present at any meeting, no action other than to adjourn said meeting may be taken.

§7.    Each Assembly District Committee shall have the power to establish rules for its conduct and activities subject to the Rules of the County Committee. Provided, however, that notwithstanding any provision in the Rules of the County Committee, each Assembly District Committee shall have the power to abolish, limit or otherwise restrict the use of proxies at meetings of the Assembly District Committee by rule duly passed to that effect.

§8.    Each Assembly district Committee shall elect a Chairperson, Vice-Chairperson,

Secretary, Treasurer and such other officers as the rules of such Committee provide. These officers shall perform the duties usually belonging to said officers and such other duties as may be assigned to them by the Assembly District Committee.

§9.(A) Each Assembly District Committee shall have the following standing committees:

     (1)     Committee on Rules and Resolutions
     (2)     Committee on Public Affairs and Legislation
     (3)     Committee on Community Services
     (4)     Committee on Inter-Group Relations
     (5)     Committee on Public Meetings
     (6)     Committee on Public Relations

(B)    The powers and duties of these standing committees shall be similar to those of the like standing committees of the Executive Committee as prescribed in Article VI of these Rules, except that the Chairpersons of these standing committees shall not be members of the Advisory Committee.

(C)    All standing committees shall render regular reports to the Assembly District Committee at each regular meeting of the said committee. Said reports shall contain information regarding the activities of the committee and their recommendations for action regarding the subject matter under the jurisdiction of said committees.

§10.    Each Assembly District Committee shall have the power to appoint other standing committees as it may deem proper in the discharge of its duties, and may fix the quorum for all standing committees.

§11.    The Chairperson of the Executive Committee of the County Committee may, at any time after the organization meeting of the County Committee, appoint special committees of three members of the Executive Committee to organize an Assembly District Committee in any Assembly District which has failed to organize.

## ARTICLE VIII
### Primaries, Conventions, Special Nominations and Organization
### of New Assembly Districts

§1.    An official primary election shall be held in each year on such date and between such hours as shall be provided in the Election Law. At such primary, candidates for public office shall be nominated.

§2.     In each even numbered year, members of party committees to be elected by the direct vote of the duly enrolled Democratic voters shall be elected at the primary elections.

§3.     In years when a President and Vice-President of the United States are to be elected, a primary election shall be held on such date and between such hours as shall be provided in the Election Law. At such primary, there shall be elected delegates and alternate delegates from Kings County to the National Democratic Convention to nominate candidates for President and Vice-President of the United States, as the Rules of the Democratic Party may prescribe.

§4.     Unofficial primary elections may be called from time to time by the County Committee.

§5.     Vacancies in nominations for public office and nominations to fill vacancies in public office occurring too late to be filled .by primary election or by convention, and all other nominations which may under the Election Law be filled by such committee as the Rules of the Party provide, shall be filled in accordance with the following rules:

(a)     In the event that the vacancy occurs as to a public office to be voted for by the electors of the entire county, it shall be filled by the members of the Executive Committee at a regular meeting or at a special meeting to be called for said purpose.

(b)     In the event that the vacancy occurs in a political subdivision wholly in the County of Kings, it shall be filled by the members of the County Committee in said political subdivision at a regular meeting or at a special meeting to be called for said purpose.

(c)     Vacancies occurring in nominations where candidates are to be voted for by the electors from more than one county, shall be filled in the manner prescribed by the State Committee.

(d)     A special meeting of members of the County Committee from any political subdivision for the purpose of filling vacancies in accordance with this Section, shall be called by the Chairperson of the Executive Committee. Notice of the time and place of such special meeting shall be sent by mail or telegram to each member of the County Committee not less than two days before such meeting notwithstanding any other provision of these Rules. A special meeting of the Assembly District Committee to fill a vacancy as to a public office to be voted for by the electors of the Assembly District, shall be called by the Chairman of the Assembly District Committee giving the same notice.

## ARTICLE IX

Page 15

Discipline

§1.    An application for the removal of a member of a party committee for disloyalty to the Democratic Party, corruption in office, or enrollment in another party, must be accompanied by written charges, duly verified by the complainant, stating his place of residence and specifying in detail the acts of which it is claimed the person charged is guilty. Such charges and specifications shall be presented to the County Committee and shall be at once referred, without debate, to a special committee of five members of the County Committee appointed by the Chairperson. Such committee shall give not less than five days notice by mail or telegram of the time and place for the hearing, and shall cause a copy of the charges and specifications to be served upon the accused. The complainant shall receive like notices. Such notices shall be sent to the accused at his place of residence as stated in the official roll or in the books of the County Committee, and to the complainant at the address given in his complaint. Each party shall be required to produce his witnesses and any documentary evidence that he may have before such committee. The committee shall proceed with the hearing with all convenient speed and report its findings to the County Committee for its action.

§2.    Any officer of the County Committee and Assembly District Committee may be removed upon the vote of two-thirds of the members of such committee authorized to vote at a special meeting to be called for such purpose. Any officer of the Executive Committee may be removed upon the vote of two-thirds of the members of the Executive Committee, at a special meeting to be called for such purpose. No less than ten days prior to any meeting at which such action is to be taken, notice in writing shall be sent by mail to every member of the committee at which such action is to be considered. Said notice shall contain the purpose for which the special meeting is called.

§3.    An application made by a voter to have the name of a person stricken from the enrollment books, pursuant to the Election Law, as not being in sympathy with the principles of the Democratic Party, must be supported by oral proof or by affidavit respecting the acts charged, and must be presented to the Chairperson of the County Committee at least thirty days before a primary election, but the Chairperson may in his or her discretion entertain an application presented within a lesser period before a primary election. The procedure prescribed by the Election Law, which regulates this matter, must, however, be complied with.

§4.    In any proceedings or hearings provided for in Sections 1 and 3 of this Article, the accused member or voter shall at all times be entitled to representation by counsel. Any person removed in accordance herewith shall be precluded from holding a party or committee office or position and shall not be eligible for nomination in party primaries for a period not to exceed five (5) years from the date of removal.

## ARTICLE X
Amendments

§1. These Rules may be amended from time to time by a majority of the members of the County Committee or when the County Committee is not in session, by a majority of the members of the Executive Committee present at a meeting at which there is a quorum, provided a copy of the proposed amendments shall be sent with the notice of the meeting at which such amendments are to be proposed, such notice to be not less than five days before such meeting, and to be mailed to the post office address of each member of the Committee.

## RULES OF ORDER

### Rule I

The following shall be the order of business at meetings of all party committees except at the organization meeting thereof.

1. Calling of the Roll
2. Reading the Minutes of the Last Meeting
3. Reports of Standing Committees
4. Reports of Special Committees
5. Reports of Treasurer and Secretary
6. Miscellaneous and Unfinished Business
7. New Business
8. Adjournment

### Rule II

When the minutes of the preceding meeting shall have been read, errors therein, if any, may be corrected.

### Rule III

The presiding officer shall preserve order and decorum and decide all questions of order, subject to an appeal to the committee.

### Rule IV

All motions and addresses shall be made to the presiding officer, the member rising in

Page 17

his seat.

### Rule V

No motion shall be debated or moved until seconded, but all motions shall be considered as seconded until the mover thereof yields the floor.

### Rule VI

When the motion is seconded, it shall be stated by the presiding officer, before debate, and every motion shall be reduced to writing on the request of the presiding officer or of any member.

### Rule VII

On any question taken, the ayes and noes shall be entered, if required by a majority of the members present at a meeting, a quorum being present.

### Rule VIII

While a member is speaking he shall not be interrupted, except to be called to order, when he shall sit down until the point of order is decided.

# Code of Ethics

I.          Statement of Principles.

II.         Definitions.

III.        County Committee Ethics Commission.

IV.        Conflict of Interest.

V.          Dual Office-Holding.

VI.        Financial Disclosure.

VII.       Certificate of Party Leaders.

VIII.      Penalties.

IX.        Revision and Amendment.

X.          Effective Date.

I.    <u>Statement of Principles</u>.

Public trust in party leadership is essential if the Democratic Party in New York City and Kings County is to achieve continued success and deserve it. Rules of ethical guidance for the conduct of party leaders can help earn that public trust.

It is essential that party leadership not be used for private gain. It is also essential that the Democratic Party attract those citizens best qualified to serve, and not impede unreasonably or unnecessarily their recruitment and retention or unfairly deny to them the economic rights and opportunities available to all other citizens.

It is the intent of this Code of Ethics to implement these objectives of promoting both the integrity of the Democratic Party arid the recruitment and retention of qualified party leadership by prescribing restrictions against abuses of political position for private financial gain without creating unnecessary barriers to party service.

II.   <u>Definitions</u>.

"Code of Ethics" - The Democratic Party Model Code of Ethics, as set forth herein and as may be amended from time to time.

"County Committee" - The Kings County Democratic County Committee

"Committee Ethics Commission" - The Kings County Democratic County Committee Ethics Commission, as created pursuant to this Code of Ethics.

"Compensation" - Any money, thing of value or financial benefit conferred in return for services rendered or to be rendered. With regard to matters undertaken by a firm, corporation or association, Compensation shall mean net revenues, as defined in accordance with generally accepted accounting principles as applied by the State Ethics Commission.

"Legislative Body" -The New York State Assembly or Senate, any county or municipal legislative body or any board of estimate.

"Licensing" - Any State Agency, New York City Agency or Other Local Agency activity, other than before the Division of Corporations and State Records in the Department of State, respecting the grant, denial, renewal, revocation, enforcement, suspension, annulment, withdrawal, recall, cancellation or amendment of a license, permit or other form of permission conferring the right or privilege to engage in Ci) a profession, trade, or occupation or (ii) any business or activity regulated by a Regulatory Agency (or, with respect to any New York City Agency activity, a regulatory agency of a New York City Agency), which in the absence of such license, permit or other form of permission would be prohibited.

"Ministerial Matter" -An administrative act carried out in a prescribed manner not allowing for substantial personal discretion.

"New York City Agency" -A city, county, borough or other office, position, administration, department, division, bureau, board, commission, authority, corporation or other agency of government, the expenses of which are paid in whole or in part from the New York City treasury, and shall include the Board of Education, the Board of Higher Education, school boards, city and community colleges, community boards, the New York City Transit Authority, the New York City Housing Authority and the Triborough Bridge and Tunnel Authority, but shall not include any court or corporation or institution maintaining or operating a public library, museum, botanical garden, arboretum, tomb, memorial building, aquarium, zoological garden or similar facility.

"Other Local Agency" - Any county, city, town, village, school district or district

Page 20

corporation, or any agency, department, division, board, commission or bureau thereof; and any public benefit corporation or public authority not included in the definition of State Agency; but not including any New York City Agency or any entity expressly excluded from the definition of New York City Agency.

"Party Leader" - (a) Each chair or acting chair of the County Committee;

(b) each person (usually designated by the rules of a county committee as the "county leader" or "chairman of the executive committee") by whatever title designated, who pursuant to the rules of the County Committee or in actual practice, possesses or performs any or all of the following duties or roles:

(i) the principal political, executive and administrative officer of the County Committee;

(ii) the power of general management over the affairs of the County Committee;

(iii) the power to exercise the powers of the Chair of the County Committee as provided for in the rules of the County Committee;

(iv) the power to preside at all meetings of the Executive Committee of the County Committee, if such Executive Committee is created by the rules of the County Committee or exists de facto, or any other committee or subcommittee of the county vested by such rules with or having de facto the power of general management over the affairs of the County Committee at times when the County Committee is not in actual session;

(v) the power to call a meeting of the County Committee or of any committee or subcommittee vested with the rights, powers, duties or privileges of the County Committee pursuant to the rules of the County Committee, for the purpose of filling an office at a special election in accordance with §6-114 of the Election Law, for the purpose of filling a vacancy in accordance with §6-116 of such law; or

(vi) the power to direct the treasurer of the County Committee to expend funds of the County Committee;

(c) each leader or co-leader of each assembly district within Kings County;

(d) each officer serving the County Committee in a full-time capacity; and

(e) each managerial employee and professional employee performing duties of a

policy-making nature and serving the County Committee in a full-time capacity.

"Regulatory Agency" - The Banking Department, Insurance Department, State Liquor Authority, Department of Agriculture and Markets, Department of Education, Department of Environmental Conservation, Department of Health, Division of Housing and Community Renewal, Department of State (other than the Division of Corporations and State Records), Department of Public Service, the Industrial Board of Appeals in the Department of Labor and the Department of Law.

"Representative Capacity" - The presentation of the interests of a client or other person pursuant to an agreement, express or implied, for Compensation for services.

"State Agency" - Any state department, or division, board, commission, or bureau of any state department, any public benefit corporation, public authority or commission at least one of whose members is appointed by the Governor, or the State University of New York or the City University of New York, including all their constituent units except community colleges and the independent institutions operating statutory or contract colleges on behalf of the State.

"State Ethics Commission"—The State Ethics Commission established pursuant to §94 of the Executive Law.

III.   <u>County Committee Ethics Commission</u>.

§1.   a.   The Committee Ethics Commission shall consist of five enrolled Democrats residing within Kings County, serving terms of four years each (except that the first terms of two of the initial members shall be six years each) with no more than three terms expiring during the same year. No Party Leader of the County Committee, no more than one member of Executive Committee of the County Committee and no more than one officer of the County Committee shall serve as a member of the Committee Ethics Commission. Committee Ethics Commission members shall be nominated by the Chair of the County Committee and appointed with the approval of the County Committee or its Executive Committee. The Chair of the County Committee shall designate a Commission chair from among the Committee Ethics Commission members and act promptly to nominate persons to fill vacancies on the Committee Ethics Commission as they arise. The members of the Committee Ethics Commission may be removed by the Chair of the County Committee for substantial neglect of duty, gross misconduct in office, inability to discharge the powers or duties of office or violation of this Code of Ethics, after written notice and opportunity for a reply. The Committee Ethics Commission may appoint a counsel to serve at its discretion and may employ other employees or consultants within the budget set by the County Committee.

b.      The Committee Ethics Commission shall be bound by this Code of Ethics in the administration of hearings and the rendering of decisions and shall maintain for public inspection all disclosures filed under Article IV of this Code. The Committee Ethics Commission may establish rules for the Commission governing standing, jurisdiction and the right of appeal.

§2. Complaints.

a.      Any enrolled Democrat (the "Complainant") may submit to the Committee Ethics Commission (privately and without any public release or announcement with respect thereto) a written complaint (a "Complaint") alleging a specific violation of the Code of Ethics by a Party Leader (the "Respondent").

b.      The Committee Ethics Commission may independently initiate a Complaint alleging a specific violation of the Code of Ethics by a Party Leader (the "Respondent")

§3. Hearings.

a.      Upon receipt or initiation of a Complaint, the Committee Ethics Commission shall promptly give the Respondent a copy thereof.

b.      Within 15 days of receipt of the copy of such Complaint, the Respondent may submit a written response to the Committee Ethics Commission. Promptly thereafter (and in no case later than 30 days after the conclusion of such 15-day period), the Committee Ethics Commission may, in its discretion, dismiss the Complaint, issue a reprimand or admonition to the Respondent or schedule a hearing on the merits of the Complaint, except that if the Respondent, in his or her response, requests that a hearing be held, then the Committee Ethics Commission shall schedule such a hearing. The Committee Ethics Commission shall dismiss and take action to discourage unfounded or frivolous Complaints.

c.      If a hearing is to be held, then,- at least 15 days prior to the date scheduled by the Committee Ethics Commission, the Complainant, if any, and Respondent shall each be notified of the time, date and place of such hearing.

d.      Hearings shall be private, unless the Respondent requests otherwise, but all reprimands, admonitions, penalties and other determinations adverse to the Respondent shall be made public by the Committee Ethics Commission.

e.      In conducting a hearing, the Committee Ethics Commission may request

written or oral testimony. The Respondent may present written or oral testimony on his or her behalf and will be entitled to have counsel present at such hearing.

        f.     A quorum of at least four members of the Committee Ethics Commission shall be present at any hearing.

        g.     A majority vote of all the members of the Committee Ethics Commission shall be required to make any determination with respect to a Respondent, including determinations made as a result of a hearing.

        h.     If the Committee Ethics Commission has made an adverse determination with respect to a Respondent, and the vote for such determination was not unanimous, the Respondent may, within 30 days of such determination, appeal such determination to the County Committee or, at the Respondent's election, to its Executive Committee.

§4. Advisory Opinions.

        a.     The Committee Ethics Commission may, in its discretion, issue public or private advisory opinions with respect to questions of ethical conduct, conflicts of interest and other matters arising under this Code of Ethics. Records of all public advisory opinions shall be kept by the Committee Ethics Commission for consultation, as appropriate, by enrolled Democrats.

        b.     Any Party Leader may request in writing a public or private advisory opinion regarding conduct relating to his or her public or party responsibilities. Private advisory opinions shall be treated as confidential by the Committee Ethics Commission.

IV.   <u>Conflict of Interest.</u>

§1. No Party Leader, no firm or association in which such Party Leader is a member and no corporation, ten per centum or more of the stock of which is owned or controlled directly or indirectly by such Party Leader, during the Party Leader's tenure in office shall:

        a.     receive, directly or indirectly, or enter into any agreement express or implied for, any Compensation, in whatever form, for the appearance or rendition of services (whether by such Party Leader, firm, association, corporation or another) (x) in relation to any bill, resolution or other matter before any Legislative Body or (y) in relation to any case, proceeding, application or other matter before any State Agency, New York City Agency or Other Local Agency where such appearance or rendition of services before such State Agency, New York City Agency or Other Local Agency is in connection with:

Page 24

(i) the purchase, sale, rental or lease of real property, goods or services, or a contract therefor, from, to or with any such Agency;

(ii) any proceeding relating to rate-making;

(iii) the adoption or repeal of any rule or regulation having the force and effect of law;

(iv) the obtaining of grants of money or loans;

(v) Licensing; or

(vi) any proceeding relating to a franchise provided for in the Public Service Law;

provided, however, that with regard to this Subsection IV.l.a.:

(A)     nothing shall prohibit (x) a leader or co-leader of any assembly district (or any firm or association in which such person is a member or a corporation in which such person is a shareholder) from appearing or rendering services in relation to any matter before a State Agency; or (y) a leader or co-leader of any assembly district (or any firm or association in which such person is a member or a corporation in which such person is a shareholder) from appearing or rendering services in relation to any matter before a Legislative Body or a New York City Agency or Other Local Agency; or (z) any other Party Leader (or any firm or association in which such person is a member or a corporation in which such person is a shareholder) from appearing or rendering services in relation to any matter before (i) a Legislative Body whose jurisdiction is co-extensive with that of the State, a county other than Kings County or any other political subdivision outside New York City or (ii) an Other Local Agency if, in the case of either (y) or (z):

(1)     the identity of the source of such Compensation, the identity of such Party Leader (including his or her party position) and the fact of such representation are promptly disclosed in writing to the Committee Ethics Commission; and

(2)     the Compensation received for such appearance or rendition is not contingent upon the success of any enterprise or the success of any case, proceeding, application or other matter pending before such Agency or bill, resolution or other matter before such Legislative Body; for purposes of this paragraph (2), such Compensation includes an equity interest in a venture dependent for its success upon government action, including the approval of such case, proceeding, application, bill, resolution or other matter, or a venture in any other way contingent upon the success of such appearance or rendition of services; and

Page 25

(3)     any such case, proceeding, application or other matter involving the sale or lease by or to such Agency of any goods, services or real property is subject to reasonable public notice and competitive bidding or other selection process unrelated to the use of undue or improper influence;

(B)     nothing shall prohibit such Party Leader, firm, association or corporation from appearing before a State Agency, New York City Agency or Other Local Agency in a Representative Capacity if such appearance in a Representative Capacity is in connection with a Ministerial Matter;

(C) nothing shall prohibit such Party Leader from Participating in or advocating any matter in an official capacity; and

(D) a Party Leader who is a member, associate, retired member, of counsel to, or shareholder of any firm, association or corporation shall not be deemed to have made an appearance or to have rendered services solely by the submission to a State Agency, New York City Agency, Other Local Agency or Legislative Body of any printed material or document bearing his or her name, but unsigned by him or her, such as by limited illustrations the name of the firm, association or corporation on the letterhead of any stationery, which pro forma serves only as an indication that he or she is a member, associate, retired member, of counsel to or shareholder;

b.     (x) sell any goods or services having a value in excess of $25 to any State Agency, New York City Agency or Other Local Agency or (y) contract for or provide such services with or to any private entity where the power to contract, appoint or retain on behalf of such private entity is exercised, directly or indirectly, by a State Agency, New York City Agency or Other Local Agency or officer thereof, unless such goods or services are provided pursuant to an award or contract let after public notice and competitive bidding; provided, however, that (i) with respect to sales to Other Local Agencies by such Party Leader, firm, association or corporation and (ii) with respect to sales to State Agencies or New York City Agencies by leaders or co-leaders of assembly districts (or any firm or association in which such person is a member or a corporation of which such person is a shareholder), such goods or services may be provided pursuant to another selection process unrelated to the use of undue or improper influence; and provided further, however, that this Subsection IV.l.b. shall not apply to the publication of resolutions, advertisements or other legal propositions or notices in newspapers designated pursuant to law for such purpose and for which the rates are fixed pursuant to law; or

c.     accept, directly or indirectly, for such Party Leader's personal gain, anything of value, whether in the form of a service, loan, gift, promise, or contribution to his

or her campaign for party office in excess of $100, from any person, firm, association, corporation or other entity which to his or her knowledge has a financial interest in the outcome of any pending County Committee decision, contract, policy or appointment; provided, however, that nothing contained in this § IV.l. shall be construed or applied to prohibit any such firm, association or corporation from appearing, practicing, communicating or otherwise rendering services in relation to any matter before, or transacting business with any State Agency, New York City Agency or Other Local Agency or Legislative Body, where such Party Leader does not share in the net revenues (as defined in accordance with generally accepted accounting principles as applied by the State Ethics Commission) resulting therefrom, or, acting in good faith, reasonably believed that he or she would not share in the net revenues as so defined.

§2. Notwithstanding and in addition to the foregoing provisions of § IV.l.,

a. no Party Leader who is a member, associate, retired member, of counsel to or shareholder of any firm, association or corporation which is appearing or rendering services in connection with any case, proceeding, application or other matter listed in Subsection IV.l.a. shall orally communicate, with or without Compensation, as to the merits of such cause with an officer or an employee of the Agency concerned with the matter; and

b. no Party Leader shall use or attempt to use his or her party position as a means of undue or improper influence to secure from any State Agency, New York City Agency or Other Local Agency for him or herself or others with whom he or she has a family, employment or business or financial relationship any benefits, privileges or exemptions not generally available to members of the public.

V.   <u>Dual OfficeHolding</u>.

No Party Leader, during his or her tenure in such office, shall simultaneously:

a.   hold any appointive office of a policy-making nature in the executive branch of either the federal or state government; or

b.   hold or seek any state—wide elective public office; or

c.   hold or seek any city-wide elective public office in New York City or the Presidency of the Borough of Brooklyn; or

d.   serve as a judge of any court of record, attorney general or deputy or assistant attorney general or solicitor general, district attorney or assistant district attorney.

Page 27

VI.   <u>Financial Disclosure</u>.

To the extent covered thereby, each Party Leader shall comply with the applicable provisions regarding financial disclosure contained in § 73-a of the Public Officers Law, § 812 of the General Municipal Law or such other law, ordinance or resolution requiring financial disclosure by such Party Leader.

VII.   <u>Certification of Party Leaders</u>.

Promptly after a Party Leader's election or appointment to Party office, the Committee Ethics Commission shall provide such Party Leader with a copy of this Code of Ethics together with such other material as the Committee Ethics Commission may prepare related thereto. Within 10 :days of receipt of the Code of Ethics, a Party Leader shall file with the Committee Ethics Commission a certificate (in the form attached hereto as Annex A) acknowledging receipt of the Code of Ethics and any other materials prepared by the Committee Ethics Commission related thereto, and that he or she has read the same and undertakes to conform to the provisions, purposes and intent thereof and to the norms of conduct for leaders of the Democratic Party.

VIII.   Penalties.

§1.   The Committee Ethics Commission, within two weeks of its being notified or otherwise learning of the issuance, filing or serving of a complaint, information, indictment or other instrument charging a Party Leader with any criminal offense, shall, after notice to the Party Leader, hold a hearing as to whether such offense is of the type that, upon conviction thereof and pursuant to § 2 of this Article VIII, the party office of such Party Leader shall automatically become vacant, and, upon a determination that such crime or offense is of such type, such Party Leader shall automatically and immediately be suspended from party office pending final adjudication of his or her case.

§2.   The party office of any Party Leader convicted in any state or federal court of a criminal offense that constitutes (or, had such offense occurred in New York, would have constituted) a felony under the laws of the State of New York shall automatically become vacant immediately upon such conviction.

§3.   Pursuant to the procedures set forth in Article III above, a Party Leader may, in the Committee Ethics Commission 's discretion, be reprimanded, admonished or suspended

or removed from party office by a determination by the Committee Ethics Commission of a violation by such Party Leader of the Code of Ethics.

§4.    A Party Leader who, pursuant to this Article VIII, is removed from office for a violation of the Code of Ethics, or for conviction of a crime included in § 2 of this Article VIII, may not hold party office for five years from the date of removal, or, if later and if such Party Leader was convicted of such a crime and sentenced to imprisonment, from the date of expiration of his or her maximum sentence of imprisonment or discharge from parole.

IX.    <u>Revision and Amendment</u>.

The Committee Ethics Commission shall review the provisions of the Code of Ethics from time to time and recommend to the County Committee such changes or additions as it may consider appropriate or desirable.

X.    <u>Effective Date</u>.

The provisions of this Code of Ethics shall apply to a Party Leader effective January 1, 1989; provided, however, that (1) the provisions of Subsection IV.l.a. shall not apply to the appearance or rendition of services before a State Agency, New York Agency, Other Local Agency or Legislative Body where the Party Leader, firm, association or corporation subject to such provisions was substantially and actively involved in the case, proceeding, application or other matter, or transaction of business as of January 1, 1988 and substitution of new counsel would impose substantial hardship on the client and (2) nothing contained in Subsection V.c. shall be applied to prohibit a Party Leader from simultaneously holding any of the public offices specified therein if such Party Leader holds such party office and public office as of the date on which this Code of Ethics is adopted and continues to hold each such office for consecutive successive terms thereafter.

Page 29

*ANNEX A*

**DEMOCRATIC PARTY OF THE STATE OF NEW YORK**

**Certificate of Party Leader**

COUNTY OF _____

STATE OF NEW YORK

I, _____, having been duly sworn, hereby certify that I am currently an enrolled member of the Democratic Party; that I am qualified under the Constitution and laws of the State of New York and the Rules of the New York State Democratic Party to hold the party office to which I have been elected; that I acknowledge receipt of a copy of the Code of Ethics of the Kings County Democratic County Committee the Democratic Party of the State of New York; that I have read the same and undertake to conform to the provisions, purposes and intent thereof and to the norms of conduct for leaders of the Democratic Party.

_____

Sworn to and subscribed to
before me this          day of
_____ 20__      at _____
County, New York.


_____
        Signature of Notary Public

Page 30

# EXHIBIT 7

## Kings County Democratic County Committee
### Report on Judicial Selection Procedures
#### As Amended on December 14, 2011

1. A newly-constituted screening panel shall be established, effective October 1, 2003. The panel shall review and interview all legally qualified candidates for Judicial Office who request such a review. They shall judge each candidate as either "Qualified" or "Not Qualified at this time". The panel may, in its discretion, publish explanatory language in any determination finding a candidate "Not Qualified at this time." Prior to the publication of any list of Committee findings, candidates shall be permitted to withdraw their candidacies, unequivocally and with prejudice. Of the Qualified Candidates the Panel shall report out a limited pool of recommended candidates based on the total number of vacancies for that Judicial office (i.e., civil, supreme). The total pool shall be 5 individuals per vacancy for each type of judicial office. For the purposes of determining the size of the Pool, incumbent's seats shall be included.

   a]   The panel may waive the submission of an application and the formal interview of any candidate who has been screened and adjudged "Qualified" in each of two (2) successive years for a period not to exceed three years, provided however, that such candidate submits a form affidavit (as prepared by the panel) to the effect that no material change to their background, qualification or fitness has occurred. Upon the grant of such waiver to any such candidate, the panel shall report such candidate as "Qualified" in the same manner as those candidates who have been subject to screening in the current year.

   b]   The panel is authorized to impose absolute deadlines for the submission of applications, affidavits and required documentation by putative candidates. The panel may reject, as untimely, any documentary submission received after a published deadline.

2. The panel's determination for each and every person interviewed shall be shared with all members of the Executive Committee prior to an endorsement vote. In the case of candidates for the Civil Court, this should be at least four weeks prior to the first day to circulate petitions or as soon as practical. In the case of Supreme or Surrogates Court, these findings should be published sixty (60) days before the first day to convene the Judicial Convention or as soon as practical and made available to all Delegates and Alternate Delegates attending the Judicial Convention and to all members of the Executive Committee.

3. In addition to any existing and/or additional requirements of the panel, any person who wishes to be interviewed must disclose any and all action taken against them by any bar disciplinary committee, including private admonitions. In addition, any such person who is or has been a sitting judge must disclose any and all action taken against them by the Commission on Judicial Conduct, including private admonitions. Additionally, all open and pending inquiries must be disclosed as well. Any candidate who asserts that no such action has ever been taken against them must affirm so in writing.

4. The Executive Committee may not endorse any candidate for Judicial Office that is not recommended by the Screening Panel. The Executive Committee may not endorse for nomination by the Judicial Convention any candidate for Supreme Court that is not found to be "Recommended" by the Screening Panel. Incumbent Judges seeking re-election to the same office shall be deemed Recommended unless seventy-five percent (75%) of the quorum determines that the Judge should not be reported out as Recommended. For the purposes of these rules Judges appointed to fill interim vacancies shall not be

deemed Incumbent Judges.

5. No member of the Screening Panel may be a candidate nor may they be related to any candidate. "Related" shall be defined to include relation by marriage, and shall be limited to relationships that are "first cousin" or closer.  Refusal is not sufficient protection.  Anyone who is related to any candidate in a given year may not serve at all on the Panel.

6. The Panel shall consist of the following:

a] Two members selected by the Brooklyn Bar Association;

B] One member selected by the Brooklyn Women's Bar Association;

c] One member selected by the Kings County Criminal Bar Association;

D] One member selected by the Association of the Bar of the City of New York;

e] One member selected by the Columbian Lawyer's Association of Brooklyn;

F] One member selected, annually on a rotating basis by one of the following four (4): Legal Aid Society of New York City; Brooklyn Legal Services, Corporation A; and South Brooklyn Legal Services; Bushwick Housing and Legal Services.

g] One member selected by the Chairman of the Board of Trustees of the Brooklyn Law School;

X] One member selected by the Metropolitan Black Bar Association;

I] One member selected by the Puerto Rican Bar Association;

J] Each year, on a rotating basis, three of these groups shall be invited to participate and shall select their own member of the Panel, provided such member meets the other criteria specified in this rule for membership: Lesbian & Gay Law Association of Greater New York (LeGaL), Lawyers Torah Club, Catholic Lawyers Guild of Kings County, Association of Black Women Attorneys, Brehon Law Society, Dominican Bar Association, Hispanic National Bar Association, Jewish Lawyers Guild, Judicial Friends, Metropolitan Women's Bar Association, New York State Women's Bar Association, Protestant Lawyers Association, and Asian American Bar Association of the City of New York, United Jewish Organizations of Williamsburg, Inc.., New York State Court Officers Association, Kings Bay YM-YWHA, Kings County Conferenceof the Knights of Columbus and the Federation of Italian-American Organizations of Brooklyn, Ltd.;

K] Each year, on a rotating basis, one of these groups shall be invited to participate and shall select their own member of the Panel, provided such member meets the other criteria specified in this rule for membership: Brooklyn-Manhattan Trial Lawyers Association, Association of Trial Lawyers of the City of New York, New York Criminal Bar Association, New York State Association of Criminal Defense Lawyers, and the New York State Bar Association;

l] [Two] Three members selected by the Chairperson of the Executive Committee of the Kings County Democratic Party, one of whom shall serve as the Chairperson of the Panel.

m]     One member selected by the New York State Trial Lawyers Association.

n]     Four Attorneys and three Community Organization members selected by the Chairperson of the Executive Committee of the Kings County Democratic Party from a list nominated by a majority of the Executive Committee members from each of seven groups of Assembly Districts referenced in Provision 8 below.  In selecting from such list, the Chairperson may not select nominees from a particular group in consecutive years.  Members in this category may not hold any public office or party position or seek such office or position during their tenure on the Committee.

7.     Every member of the Screening Panel [who is an attorney] must be an admitted member of the Bar of the State of New York in good standing and all members must maintain a residence or employment/practice in the Second Judicial District and be an enrolled member of the Democratic Party.

8.     The Assembly District Groups shall be as follows:

a] 40, 42, 58

b] 41, 45, 59
c] 46, 47, 48

d] 44, 52, 60

e] 50, 53, 54

f] 49, 51, 55

g] 43, 56, 57

9.     In the event that any of the groups specified in Section 6 ["a" through "m" inclusive] shall decline to participate, then additional groups shall be invited from those listed in Section 6 [j] to compensate therefore, thus endeavoring that the Panel retains a ratio of members that are independent of the political party process as intended by these procedures.

10.    Invitations to groups shall be delivered on or before February 15th of each year.  Responses from each group and nominees from the Assembly District Groups shall be received on or before March 1st of each year.  The fully-constituted Panel shall be designated on or before March 1st of each year and shall meet, if at all possible, within the first two weeks of March of each year.

11.    No candidate or Member of the Executive Committee may communicate with a member of the Screening Committee regarding the candidacy of any individual proposed for screening.

12.    The Executive Committee and the Chairman, thereof, shall exercise due diligence in requiring the composition of the Screening Committee to reflect the racial, ethnic, religious, gender, and sexual preference diversity of the County of Kings.

13. Before undertaking any candidate evaluations, the Screening Committee shall adopt formal written criteria, upon which all such evaluations shall be based.

14. The Screening Committee shall be guided by and adopt Rules of Procedure, not inconsistent with the Blue Ribbon Advisory Panel to the Chairman of the Executive Committee of the Kings County Democratic County Committee with the exception of Recommendation IX.  The Panel shall not treat a pending grievance as an automaticbar to a Recommendation.

15. Should the Screening Committee recommend fewer than five times the number of "Qualified" candidates for the total number of vacancies for the judicial offices to be nominated in any year, then the Committee shall continue to accept additional applications, from new applicants, until such threshold has been met.

16. The Chairman of the Committee shall be a voting member of the Screening Committee, should be chosen by the Chairman of the Executive Committee and serve for a two-year renewable term.  Notwithstanding this, the Chairman shall serve at the pleasure of the Chairman of the Executive Committee and may be dismissed by the Chairman of the Executive Committee at any time.

17. The Screening Panel shall not be discriminatory in its decisions and should consider diversity when making determinations.  The Screening Committee should consider the residence of the Candidate.  The Screening Panel should consider the Community involvement of the candidate and his or her standing in their respective community.

18. The Panel shall make use of subcommittees and pre-interviews.  The Panel shall institute an expeditious process allowing candidates to appeal screening panel decisions.

19. A quorum shall consist of at least two-thirds of the current members in good standing.  A sixty percent (60%) vote of the quorum should be required for all decisions, except for the case of incumbent judges as stated heretofore **and further excepting that any candidate having been found "Qualified" in any year may only be found "Not Qualified at this time" in the following year upon a majority vote of a quorum.** Attendance of panel members shall be mandatory, and a member who fails to attend two (2) consecutive meetings without a satisfactory explanation should be dismissed.

New matter is **underlined in bold**, matter to be deleted is in [brackets].

# EXHIBIT 8

# JUDICIAL SCREENING COMMITTEE FOR THE DEMOCRATIC PARTY IN AND FOR KINGS COUNTY
## Amended January 23, 2012

## Committee Rules

1) Every member of the Screening Panel must be an enrolled member of the Democratic Party.

2) No member of the Screening Panel may be a candidate nor may they be related to any candidate. "Related" shall be defined to include relation by marriage, and shall be limited to relationships that are "first cousin" or closer. Recusal is not sufficient protection. Anyone who is related to any candidate in a given year may not serve at all on the panel.

3) Any member of this Committee or any Court Committee, who has a personal, professional, political or other close relationship with a candidate for judicial or other office, shall recuse himself or herself from participating in the investigation of, deliberation and vote on the qualifications of such candidate. Likewise, a member who knows, or has reason to know, that his or her employer, law firm or law partner (or any political action committee formed by the employer, law firm or law partner) has such relationship, shall recuse himself or herself from these processes. Recusal (or disqualification) shall not preclude the member from offering to the Committee factual information or opinions about the candidate in question, provided that the member first discloses to the Committee the fact of, and reasons for, his or her recusal. The member, however, should not otherwise participate in the investigation of, or be present in the Committee room during the interview of, deliberation or vote on the qualifications of such candidate.

4) The appropriateness of a member's participation may be raised by any other member, either privately with the Chair or to the members of the Committee present at the meeting. Every effort, however, should be made to raise the question first directly with the member whose participation is being questioned. If necessary, the appropriateness of a member's participation may be decided by the Chair or, in the discretion of the Chair, by a majority of the members of the Committee present at the meeting.

5) No member of this Committee or of the investigating subcommittee shall:
   - serve as a member of a committee for the Supreme Court candidate;

1

- make any financial contribution directly or indirectly to the judicial candidate;

- actively participate in any campaign for the judicial candidate; or

- otherwise act on behalf of any judicial candidate for judicial or other office within the jurisdiction of this Committee.

6) Each member of the Committee is required to communicate with his or her employer or law firm to advise the employer or law firm that he or she is a member of the Judiciary Committee, and to request that the employer or law firm advise him or her as to when and if:

- the employer or law firm (or any political action committee formed by the employer or law firm) has made any contribution to , or participated actively in the campaign of a candidate for judicial or other office within the jurisdiction of this Committee; and

- during the year of such notice, the employer or law firm makes any such contribution to or participates actively in the campaign of a candidate for judicial or other office within the jurisdiction of this Committee.

7) No panel member shall receive communication concerning the candidates appearing before the panel except as authorized by designated Panel Consulting procedures set forth in these guidelines. Any panel member approached by anyone who attempts to make such communications shall direct such person to contact the Panel Chair and/or assigned Committee Member, and such person will be required to disclose such information to the panel. If any person wishes to contact the panel or a panel member concerning candidates appearing before it, such person shall contact the Chair, who should convey such information to the panel. Each member of the panel shall promptly disclose to the other committee members all communications made by or to him or her which concern the candidates appearing before the panel or its proceedings.

8) Panel members serve in their individual capacity and not as representatives of the groups which nominated them.

9) The panel shall judge each candidate as either "Qualified" or "Not qualified at this time." Of the Qualified Candidates the Panel shall report out a limited pool of recommended candidates based on the total number of vacancies for that judicial office (i.e., Civil, Supreme). The total pool shall be five (5) individuals per

2

vacancy for each type of judicial office. For the purposes of determining the size of the pool, incumbent's seats shall be included.

10) A quorum shall consist of a least two-thirds (66 2/3 %) of the current members in good standing. A sixty percent (60%) vote of the quorum is required for all decisions, except for the case of incumbent judges. Incumbent Judges seeking re-election to the same office shall be deemed qualified unless seventy-five (75%) of the quorum determines that the Judge should not be reported out as "Recommended." For the purposes of these rules Judges appointed to fill interim vacancies shall be deemed incumbent Judges. If a candidate is found qualified in any year, the candidate to be found qualified in any successive year need only be found qualified by a majority vote of the quorum.

11) **Attendance of panel members shall be mandatory, and a member who fails to attend two (2) consecutive meetings without a satisfactory explanation will be dismissed.**

12) No minutes of the panel's deliberations shall be kept except to record those who appear before it, those members present at each meeting, and the vote on the qualifications of each candidate.

13) **Except for the Report to the Executive Committee of the Democratic Party, all proceedings before the panel and all investigative reports shall be treated as strictly confidential**. Any inquiries concerning such proceedings or reports shall be referred to the Chair of this Committee. In the event that a member violates this provision, the Chair must discharge that member from any further deliberations of the panel.

14) A questionnaire and standard resume will be prepared for the use of the panel.

15) The panel shall consult with the State Grievance Committee to ascertain any instances of professional misconduct with respect to any candidates appearing before it and with appropriate government agencies and commissions for the same purpose. The panel may also choose to take other actions that it reasonably believes to be necessary to make a fair and appropriate determination of the qualifications of the candidate for the judicial office sought. Such actions may include, but are not limited to personal interviews, examination of professional history and professional conduct, and meetings with members of the bar and public who are familiar with the candidates.

16) The report of the panel shall be written, signed by the Chair, and shall name the candidates found to be "Qualified"/ "Not Qualified at this Time" as well as those found "Recommended" for the judicial vacancy or vacancies to be filled.

17) In investigating the qualifications of a candidate, the Chair shall appoint a subcommittee of one or more members of the Committee (designating one such

3

member as the Reporter for the subcommittee) to conduct the necessary investigation, and submit a pre-screening report and recommendation to the Committee. The selection of the sub-committee shall be by lottery. The sub-committee shall conduct a personal interview of the candidate. All pre-screening reports shall be circulated prior to the interview. The confidentiality of the report is paramount. Copies of the report shall be returned to the person or persons who conducted the interview after voting has occurred. In the event the candidate is asked to return for a further interview, the copies of the pre-screening report shall be returned to the person or persons who prepared the pre-screening report and produced at the continuing interview and then returned to the person or persons who prepared the report. After final votes are taken all copies shall be returned to the person or persons who prepared the report. One copy shall be kept by the Chair and one copy shall be kept by the person or persons who prepared the report. All other copies shall be destroyed. Any committee member who distributes a copy of a pre-screening report without the consent of the Committee shall be immediately suspended from the Committee.

18) The Reporter for each subcommittee shall:
- coordinate the evaluation of the candidate and the assignments to subcommittee members

- review the relevant records of this Committee

- ascertain whether the candidate has been the subject of any consideration by any disciplinary body

19) All members of the Committee shall be required to participate in the sub-committee screening process and shall accept, upon request by the Chair, the assignment of screening at least three candidates.

20) In the event that the sub-committee determines that there are particular areas of concern, the candidate will be orally apprised either by the Chair or a designated member of the sub-committee prior to being interviewed by the full Committee. The candidate will be requested to be prepared to address before the full Committee the areas of concern detailed in the written communication. The candidate shall be informed that he or she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues. In the event, the candidate desires to provide additional written materials; the candidate must provide 24 copies of such materials to be distributed to the Committee at the interview of the full Committee.

21) All Candidates shall be interviewed by the full Committee. All determinations of the Committee shall be published at the end of the interview and voting process for **all** candidates seeking the respective offices of Judge of the Civil Court or Justice of the Supreme Court. Voting shall be conducted by secret ballot and

4

maintained by the Chair in a sealed envelope which shall be opened and counted in the presence of the Committee at the end of the interview process of all candidates for the respective offices of Judge of the Civil Court or Justice of the Supreme Court. <u>By a majority vote, the Committee may chose to delay voting on the applicant until further information is provided or an additional interview is obtained.</u>

22) Candidates shall be rated as "Qualified" or "Not Qualified at this Time." If conditions exist to trigger an evaluation as to whether a qualified candidate is deemed to be recommended, such rating will also be provided. In its rating, the Committee shall consider the candidate's possession of such special qualifications as may be necessary or desirable for the performance of the duties of the office for which he or she is being considered.

23) The rating "Qualified" shall be reserved for candidates who have affirmatively demonstrated qualifications which are regarded by the Committee to be necessary for the performance of the duties of the office for which they are being considered.

24) The Committee shall rate candidates who refuse to cooperate with the Committee and to be interviewed by the Committee, after a reasonable opportunity to do so, as "Not Qualified at this time" and the Committee shall notify those candidates that the Committee has so rated them because of their refusal to cooperate with and to be interviewed by the Committee, and for any other reasons that may warrant that rating as well. Such candidates shall not be entitled to request reconsideration.

25) The Committee shall evaluate candidates for judicial office based upon the following criteria:
   a. Judicial demeanor and temperament
   b. Judicial scholarship and knowledge of law
   c. Judicial industriousness and diligence
   d. Judicial experience
   e. Judicial integrity
   f. Judicial fairness

26) In the event the applicant is not presently a Judge, the criteria are as follows:
   a. Demeanor and temperament
   b. Scholarship and knowledge of law
   c. Industriousness and diligence
   d. Experience
   e. Integrity
   f. Fairness

27) The Screening Committee may, in its discretion, publish explanatory language in any determination finding a candidate "Not Qualified at this time."

28) All votes by members of the Committee shall be in person. **No Committee Member may vote by proxy.**

29) **All candidates must also appear in person for the full Committee interview**. Where the candidate cannot appear in person because of extraordinary circumstances, the Committee by a vote of at least 60% of the quorum may permit a candidate to appear by telephonic conference call. This option is not available to those who have never appeared for screening except where the candidate is a sitting Judge and otherwise has mustered the vote of 60% of the quorum.

30) At the end of the deliberative process, all applications of the candidates shall be retrieved by the Chair. The Chair shall make arrangements for the destruction of all copies with the exception of one copy or original to be kept in the possession of the Chair. The application shall remain confidential and shall not be disclosed without a vote of the Committee.

31) If a candidate who has been found "Not qualified at this time" decides to appeal, the candidate shall notify the Chair in writing within **five** business days of being informed of the Committee's decision, the "appeal notice". The appeal process consists of the following:

   a) The Appellate Panel consists of the Chair, the two (2) sub-committee members, who vetted the candidate and two (2) additional members that shall be chosen through random selection from the members who voted at the full committee interview.

   b) The appeal shall be heard within two (2) weeks of the candidate's notice of appeal. The candidate shall be informed within **four** business days of the appearance before the panel. The candidate shall then be given an additional two business days to withdraw his/her candidacy unequivocally and with prejudice to avoid publication of the Committee's findings.

   c) The decision shall be made based solely upon the materials previously supplied and a short statement (not in excess of 300 words), setting forth with specifically how and in what manner the application submitted by the candidate and the

6

information supplied at the candidate's interview has materially changed since the interview. This statement shall be submitted to the Chair with the appeal notice. New references will <u>not</u> be accepted.  Additionally, if in the determination of the appeals panel, the "newly submitted information" was available and could have been supplied at the time the original application was submitted, but was not, such "newly submitted" information will not be considered by the Appeals Panel.

d)   However, if the basis of the appeal is in any part due to a failure of a member of the Committee to adhere to either of rules as set forth in the **Kings County Democratic County Committee Report on Judicial Selection Procedures as Amended on December 14,2011** or **the Rules of the Judicial Screening Committee for the Democratic Party in and For Kings County as Amended on January 23,2012**, and the Chair determines that at credible basis exits for such assertion, then the applicant is permitted to offer new material(s) not considered previously and will be so informed prior to submitting his or her Appeal of such a determination.

e)   In the event the candidate's appeal is successful, the matter shall be remanded to the full Committee for re-evaluation. Only the members who sat on the Committee when the candidate was found "not qualified at this time" shall be eligible to vote.

# EXHIBIT 9



# Judicial Selection Methods in the State of New York:

## A Guide to Understanding and Getting Involved in the Selection Process

COUNCIL ON JUDICIAL ADMINISTRATION

MARCH 2014

NEW YORK CITY BAR ASSOCIATION
42 WEST 44TH STREET, NEW YORK, NY 10036

JUDICIAL SELECTION METHODS IN THE STATE OF NEW YORK:  A GUIDE TO UNDERSTANDING AND GETTING INVOLVED IN THE SELECTION PROCESS[1]

I. Introduction

II. Courts and Their Selection Processes

    A.  Federal Courts

        1. Article III Judges: Second Circuit and District Judges

        2.  Magistrate Judges

        3.  Bankruptcy Judges

    B.  State Courts

        1. Court of Appeals

        2. Appellate Divisions: First and Second Departments

        3. Court of Claims

        4. Appellate Term

        5. Supreme Court

        6. Surrogate"s Court

    C.  New York City Courts

        1. Civil Court

        2. Family Court, Criminal Court, and interim Civil Court

        3. Housing Part of the Civil Court

    D. Assignment of Judges in New York

---

[1]The Committee wishes to thank the Special Committee to Encourage Judicial Service for allowing the use of its manual "How to Become a Judge" as our starting point.

III. How You Can Be Involved in the Process of Selecting Judges

    A.  The Screening Process

        1.  Statutory Nominating Bodies

            a. Commission on Judicial Nomination for Court of Appeals

            b.  Housing Court Advisory Council

        2.  Screening Panels Sponsored by Political Organizations

        3. Gubernatorial Screening Panels

            a. Appellate Division

            b.  Court of Claims

        4.  Mayoral Screening Panel

        5.  Bar Association Review of Candidates

        6. Independent Judicial Election Qualification Commission

        7. New York Senators" Screening Panels for Article III Judges

        8. Magistrate and Bankruptcy Judges Screening Panels

    B.  The Political Process

        1.  Primary Elections

        2.  Judicial Convention

IV.  Conclusion

Appendix

I. Introduction

There are over 1,200[2] judges[3] appointed or elected under the laws of New York State, and over 150 federal court judges currently sit on the bench in New York State.[4] Although the state court"s directory of judges provides a brief biography of all judges sitting in New York State and local courts[5] and the relevant federal district court websites include each district judge"s biography and courtroom procedures,[6] these resources provide little, if any, insight into the corollary questions:  How are judges selected and how can lawyers get involved in the selection processes?

This guide, "Judicial Selection Methods in the State Of New York:  A Guide to Understanding and Getting Involved in the Selection Process," is intended to help answer these questions.

A wide variety of opportunities to participate abound, either by voicing an opinion to the appointing authority, for example mayor or governor, running for election as a delegate to a judicial convention, or becoming a member of a screening panel.[7]

_____

[2] http://www.nycourts.gov/reports/annual/pdfs/2006annualreport.pdf.  Does not include Housing Court.

[3] The term "judge" is used generically throughout this Guide.  Readers are urged to consult the appropriate resource to confirm how to properly address a judge.  For example, judges elected to the New York State Supreme Court are "justices."  N.Y. Const. Art. VI § 20(a).

[4] In addition, there are 2,200 Town and Village courts or "justice courts" outside of New York City.  "These courts have jurisdiction over a broad range of matters, including vehicle and traffic matters, small claims, evictions, civil matters and criminal offenses." http://www.nycourts.gov/courts/townandvillage.

[5] http://www.nycourts.gov/judges/directory.shtml.

[6] http://www.fjc.gov/servlet/nAsearch?lname.  For the SDNY, http://www.nysd.uscourts.gov/judges.php.

[7] On January 19, 2012, the New York City Bar Association in conjunction with the New York State Bar Association, Asian American Bar Association of New York, Association of Black Women Attorneys, Dominican Bar Association, Korean American Lawyers Association of Greater New York, City Bar"s Committee to Encourage Judicial Service, Minorities in the Courts Committee, and Minorities in the Profession Committee, New York County Lawyers" Association Task Force on Judicial Selection, Nigerian Lawyers Association, Metropolitan Black Bar Association of New York, Puerto Rican Bar Association of New York, and the South Asian Bar Association of New York hosted a program entitled "Demystifying the Judicial Screening Process," with the same objective -- to encourage participation in the process of selecting, electing, and appointing judges.

The New York City Bar Association ("City Bar") encourages interested attorneys and members of the public to participate in the process of selecting judges.[8]  Diverse participation is good for the process of selecting judges.  Greater participation by individuals brings transparency to the process and promotes public confidence in our courts.  This guide is intended to encourage such participation in the process.[9]  Beginning with a brief summary of the different methods for selecting judges for each court, this guide sets forth ways that attorneys and others can participate in judicial selection.  Consistent with the City Bar's jurisdiction, this guide focuses on judges in New York City.

Much of the information in this guide is subject to change.  The guide is current through October 23, 2013.

II. <u>Courts and Their Selection Processes</u>

A.  Federal Courts[10]

1.  Article III Judges: Second Circuit and District Judges

The U.S. Constitution provides in Article III, Section 1, "The Judicial Branch, Judicial Powers:"

> The judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior.

United States Court of Appeals and District Court judges are appointed by the President, with the advice and consent of the Senate.[11]  The President appoints 13

---

[8]Judicial election reform has been a priority of the City Bar since its birth in 1870. George Martin, Causes and Conflicts: The Centennial History of the Association of the Bar of the City of New York 1870 - 1970 (1977).  George Martin, Making Sure We are True to Our Founders: The Association of the Bar of the City of New York 1970 - 1995 (1997).

[9]For those readers interested in becoming a judge, see the City Bar's "How to Become a Judge."  http://www.nycbar.org/pdf/report/become_a_judge.pdf.

[10] For a diagram of the structures of the federal courts, *see* http://www.uscourts.gov/educational-resources/get-informed/federal-court-basics/structure-federal-courts.aspx

[11]U.S. Const. Art. II, § 2 (2).

judges for the Second Circuit,[12] 28 district judges for the Southern District of New York ("SDNY"),[13] and 15 district judges for the Eastern District of New York ("EDNY").[14] Appointments are for the judge"s lifetime.  Appointments to federal judgeships historically have been made at the suggestion of a United States Senator from the state within the territorial jurisdiction of the court.[15]

2. Magistrate Judges

Duties assigned to magistrate judges vary considerably from court to court. Magistrate judges may preside over federal misdemeanor cases, preliminary matters in felony cases, and are usually the first judicial officer a criminal defendant sees after arrest or indictment.  In most districts, magistrate judges also handle pretrial motions and hearings in civil cases and felony criminal cases, which are eventually turned over to district judges for final disposition.

Vacancies or positions as magistrate judges in the SDNY[16] and EDNY[17] (and instructions to applicants for submission of their qualifications) are announced on the court"s website and in the New York Law Journal as such vacancies arise.  The term is eight years.[18]

Members in good standing of the bar for at least five years are eligible to apply to be a magistrate judge.[19] Competence to perform the duties of the office is determined by the appointing court.[20]

---

[12]28 U.S.C. § 44(a).  The jurisdiction of the Second Circuit is New York, Connecticut, and Vermont.  In addition, Federal judges, unlike state judges, may take "senior status" rather than face mandatory retirement.

[13]28 U.S.C.  § 133.  The jurisdiction of the SDNY includes Bronx, Dutchess, New York, Orange, Putnam, Rockland, Sullivan, and Westchester counties.  28 U.S.C. § 112(b).

[14]28 U.S.C § 133.  The jurisdiction of the EDNY includes Kings, Nassau, Queens, Richmond, and Suffolk counties.  28 U.S.C. § 112(c).

[15]David S. Law, Appointing Federal Judges: The President, The Senate, and The Prisoner"s Dilemma.  26 Cardozo L. Rev. 479 (2005).

[16]The SDNY has 15 magistrates.

[17]The EDNY has 16 magistrates.

[18] 28 U.S.C. § 631(e).

[19]28 U.S.C. § 631(b)(1).

[20]28 U.S.C. § 631(b)(2).

3. Bankruptcy Judges

Bankruptcy judges may hear and determine all cases arising in or related to the U.S. Bankruptcy Code.[21]

The United States Court of Appeals for the Second Circuit appoints bankruptcy judges for the SDNY and EDNY.[22]  Vacancies or positions are announced in the New York Law Journal and the website for the Second Circuit as positions arise.  The term is 14 years.[23]

B.  State Courts[24]

1. Court of Appeals

The Court of Appeals, New York State"s highest court, is composed of a Chief Judge and six Associate Judges, each appointed to a 14-year term.[25]  New York's highest appellate court was established to articulate statewide principles of law in the context of deciding particular lawsuits.  The Court thus generally focuses on broad issues of law as distinguished from individual factual disputes.

The jurisdiction of the Court of Appeals is limited to the review of questions of law except where the Appellate Division, on reversing or modifying a final or interlocutory judgment in an action or order, finds new facts and a final judgment and a final order pursuant thereto is entered.[26]

Appointment is by the Governor from a list of nominees prepared by the Commission on Judicial Nomination ("Commission"), with the advice and consent of the State Senate.[27]   Eligibility requirements include residence in New York State and admission to practice as an attorney in New York State for at least ten years.[28]  Vacancies and unexpired terms are filled by appointments made in the same manner as original appointments.[29]  The Commission publishes notices of vacancies and application information locally in the New York Law Journal.

---

[21]28 U.S.C. § 157.

[22]28 U.S.C. § 152(a).

[23]28 U.S.C. § l52(a)(1)(b).

[24]Annexed as Appendix 1 is a diagram of the New York State Court system.

[25]N.Y. Const. Art. VI § 2(a).

[26]N.Y. Const. Art. VI § 3(a).

[27]N.Y. Const. Art. VI § 2(e).

[28]*Id.*

[29]N.Y. Const. Art. VI § 2(f).

2. Appellate Divisions:  First and Second Departments[30]

The jurisdiction of the Appellate Division includes appeals from judgments or orders as to which appeal is authorized, from the Supreme Court, Surrogate"s Court, Appellate Term of the Supreme Court in civil matters, Family Court, Court of Claims, and County Courts.[31]  Appellate Division Justices are appointed by the Governor of the State of New York who selects them from among the Supreme Court Justices.  To be eligible for appointment a Justice must first be elected to Supreme Court.  A majority of associate Justices also must be residents of the Departments in which they serve.[32]  The term for the Justices is until the expiration of his/her term as Supreme Court Justice.[33]

3. Appellate Terms

The Appellate Term hears appeals from Civil Court and convictions in New York City Criminal Court.[34]

The Appellate Term is composed of three to five elected Supreme Court Justices designated by the Chief Administrator of the Courts with the approval of the presiding justice of the appropriate Appellate Division.[35]

4. Court of Claims

The 17 originally authorized judges of the Court of Claims are designated "Part A Judges" and have jurisdiction over claims against the State for the appropriation of any real or personal property, breach of contract, torts of state officers and employees committed while acting as such, claims for damages against the State for unjust conviction and imprisonment, and special proceedings to distribute moneys pursuant to Eminent Domain Procedure Law § 304(E).[36]

A specified number of additional Court of Claims judges, known as "Part B Judges," may be appointed.[37]  Most of the additional "Part B" Court of Claims judges

---

[30]*See* Appendix 2 for map of departments.

[31]N.Y. C.P.L.R. Art. 57; N.Y. Const. Art. VI § 5; N.Y. Family Court Act § 1111; N.Y. Ct. Cl. Act § 24.

[32]N.Y. Const. Art. VI § 4(f).

[33]N.Y. Const. Art. VI § 4(c).
[34]N.Y. Const. Art. VI  § 8(a), (d).

[35]N.Y. Const. Art. VI § 8(a).

[36]Court of Claims Act §§ 2, 3(3-a), 9(2).

[37]Court of Claims Act § 2(2)(b)-(d).

serve as acting judges of the Supreme Court, Criminal Term.[38]

Court of Claims judges are appointed by the Governor with the consent of the State Senate.[39]  Eligibility requirements include admission to practice as an attorney in New York with at least ten years experience in practice.[40]  The term is nine years.[41]  Vacancies, other than by expiration of term, are filled for the unexpired term in the same manner as an original appointment.[42]

5. Supreme Court

The Supreme Court has general original jurisdiction in law and equity.  The Appellate Term and Appellate Division of the Supreme Court have appellate jurisdiction.

Eligibility requirements include that a Supreme Court Justice must be admitted to practice as an attorney in New York for a minimum of ten years.[43]

Supreme Court Justices are elected to 14-year terms.  A Supreme Court Justice may serve until December 31 of the year in which he or she reaches age 70, and may thereafter perform duties as a Supreme Court Justice if it is certified that his or her services are necessary to expedite the business of the court, and that he or she is physically and mentally competent to fully perform the duties of such office.  Certification is valid for a two-year term and may be extended for up to two additional two-year terms, but in no event beyond December 31 in the year in which he or she reaches age 76.[44]  Judges who apply for certification appear before the NY City Bar Association"s Judiciary Committee.

Supreme Court Justices are elected by judicial district.[45]  New York State is divided into 13 judicial districts.  The following judicial districts are located in New York City:[46]  First District - Manhattan (New York); Second District - Brooklyn (Kings); Eleventh District (Queens); Twelfth District (Bronx); Thirteenth District - Staten Island

---

[38]22 N.Y.C.R.R. Parts 33 and 121.2.

[39]N.Y. Ct. Cl.  Act § 2(2)(a).

[40]N.Y. Ct. Cl. Act § 2(7).

[41]N.Y. Ct. Cl. Act § 2(3).

[42]N.Y. Const. Art. VI § 21(b).

[43]N.Y. Const. Art. VI § 20(a).

[44]N.Y. Const. Art. VI § 25(b).

[45]N.Y. Const. Art. VI § 6( c).

[46]N.Y. Judiciary Law § 140.

(Richmond).[47]  Each judicial district has the following number of justices of the Supreme Court:

> First District - 38;
> Second District - 49;
> Eleventh District - 39;
> Twelfth District - 25;
> Thirteenth District - 3.[48]

For a party to nominate a candidate for Supreme Court, it must hold a judicial district-wide nominating convention.[49]

Interim appointments are made to fill vacancies and unexpired terms on the Supreme Court.  Appointments to fill vacancies on the Supreme Court in the five counties of New York City, created other than by expiration of a term, are made by the Governor, upon advice and consent of the State Senate.[50]

Acting Supreme Court Justices also preside over cases in Supreme Court.[51]  An acting Supreme Court Justice has the same jurisdiction as a Supreme Court Justice, but is designated by the Chief Administrator of the Courts upon consultation and agreement with the presiding justice of the appropriate Appellate Division.[52]  According to New York Court rules, selection is made upon recommendations from a panel consisting of the appropriate Deputy Chief Administrator for the Courts, the Deputy Chief Administrator for Management Support, the Administrative Judge for Matrimonial Matters, if any, and the Administrative Judge of the court where the judge serves.[53]  The panel consults with Administrative Judges, bar associations, and other persons or groups as may be appropriate, and considers the productivity, scholarship, temperament, and work ethic of eligible candidates and any complaints made against the judge being considered.[54]  Seniority is a factor.  To be eligible, a judge must serve as a judge in a court of limited jurisdiction (Court of Claims, County Court, Surrogate"s Court, Civil, Criminal, or Family

---

[47]These districts are not to be confused with the smaller judicial (or Municipal Court) districts relevant to the election of Civil Court Judges.

[48]N.Y. Judiciary Law § 140-a.

[49]Election Law §§ 6-124, 6-126.

[50]N.Y. Const. Art. VI § 21(a).

[51]N.Y. Const. Art VI §26.

[52]A chart of the administrative structure of the New York State courts is available at http://www.nycourts.gov/admin/AdminStructure.pdf.

[53] Morgenthau v. Cooke, 56 N.Y.2d 24 (1982) (rejecting Chief Judge's plan to rotate Acting Supreme Court Judges and finding Chief Administrator without authority to make such temporary assignments without establishing standards and policies).

[54]22 N.Y.C.R.R. Parts 33 and 121.2(a), (b).

Court) for at least two years[55] and reside in the Department for which the appointment is made.[56]   Acting Supreme Court Justices often serve for more than a year and some for over 20 years.  An Acting Supreme Court Justice is not eligible for appointment to the Appellate Division or Appellate Term.

6. Surrogate"s Court

There are two Surrogates in both New York County and Kings County. There is one in each of the other counties in New York City.  The jurisdiction of Surrogate"s Court is full and complete general jurisdiction in law and in equity to administer justice in all matters relating to estates and the affairs of decedents.[57]

The selection process is by county-wide election.  Eligibility requirements include admission to practice as an attorney in New York for at least ten years.[58]  The term is 14 years in New York City and ten years in all other counties.[59]  Service terminates December 31 of the year in which the judge reaches the age of 70.

Appointments to fill vacancies in the Surrogate"s Court, other than those created by expiration of a term, are made by the Governor upon advice and consent of the State Senate.[60]

C. New York City Courts

1.  Civil Court

The Civil Court has city-wide jurisdiction over actions and proceedings for the recovery of money and chattels; foreclosure of mechanics" liens and liens on personal property where the amount sought to be recovered or the value of the property does not exceed $25,000, exclusive of costs and interest; summary proceedings to recover possession of real property and to remove tenants therefrom; and unlimited jurisdiction to enter judgment upon a counterclaim for the recovery of money.[61]

Civil Court judges must be admitted to practice as an attorney in New York for at

---

[55]22 N.Y.C.R.R. Part 121.2( c).

[56]N.Y. Const. Art. VI § 26.

[57]N.Y. Surrogate"s Court Procedure Act § 201(3).

[58]N.Y. Surrogate"s Court Procedure Act § 2603(4).

[59]N.Y. Const. Art. VI § 12(c).

[60]N.Y. Const. Art. VI § 21(a).

[61]N.Y. Const. Art. VI, § 15(b).

least ten years before taking office.[62] Civil Court judges are elected to ten-year terms[63] and are eligible to serve until December 31 of the year in which the judge reaches the age of 70.[64]

Civil Court judges are elected either by county or smaller judicial districts within each county.[65]

The Mayor appoints Civil Court judges to complete unexpired terms. See below for description of the Mayor"s appointment process to Family Court, Criminal Court, and Interim Civil Court.

2. Family Court,[66] Criminal Court, and Interim Civil

The Family Court has jurisdiction over actions and proceedings concerning (1) the protection, treatment, correction, and commitment of minors in need of the exercise of the authority of the court because of circumstances of neglect, abuse, delinquency, or dependency; (2) the custody of minors except for custody incidental to actions and proceedings for marital separation, divorce, or annulment of marriage or dissolution; (3) the adoption of persons; (4) the support of dependents except when incidental to actions and proceedings in this state for marital separation, divorce, annulment of marriage or dissolution of marriage; (5) paternity; (6) termination of parental rights; (7) the guardianship of minors; and (8) crimes and offenses by or against minors, or between spouses, or between parent and child, or between members of the same family or household. The Family Court may also take jurisdiction over certain matters referred to it by the Supreme Court.[67]

The Criminal Court has city-wide criminal jurisdiction over crimes and other violations of law other than those prosecuted by indictment; and over such other actions and proceedings, not within the exclusive jurisdiction of the Supreme Court, as may be

---

[62]N.Y. City Civ. Ct. Act § 102-a(1).

[63]N.Y. Const. Art. VI § 15(a).

[64]N.Y. Const. Art. VI § 25(b). Interim vacancies are filled by appointment of the Mayor until the last day of December after the next election. N.Y. City Civ. Ct. Act § 102-a(3).

[65]Whether a candidate is elected to a „county-wide" seat or a district seat depends on which vacancy is being filled.

[66]This guide focuses on judges in New York City. Outside of New York City, Family Court judges are elected using a primary election system as opposed to a convention system like Supreme Court Justices.

[67]N.Y. Const. Art. VI §§ 7(a), 13(b)(1)–(7), 13(c).

provided by law.[68]  Specifically, the Criminal Court has trial jurisdiction over all offenses other than felonies and preliminary jurisdiction of all offenses, subject to divestment by the Supreme Court and its grand juries.[69]

The Mayor appoints judges to sit in the New York City Criminal Court and in the Family Court within the City.[70]  These appointments are for ten-year terms.  Once a judge is appointed, he/she can be transferred from one court to another by the Office of Court Administration, and after two years" service in the lower courts, he/she may be designated by the Chief Administrator of the Courts as an Acting Supreme Court Justice.  In addition, the Mayor appoints judges to fill vacancies on the New York City Civil Court.  These judges serve until the next regularly scheduled election.

## 3. Housing Part of the Civil Court

The jurisdiction of Housing Judges[71] includes actions and proceedings involving the enforcement of state and local laws for the establishment and maintenance of housing standards including the Multiple Dwelling Law and the Housing Maintenance Code, and the Building Code and Health Code of the Administrative Code of The City of New York.[72]  Housing judges also hear summary proceedings seeking eviction of residential tenants.

The eligibility requirements are admission to practice as an attorney in New York

---

[68]N.Y. Const. Art. VI § 15(c).

[69]N.Y. Crim. Proc. Law § 10.30.

[70]N.Y. Const. Art. VI §§ 13(a), 15(a).

[71]N.Y. City Civ. Ct. Act §110 provides:

(e) Actions and proceedings before the housing part shall be tried before civil court judges, acting civil court judges, or housing judges. Housing judges shall be appointed pursuant to subdivision (f) of this section and shall be duly constituted judicial officers, empowered to hear, determine and grant any relief within the powers of the housing part in any action or proceeding except those to be tried by jury. Such housing judges shall have the power of judges of the court to punish for contempts.  Rules of evidence shall be applicable in actions and proceedings before the housing part. The determination of a housing judge shall be final and shall be entered and may be appealed in the same manner as a judgment of the court; provided that the assignment of actions and proceedings to housing judges, the conduct of the trial and the contents and filing of a housing judge"s decision, and all matters incidental to the operation of the housing part, shall be in accordance with rules jointly promulgated by the first and second departments of the appellate division for such part.

[72]N.Y. City Civ. Ct. Act § 110(a).

for five years, two of which must have been in active practice, before taking office. Reappointment is possible.[73]   The term is five years.[74]

Housing Judges are appointed by the Administrative Judge from a list of candidates found qualified by the Advisory Council to the Housing Part of the Civil Court.[75]

D. Assignment of Judges in New York

Once a judge is selected, either by election or appointment, he/she will be assigned to a court and a part.  The Chief Judge of the State of New York, in consultation with the Chief Administrative Judge, Administrative Judges, Supervising Judges and the Presiding Justice of the relevant Appellate Division, assigns judges to sit in the County in which they were selected or another county.[76]  For example, a judge elected to New York City Civil Court in Manhattan could be assigned to Family Court in the Bronx.  A Supreme Court judge is usually assigned to the county in which he/she was elected, but could be assigned out of county.  Civil Court or Family Court Judges may be assigned by the Chief Judge to Supreme Court and are referred to as "Acting Supreme Court Judges."[77]  However, Family Court and Civil Court judges assigned to be Acting Supreme Court Justices are not eligible to serve in the Appellate Division or Appellate Term.

See Appendix 6 for chart comparing courts and methods of selection.

III. <u>How You Can Be Involved in the Process of Selecting Judges</u>

You can get involved in the process of selecting judges in a variety of ways.  The most modest form of engagement is to research the candidates, meet the candidates at community forums, become an active member of your community by talking to friends and neighbors about the candidates and your experience with the candidates, and vote. You might persuade a talented colleague to apply for a judgeship or a sitting judge to apply for a higher court.  You can become more engaged by joining a local political club where you might assist the campaign of a judicial candidate or become a delegate to your party"s Judicial Convention.  Your assistance might take the form of collecting signatures for Civil Court candidates to get on the primary ballot, donating funds to

---

[73]N.Y. City Civ. Ct. Act § 110(I).

[74]*Id.*

[75]N.Y. City Civ. Ct. Act § 110(f).

[76]N.Y. Const. Art. VI § 26.

[77]Rules of the Chief Judge, 22 N.Y.C.R.R. Part 33.

support a candidate,[78] or fundraising.[79]  You may comment on a candidate when a screening panel calls you, or seek appointment to a screening panel.  Consider becoming a screening panel administrator.  You might join a community group involved in the process of selecting judges or apply to the governor, mayor, or county leader to request appointment to a screening committee.  Join a bar association judiciary committee.  You might apply to the Chief Judge for appointment to an Independent Judicial Election Qualification Commission.

If you wish to become involved in the process by sitting on screening panels, you must become known to persons who appoint to such panels.  Most screening panel members are active members of community groups or bar associations.

A. The Screening Process

Regardless of what judicial selection method is utilized, be it appointment or election, invariably, every judicial candidate will be vetted by at least one judicial screening panel.  As described below, there is a wide array of screening panels to which candidates may be required to submit by appointing or endorsing bodies, and others which are voluntary, such as bar association screening panels.  All screening panels are designed to assess the qualifications of judicial candidates and make a recommendation based on the panel"s particular rating system.  When a candidate is recommended it is known as being "reported out" of the screening panel.  Screening panels typically include lawyers, both practicing and non-practicing, and law professors.  Some screening panels also include non-lawyer members of the community.

It is difficult to set forth definitive criteria for evaluating candidates for judicial office, particularly given the multitude of different screening bodies, which may employ different standards, and the varying minimum qualifications for different judicial positions.  But generally, the standards most often stated include:

-General intellectual ability;

-Knowledge of the law, including knowledge of the specific body of law applicable to the court in which the position is sought.  Because judges often sit in courts to which they were not originally elected or appointed (e.g., Civil Court judges may sit by assignment in the Criminal Court or in the Criminal Term of the Supreme Court), knowledge of other areas of the law also is important;

---

[78]There are limits in election laws as to the amount an individual or entity may donate.  You should become familiar with applicable election laws.  Furthermore, the Rules of the Chief Administrator of the Courts Rule 151.1 bars "assignments to cases where lawyers, their firms or their clients have contributed $2,500 or more to the judge"s campaigns in the previous two years, or have collectively contributed $3,500 or more."

[79]Many candidates self finance their campaigns.

-Appropriate demeanor and judicial temperament, including an ability to deal patiently and considerately with both attorneys and *pro se* litigants and, in the case of appellate courts, with other judges in a collegial setting;

-Industriousness and a proven willingness to work hard;

-An ability to discern facts and weigh conflicting evidence;

-An ability to understand legal arguments and to make prompt, correct determinations of legal issues;

-An absence of bias, and a commitment to equal justice for all;

-Integrity, candor, and an absence of outside political or other influence;

-A commitment to public service, particularly to judicial service; and

-Courtroom experience.[80]

Political party affiliation or activity is not a criterion employed by the statutory nominating bodies (e.g., the State of New York Commission on Judicial Nomination and the Advisory Council to the Housing Part of the Civil Court) and other merit selection nominating bodies (as opposed to screening bodies) described in this Guide, nor is it a criterion of the Mayor"s Advisory Committee or the screening committees appointed by the Governor.

1. Statutory Nominating Bodies

a. Commission on Judicial Nomination for Court of Appeals

The members of the Commission, who serve without compensation, are appointed by the Governor (four), the Chief Judge of the Court of Appeals (four), the Speaker of the State Assembly (one), the Temporary President of the State Senate (one), the Minority Leader of the State Assembly (one), and the Minority Leader of the State Senate (one).[81]  Among each group of four members appointed by the Governor and the Chief Judge, respectively, no more than two may be enrolled in the same political party, two must be members of the bar of the State and two must be

---

[80]*See* http://www.americanbar.org/content/dam/aba/administrative/judicial_independence/reformat.authcheckdam.pdf.

[81]N.Y. Const. Art. VI § 2(d)(1).

laypersons.[82]  For a list of the current members of the Commission, see
http://www.nysegov.com/cjn.

b. Housing Court Advisory Council

The Advisory Council is a statutory body composed of fourteen members, who
serve without compensation, appointed by the Administrative Judge with the approval of
the Presiding Justices of the Appellate Divisions for the First and Second Judicial
Departments.  The Advisory Council members represent the real estate industry (2),
tenants" organizations (2), civic groups (2), bar associations (2), the public (4), the
Mayor of The City of New York (1), and the Commissioner of the Division of Housing
and Community Renewal (1).[83]

2. Screening Panels Sponsored by Political Organizations

In some counties historically dominated by a single political party (the Democratic
Party in all counties except Richmond), the selection of candidates for nomination by
that party has been tantamount to election in the general election.  Also, in some
counties, the selection of nominees is determined by local political party organizations,
with little or no involvement by an independent screening body.  Political considerations,
including a history of political party activity, contributions to political party organizations,
and acquaintance with political party officials, may influence the selection process to
varying degrees.  However, even where the nomination process appears to be
controlled by local political party organizations, the use of screening panels by these
organizations has resulted in the nomination of candidates with little prior political
involvement.

The Democratic Party"s use of independent screening panels is well-established
in Manhattan.  The screening panels established to review applicants for election to
Supreme Court, like those established to review applicants for election to the Civil
Court,[84] are comprised of appointees from a number of legal and non-legal
organizations and community groups.  They are asked on a rotating basis to appoint

---

[82]N.Y. Const. Art. VI  § 2(d)(1).

[83]N.Y. City Civ. Ct. Act § 110(g).  For a list of the present membership of the
Advisory Council, *see* http://www.nycourts.gov/courts/nyc/housing/advisory.shtml

[84]For local district Civil Court races, screening is at the discretion of leaders
within the district who select an administrator and the organizations that will appoint
screening panel members.

individuals to sit on the screening panel,[85] subject to eligibility requirements.[86]  The members of the panel are not expected to represent the appointing organizations, but act as independent evaluators.  This is recognized as a "double blind process."  Members are not compensated for their service.  Guided by an administrator who is selected by the Party's judiciary committee, these volunteer members evaluate written applications, conduct personal interviews with attorneys who have appeared before sitting judges or adversaries of practicing attorneys who are applying, review writing samples, decisions, and appellate records, and check references.  The screening panels" meetings and deliberations are considered confidential.  The screening panels typically report out the three "Most Highly Qualified" candidates for each vacant position.  Those candidates then compete for the Party"s nomination by seeking the endorsement of political leaders and local clubs.  In some cases, candidates will compete in primary elections.  Only those candidates who have been rated "Most Highly Qualified" by the Democratic Party"s independent screening panel are considered for nomination to Supreme Court at the Party"s judicial convention.

The Democratic parties in Brooklyn, the Bronx, and Staten Island have more recently established screening panels for county-wide offices.[87]

Brooklyn's panel, like Manhattan's, includes persons selected by a wide variety of bar and community groups. The party's Executive Committee is not to endorse any candidate who has not been found "qualified" by the screening panel.  As in Manhattan, the panel is to report out a limited pool of recommended candidates for each vacancy

---

[85]Organizations which have been asked by the New York County Democratic Party to appoint individuals to serve on recent screening panels include: Asian American Bar Association of New York; Asian Americans for Equality; Association of Arbitrators; Brehon Law Association; City Bar; Civitas Citizen, Inc.; Columbian Lawyers Association; Dominican Bar Association; the Fortune Society; Gay Men"s Health Crisis; Harlem Children"s Zone; Hudson Guild; Jewish Lawyers Guild; Lesbian, Gay, Bisexual and Transgender Law Association of Greater New York (LeGaL); Korean American Lawyer"s Association of Greater New York; Metropolitan Black Bar Association; NAACP Mid-Manhattan Branch; National Employment Lawyers Association of New York; National Lawyers Guild; Neighborhood Defender Service of Harlem; New York County Lawyers" Association; New York State Trial Lawyers Association; New York Women"s Bar Association; Puerto Rican Bar Association; Women"s City Club; and all local law schools.

[86]In Manhattan, for instance, an individual may not serve on a screening panel more than once in a three-year period.  N.Y. County Democrats" Rules, Art. 3, § 7( ii) ¶ 2.

[87]The Queens Democrats" published rules do not provide for independent screening.  Nor do the rules of any county"s Republican Party.  The City Bar has not requested the rules of other parties such as the Conservative, Green, or Working Families parties.

(as of this writing, the pool is five individuals per vacancy).[88]

The Bronx has a similar but less-detailed provision which also states that only those candidates deemed qualified by the independent screening panel shall be considered for designation or nomination for the respective judicial office.  The Richmond Democrats' published rules provide for a judicial screening panel but do not include provisions to guarantee the independence of the panel's members.

It may be helpful to communicate with local or county political party organizations to obtain further information about candidate selection, including the application process for any preprimary election screening bodies.  This is important because the procedures of these screening bodies may change from year to year.

3.  Gubernatorial Screening Panels

a.  Appellate Division

By order dated April 27, 2011, Governor A. Cuomo formed the Departmental Judicial Screening Committee, which has the authority to evaluate and recommend candidates for all judicial positions in the Appellate Division including that of Presiding Justice, and for appointment to the office of interim Supreme Court Justices.[89]  Only individuals found to be "highly qualified" by the Department Judicial Screening Committee can be appointed by the Governor.

Each judicial department of the state has a Departmental Judicial Screening Committee consisting of 13 members.  The Governor picks five of the members, the Chief Judge of the Court of Appeals selects two, the Attorney General appoints two, the Presiding Justice of the Appellate Division for that department chooses one, the Speaker of the Assembly and the Minority Leader of the Senate jointly pick one, the President Pro Tempore of the Senate and the Minority Leader of the Assembly select one, and the president of the New York State Bar Association appoints one.  Only individuals who are residents of, work in, or have an office in the judicial department may be selected to serve in the Departmental Judicial Screening Committee of that judicial department.  The Departmental Judicial Screening Committee is headed by a chairperson selected by the Governor from among the members of the Departmental Judicial Screening Committee.[90]  For a list of members of the committees, see http://www.governor.ny.gov/sl2/judicial-screening.

---

[88]Kings County Democratic County Committee Report on Judicial Selection Procedures as amended on December 14, 2011.  See Appendix 5.

[89]Under section 21(a) of Article VI of the Constitution, the Governor has the power to fill vacancies in the office of Justice of the Supreme Court.

[90]Executive Order 15.

Any individual the Governor selects to fill a judicial position in the Appellate Division or as a justice of the Supreme Court must have been found to be highly qualified by the Departmental Judicial Screening Committee.[91]

Each member of a screening committee shall serve for a term of three years. Any vacancies in a screening committee shall be filled in the same manner as the exiting-member who was previously appointed.  The individual filling the vacancy shall serve the remainder of the unexpired term.  Only the Governor can remove a member of a screening committee for cause.  Members of screening committees receive no compensation, but are reimbursed for any necessary expenses incurred in connection with their performances.[92]

b. Court of Claims

Governor Andrew Cuomo"s Executive Order 15 established the State Judicial Screening Committee and gave it the authority to evaluate and recommend candidates for appointment for the offices of Judge and Presiding Judge of the Court of Claims.[93] The State Judicial Screening Committee, like the Departmental Judicial Screening Committees, consists of 13 members.  Four of the 13 seats are occupied by the Chairperson from each of the Departmental Committees.  The Governor fills six of the 13 seats.  He selects four individuals from the Departmental Committee and picks two additional individuals.  The Chief Judge of the Court of Appeals chooses two individuals, and the last seat is filled by someone appointed by the Attorney General.  The State Judicial Screening Committee is headed by a chairperson chosen by the Governor from among the members.  Each member of the screening committees shall serve for a term of three years.  Any vacancies shall be filled in the same manner as the exiting-member who was previously appointed.  The individual filling the vacancy shall serve the remainder of the unexpired term.[94]

4. Mayoral Screening Panel

Under an Executive Order,[95] Mayor Michael Bloomberg made appointments from a list of candidates submitted by the Mayor's Advisory Committee on the Judiciary

---

[91]*Id.*

[92]*Id.*

[93]*Id.*

[94]*Id.*

[95]Since these procedures are not mandated by statute, they change with the election of a new mayor.

("Committee").[96]  The Mayor agreed not to appoint, or reappoint, a judge who had not been nominated or recommended by the Committee.  Newly elected Mayor Bill de Blasio has stated that he supports this process and will continue it as Mayor.[97]  The Executive Order provides that the Committee shall, with respect to non-incumbent judges:

> (a) Take steps to recruit and encourage highly qualified persons to apply for appointment;

> (b) Evaluate and conduct all necessary inquiry to determine those persons whose character, ability, training, experience, temperament and commitment to equal justice under law fully qualify them for judicial office;

> (c) Consider all relevant information to determine which of the highly qualified candidates are best qualified, and refer to the Department of Investigation for screening all persons the Committee proposes to nominate for appointment;

> (d) Nominate and present to the Mayor three candidates for appointment to each vacant judgeship, except that if there are numerous vacancies the Committee, in its discretion, may present less than three nominations (unless the Mayor requests three nominations) for each vacancy, and provide such information as may be necessary to inform the Mayor of the qualifications of each nominee.

With respect to judges seeking reappointment, the Committee recommends to the Mayor that the incumbent is "highly qualified for reappointment," or is not.  The Committee accepts applications on a continuing basis for appointments to future judicial vacancies as they arise.

The Committee consists of 19 volunteer members.  The Mayor selects nine members.  The Chief Judge of the Court of Appeals nominates four members, the Presiding Justices of the Appellate Divisions, First and Second Departments, nominate two members each, and the remaining two members are nominated on an annual rotating basis by the deans of the law schools within the City of New York.  The Mayor must approve the candidates nominated by the other authorities.  The Mayor also selects the Chairperson.  Committee members serve two-year terms.  The Executive Order provides that they include men and women, and "shall be selected with due consideration for broad community and borough representation."

---

[96]Executive Order 8, dated March 4, 2002.

[97]E-mail from Mayor de Blasio spokeswoman Lis Smith, quoted in the New York Law Journal, December 19, 2013.

Under Mayor Bloomberg, Hon. Zachary W. Carter, who formerly served as United States Attorney for the Eastern District of New York, as a Magistrate Judge for the Federal District Court, and as a judge of the New York City Criminal Court, chaired the Mayor"s Committee.  Under Mr. Carter, the Committee formed subcommittees who were responsible for conducting the initial evaluations of candidates for judicial appointment.  The Committee took steps to assure that the subcommittees evaluating candidates for the Family Court included members with specific experience in Family Court practice.[98]

5.  Bar Association Review of Candidates

Various bar associations also review candidates for judicial office.  A bar association review typically includes the candidate"s response to a questionnaire, one or more interviews with representatives of the committee, review of the candidate"s writings, and interviews of adversaries, judges, and others with whom the candidate has dealt.  Some bar associations make endorsements while others take no position other than to report on qualifications.

Most candidates for election or appointment to judicial office in New York City also submit applications for evaluation and appear for interviews by the Judiciary Committee of the City Bar.  After the evaluation is completed, the Judiciary Committee announces its finding of either "Approved" or "Not Approved."[99]  The reviews for Federal Circuit and District Court judges, Court of Claims, Supreme Court, Surrogates Court, Family Court, Civil Court, Criminal Court, and Housing Court are conducted by the Judiciary Committee of the City Bar in conjunction with the county bar association in the relevant county, and a member of the relevant court committee.[100]  Together they investigate and evaluate the qualifications of all candidates for judicial office in The City of New York.  The Executive Committee of the City Bar reviews applicants for the U.S. Supreme Court and N.Y. State Court of Appeals.  The results of these reviews are

---

[98] The names and brief biographies of other members of the Committee may be found on the Mayor's website at www.nyc.gov/judiciary.  Under Mayor Bloomberg, staff assistance was provided to the Committee through the office of the Deputy Mayor for Legal Affairs.

[99] Unlike screening panels, which limit the number of candidates to be found qualified, the bar association committees do not restrict the number of candidates for each vacancy.  For example, numerous candidates running for the same seat may be approved.

[100] The participating court committees are: Courts Committees are:  State Courts of Superior Jurisdiction; Family Court and Family Law; Housing Court; Federal Courts; Civil Court; Criminal Courts; Trusts, Estates & Surrogate"s Courts; Committee on Bankruptcy and Corporate Reorganization (for Bankruptcy Judges); and Committee on International Trade (for judges of the Court of International Trade, which is based in New York City).

reported to the appointing authority in the case of appointed judgeships, and to the public by press release in the case of elective judgeships.

To be a member of the City Bar"s Judiciary Committee, you must first be a member of the City Bar and apply to the Chair of the Judiciary Committee for a three year appointment.  The president of the City Bar makes the appointments.

Candidates may also voluntarily submit applications to additional bar association screening panels, including the Joint Minority Bar Association Screening Panel and the Lesbian, Gay, Bisexual and Transgender Law Association of Greater New York (LeGaL) Screening Panel.  The New York Women"s Bar Association has, on occasion, also formed a screening panel.

In addition, many bar associations have judiciary committees that are involved in the process of judicial selection.

6. Independent Judicial Election Qualification Commission

Candidates for election may also voluntarily submit applications to the Independent Judicial Election Qualification Commission ("JEQC"), which was established by OCA to ensure that voters are provided with as much information as possible about the qualifications of candidates for judicial office.[101]

Each qualification commission is comprised of 15 members appointed as follows: (1) The Chief Judge of the State of New York selects five members, two of whom must be non-lawyers; (2) The Presiding Justice of the Appellate Division encompassing the appropriate district commission shall select five members, two of whom must be non-lawyers; (3) The President of the New York State Bar Association selects one member; (4) Four local bar associations, located within the appropriate judicial district and designated by the Presiding Justice of the Appellate Division of the appropriate district, select one member each.

As part of that investigation, JEQC members speak to references, attorneys who have appeared before judges seeking re-election and other relevant members of the community; review the applicant"s professional writings; and usually conduct a personal interview with the candidate.  All proceedings conducted by the JEQC and all papers filed with them are kept confidential.  Judicial candidates evaluated by the JEQC are rated "qualified" or "not qualified"; a "qualified" rating is valid for three years (in the absence of any new information that may have a negative effect on that individual"s qualifications and/or background), while candidates found "not qualified" are considered not qualified for that judicial office for one year from the date of submission of the

_____

[101]For JEQC brochure *see* http://www.nycourts.gov/publications/pdfs/IJEQC-brochure.pdf.

candidate"s application to the JEQC.

The JEQC are relatively new.  To date, no study has been conducted to assess the significance of appearance or nonappearance before the JEQC in the election process.[102]

7.  New York Senators" Screening Panels for Article III Judges

Under President Barack Obama, candidates recommended to the White House must submit applications to the American Bar Association Screening Panel.  Individuals interested in participating in the selection of federal judges may wish to contact their U.S. Senators.  However, the nature of an individual Senator"s screening process may vary with the officeholder, and the influence of particular Senators on the President"s selection has historically depended on whether a Senator is of the same party as the President.  Likewise, a nominee"s prospects for Senate confirmation may depend on the political relationship between the President and members of the Senate.

8. Magistrate and Bankruptcy Judges Screening Panels

The judges of each U.S. District Court appoint a screening committee of attorneys and community leaders to make recommendations to them.  Magistrate Judges are then selected with the concurrence of a majority of the judges in the District for which the appointment is made, or by the Chief Judge of the District.[103]

Appointments of Bankruptcy judges in each district are made by a  majority of Judges of the United States Court of Appeals for each Circuit upon the recommendation of the Judicial Conference of the United States, or by the Chief Judge of the Court of Appeals when a majority of judges cannot agree.[104]  A panel of circuit judges and district judges from the  district where the judge will serve makes recommendations for appointments.

B.  The Political Process

Another way to participate in the judicial selection process is to get involved in the political process.  As previously noted, judges in New York State are either appointed by an appointing authority or elected in a general election by enrolled voters in particular geographic areas, depending on the particular judicial position.  Under the election method, which is a partisan political process, candidates must first win the

---

[102]For a list of JEQC members, *see* http://www.nycourts.gov/ad3/JEQC/MembersList.pdf.

[103]28 U.S.C. § 631(a).

[104]28 U.S.C. § 152(a)(1), (3).

nomination of their political party through a primary election or, in the case of New York State Supreme Court Justices, through a judicial convention. Typically, certain geographic areas within the city and state lean toward one party politically, and therefore the "election" of a judge is often determined de facto at the nomination stage. Thus, while individuals interested in judicial selection can get involved at the general election stage, the nomination process presents a more meaningful opportunity to participate in the judicial selection process. Set forth below is a description of the two nomination methods under the elective process and opportunities for involvement.

1. Primary Election

The most common method of nominating party candidates is a party primary election, which is employed for Civil Court judicial positions and Surrogates Court positions.[105] In New York State, the primary is held traditionally in September. To get on the primary ballot, a candidate must collect the requisite number of valid signatures on designating petitions by a date set by the New York State Board of Elections. Candidates who meet the petitioning requirements and file with the appropriate Board of Elections in a timely manner are designated as candidates for the primary election.[106] Enrolled voters within the applicable party carry designating petitions for slates of candidates, which include judicial candidates, and witness voters signing the petitions. To accomplish this task, judicial candidates, as well as other political candidates, often seek assistance from local political organizations, such as political clubs in New York City. These organizations exist in part to support and endorse candidates that stand for the principles and values embraced by the organization and play a significant role in providing the human resources to gather designating signatures for candidates they have endorsed. Once candidates are designated for the primary ballot (and survive any challenges to the number or validity of petition signatures), they typically engage in a campaign, sending out literature and seeking endorsements from other political leaders, local organizations, and news media.[107] The candidate who prevails at the primary becomes the party"s nominee and will be listed as such on the general election ballot in November (either county-wide or district-wide depending on the position).[108] Candidates

---

[105]Elected Civil Court positions can be county-wide positions or local district positions. Candidates for local district positions who qualify for the primary will appear only on the ballots (and general election ballot if they win the primary) in the local district whereas county-wide candidates appear on the ballot throughout the borough.

[106]There is also an opportunity for so-called write-in candidates to petition for the opportunity to write-in candidates. N.Y. Elec. Law §§ 6-160, 6-168.

[107]New York"s ethical rules governing judicial campaigns expressly allow for incumbent judicial candidates to launch their campaigns nine moths before the general election and remain politically active three months after the election. Code of Judicial Conduct, N.Y.C.R.R. tit. 22, § 100.0(Q).

[108]N.Y. Elec. Law § 6-168(3).

designated for the primary who are uncontested (i.e., the number of candidates does not exceed the number of available nominations) are deemed nominated and shall not appear on the primary ballot unless a valid petition for an opportunity to ballot is filed in a timely manner (i.e., petition to write-in an undesignated candidate).[109]

There are many avenues to participate in the primary process.  Individuals can participate at the grass roots level, getting involved in political clubs and organizations that endorse and support judicial candidates.  This affords interested individuals the opportunity to voice their views on particular candidates and participate in the club"s decision-making process.  Individuals may also volunteer on particular candidates" campaigns and carry designating petitions to qualify candidates for the primary ballot, assuming that such individuals reside in the state and are enrolled voters in the applicable political party.  And because candidates are subject to screening panels, individuals can get involved with a wide array of organizations, such as bar associations, that organize screening panels as described above.

2. Judicial Convention

The New York State Constitution provides for the election of its general trial level judges – Supreme Court Justices – from each of twelve geographic Judicial Districts comprised of one or more counties.[110]  But rather than using the standard primary process for nominating Supreme Court candidates, New York State employs a unique system of electing party nominees for this office – the judicial district convention.[111]  Under the convention system, the nominating function is delegated to local party representatives, known as judicial delegates and alternate delegates, who are elected from smaller geographic areas within each Judicial District, called Assembly Districts –

---

[109]*See* N.Y. Elec. Law § 6-164 for the write-in process.

[110]N.Y. Const. Art. VI § 6; N.Y. Elec. Law § 6-124; N.Y. Jud. Law § 140.

[111]N.Y. Elec. Law § 6-106.  The constitutionality of New York"s judicial nominating convention method was the subject of a constitutional challenge in *Lopez Torres, et al. v. New York State Bd. of Elections*, et al., 411 F. Supp. 2d 212 (E.D.N.Y. 2006), *aff'd*, 462 F.3d at 161 (2d Cir 2006), *rev'd* 552 U.S. 196 (2008).   The lead plaintiff, a Supreme Court judicial candidate in Brooklyn, filed suit, seeking, *inter alia,* a declaration that New York"s convention system violated the purported First Amendment rights of challengers running against candidates favored by party leaders.  Siding with the plaintiff, the district court issued a preliminary injunction enjoining use of the nominating convention, pending the enactment of a new statutory scheme, and mandating a direct primary election to select Supreme Court nominees in the interim.  411 F. Supp. 2d at 212.  The Second Circuit affirmed.  462 F.3d at 161.  The case reached the United States Supreme Court, which reversed and unanimously upheld the constitutionality of the convention system.  *New York State Bd. of Elections* v. *Lopez Torres*, 552 U.S. at 196.

the same political subdivisions by and from which New Yorkers elect their representatives for the New York State Assembly and the members of the state committees of their respective parties.[112]  The sole function of a judicial delegate (or an alternate in the event the judicial delegate is unavailable) is to place the names of Supreme Court candidates in nomination for each vacancy and vote for candidates on behalf of their constituencies.  The number of delegates and alternate delegates for each Assembly District is governed by each party"s internal rules, although New York State"s Election Law requires that the allotted number be substantially proportional to the percentage of total votes cast statewide for the party"s gubernatorial candidate in the last election.[113]

Judicial delegate and alternate delegate are party positions elected by enrolled voters within the party.  Any New York State resident who is an enrolled member of a political party can run for judicial delegate or alternate delegate within any Assembly District within the Judicial District.  The Election Law requires a designating petition signed by 500 enrolled members of the party, or 5% of the enrolled voters, whichever is less.[114]  As with other public offices and party positions, petitioning occurs within the 37-day petitioning period in the spring.[115]  And like other public offices and party positions, candidates for judicial delegate and alternate from an Assembly District often run on a slate together with candidates for other public offices or party positions, making it easier and more efficient to obtain the requisite signatures.  In addition to filing a designating petition, any group of enrolled voters may choose to run a write-in-campaign for judicial delegate by filing with the applicable Board of Elections a petition for an opportunity to ballot.[116]  If the petition is found to be valid, anyone who desires to write in against the designated slate of candidates may write in whatever name he/she wishes.[117]

Judicial delegates and alternate delegates convene at a judicial district-wide convention in September and cast their votes for those candidates whom they believe best should serve as the party"s nominee in the general election.  The manner and extent to which a judicial delegate may influence the process varies among the counties

---

[112]N.Y. Elec. Law § 6-124.  The judicial convention must be held "not earlier than the Tuesday following the third Monday in September preceding the general election and not later than the fourth Monday in September preceding such election."  N.Y. Elec. Law at § 6-158(6).

[113]N.Y. Elec. Law §§ 6-124, 6-136(3).
[114]N.Y. Elec. Law § 6-136(3).

[115]N.Y. Elec. Law § 6-136(4).  The State Assembly has passed legislation, Bill No. A8198, changing the date of the primary from September to June.  As of this writing the Senate has not concurred.

[116]N.Y. Elec. Law § 6-164.

[117]*Id.*

and political parties.  Thus, the convention system provides an additional, unique opportunity for individuals interested in judicial selection to participate by giving them an opportunity to run for a judicial delegate position in the primary.  The manner in which each convention is conducted may vary.  Delegates should learn the local customs and practices in their county and party.

Because judicial delegate and alternate delegate are elected party positions, obtaining support for candidacies for these positions, as with any elected position, is subject to the local political realities and practices on the ground.  For example, in New York County, judicial delegates and alternates are typically members of, and supported by, local political clubs, and candidates typically and naturally must have (or must win) the confidence of the club"s constituency, including political leaders associated with the club to obtain support.   Individuals interested in serving as judicial delegates or alternate delegates are encouraged to familiarize themselves with their local Assembly Districts" grass roots political organizations, process, and leadership.  As with any political process, the key is to get involved, express an interest in participation, demonstrate one"s ability to competently represent the district"s interests, and earn the confidence of those in positions to lend support at various levels.  To represent a community, one must be involved in the community.

Of course, the other typical avenues for participation in the judicial selection process, such as the array of judicial screening panels, exist with respect to Supreme Court Justice as well.  Under the New York County Democratic Committee"s rules, for example, the Committee may only support candidates for nomination for Supreme Court Justice if the judicial candidate is reported out of the party"s Independent Judicial Screening Panel.   Individuals interested in judicial selection are encouraged to explore all of these avenues.

IV. Conclusion

New York deserves a judiciary of the highest quality and independence, as well as a judiciary that reflects the broad array of views and experiences of our City"s and State"s diverse population.  Active, well-informed citizen participation in the judicial selection process can help achieve these goals.  We encourage all lawyers and others to take advantage of the opportunities for involvement that are described in this guide.

Appendix 1:   Diagram of New York Courts

Appendix 2:   List of New York State Departments and Districts

Appendix 3:   Executive Order #15 Establishing New York State Judicial Screening
Committees

Appendix 4:   Select provisions of political parties rules regarding judicial selections on
file with Board of Election

Appendix 5:   Kings County Democratic County Committee Report on Judicial Selection
Procedures as amended on December 14, 2011

Appendix 6:   Chart of Courts and their Selection Methods

Appendix 7:    Relevant City Bar Reports and Comments

APPENDIX 1

**Diagram of New York Courts**

## CIVIL COURT STRUCTURE



## CRIMINAL COURT STRUCTURE



Appendix 2

**List of New York State Departments and Districts**



APPENDIX 3

**Executive Order # 15**

Published on *Governor Andrew M. Cuomo* (http://www.governor.ny.gov)

**EO #15 ESTABLISHING JUDICIAL SCREENING COMMITTEES**

**WHEREAS**, under the Constitution and Laws of the State of New York the Governor is entrusted with the responsibility of appointing judicial officers to the offices of Judge and Presiding Judge of the Court of Claims; designating Justices of the Supreme Court to the offices of Justice, Temporary Justice, and Presiding Justice of the Appellate Division of the Supreme Court; and appointing judicial officers to fill vacancies in the offices of Justice of the Supreme Court, Judge of the County Court, Judge of the Surrogate"s Court, and Judge of the Family Court outside the City of New York; and

**WHEREAS**, a fair, impartial, independent, highly qualified, and diverse judiciary is essential to ensuring justice for all who come before New York State"s courts and to fostering public confidence in the integrity of the judicial process; and

**WHEREAS**, a fair, impartial, independent, highly qualified, and diverse judiciary is cultivated by:

1. encouraging highly qualified candidates from all parts of New York State, with diverse backgrounds and experiences, to apply for judicial offices;

2. reviewing candidates for judicial office without regard to political beliefs or party affiliation; and

3. selecting judicial officers who reflect the diverse backgrounds and experiences of the residents of New York State, based on their integrity, independence, intellect, judgment, temperament, and experience; and

**WHEREAS**, the highest quality of judicial appointments can best be assured with the assistance of diverse, credible, impartial and non-partisan judicial screening committees;

**NOW THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and laws of the State of New York, do hereby order as follows:

**A. Purpose and Duties**

1. Judicial Screening Committees are hereby established to evaluate the qualifications of candidates for appointment or designation to judicial office throughout New York State, and to recommend to the Governor those persons who are highly qualified to hold judicial office.

2. Each Judicial Screening Committee shall:

a. Actively recruit candidates for appointment or designation to the judicial offices within the committee"s jurisdiction. In recruiting candidates, the Judicial Screening Committees shall strive to find candidates that reflect the diverse backgrounds and experiences of the citizens of New York State;

b. Review and evaluate the qualifications of all candidates for appointment or designation. In reviewing and evaluating the qualifications of candidates, each committee member shall give primary consideration to each candidate"s integrity, independence, intellect, judgment, temperament and experience, and shall not give any consideration to the age, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status or political party affiliation of the candidate;

c. Recommend for appointment or designation only those candidates who, as determined by a majority vote of all members of the committee, are highly qualified for the judicial office for which they are being considered. No committee shall pass on the qualifications of any candidate until after a thorough inquiry has been made by the committee and its staff;

d. Prepare written reports on the qualifications of each candidate it determines to be highly qualified and recommends to the Governor. Committee reports shall be made available to the public upon request. All other records and deliberations of, and all communications to, any Judicial Screening Committee with respect to a candidate shall be held in confidence and shall not be disclosed to anyone other than the Governor, Counsel to the Governor, or their designees. Notwithstanding the foregoing, information submitted to any Judicial Screening Committee relating to an appointee may be disclosed to the Senate when necessary for confirmation of the appointee, and information submitted to a Judicial Screening Committee may be disclosed to any other person or organization if disclosure is required in connection with disciplinary proceedings or is otherwise required by law.

## B. State Judicial Screening Committee

1. A State Judicial Screening Committee is hereby established.

2. The State Judicial Screening Committee shall consist of thirteen members: two individuals selected by the Governor; the Chairperson of each of the Departmental Judicial Screening Committees established by Section C of this Executive Order; one of the other members of each of the Departmental Judicial Screening Committees, who shall be selected by the Governor; two persons selected by the Chief Judge of the Court of Appeals; and one person selected by the Attorney General. The chairperson of the State Judicial Screening Committee shall be appointed by the Governor from among the members of the Committee.

3. The term of office of any member of the State Judicial Screening Committee who is a member of a Departmental Screening Committee shall expire at the same time as the member"s term of office on the Departmental Screening Committee expires.

4. The State Judicial Screening Committee shall have jurisdiction to consider the qualifications of candidates for appointment to the offices of Judge and Presiding Judge of the Court of Claims, and to recommend to the Governor all persons whom it finds highly qualified for those judicial offices.

5. When exercising the power to designate the Presiding Judge of the Court of Claims pursuant to section 2(6) of the Court of Claims Act; or the power to appoint a Judge of the Court of Claims pursuant to section 9 of Article VI of the Constitution and section 2(2) and 2(4) of the Court of Claims Act; or the power to fill a vacancy in the office of Judge of the Court of Claims pursuant to section 21(b) of Article VI of the Constitution, the Governor shall appoint or designate only persons who have been recommended by the State Judicial Screening Committee as highly qualified for the judicial office to which the appointment or designation is to be made.

6. The State Judicial Screening Committee shall promulgate appropriate rules and regulations to govern its proceedings and those of the Departmental and County Judicial Screening Committees established by this Order. The rules and regulations shall include standards and procedures for ensuring, to the extent possible, uniformity of criteria for evaluating the qualifications of candidates for appointment or designation to judicial office throughout New York State.

## C. Departmental Judicial Screening Committees

1. A Departmental Judicial Screening Committee is hereby established in each judicial department of New York State.

2. Each Departmental Judicial Screening Committee shall consist of thirteen members: five members shall be selected by the Governor; two members shall be selected by the Chief Judge of the Court of Appeals; two members shall be selected by the Attorney General; one member shall be selected by the Presiding Justice of the Appellate Division for that department; one member shall be selected jointly by the Speaker of the Assembly and the Minority Leader of the Senate; one member shall be selected jointly by the President Pro Tempore of the Senate and the Minority Leader of the Assembly; and one member shall be selected by the President of the New York State Bar Association. The Chairperson of each Departmental Screening Committee shall be appointed by the Governor from among the members of the Committee. Each member of the Committee shall be a resident of, have an office in, or work in the judicial department in which he or she is to serve.

3. Each Departmental Judicial Screening Committee shall have jurisdiction to consider the qualifications of candidates for designation to the offices of Justice, Additional Justice, Temporary Justice and Presiding Justice of the Appellate Division of the Supreme Court for such department, and candidates for appointment to the office of Supreme Court Justice within such department, and to recommend to the Governor all persons whom it finds highly qualified for those judicial offices.

4. When exercising the power to designate the Presiding Justice of each Appellate Division pursuant to section 4(c) of Article VI of the Constitution; or the power to

designate other Justices of any Appellate Division pursuant to sections 4(c) and 4(d) of Article VI of the Constitution; or the power to designate Additional Justices of any Appellate Division pursuant to section 4(e) of Article VI of the Constitution; or the power to fill a vacancy in the office of Justice of the Supreme Court pursuant to section 21(a) of Article VI of the Constitution, the Governor shall appoint or designate only persons who have been recommended by a Departmental Judicial Screening Committee as highly qualified for the judicial office to which the appointment is to be made.

5. A candidate recommended as highly qualified for the office of Supreme Court Justice or Justice or Additional Justice of the Appellate Division of the Supreme Court by a Departmental Screening Committee shall be eligible for appointment or designation by the Governor to such office in any judicial department. Notwithstanding the foregoing, a person serving as a Justice of the Appellate Division of the Supreme Court may be designated by the Governor to serve as an Additional Justice, and a person serving as an Additional Justice of the Appellate Division of the Supreme Court may be designated by the Governor to serve as a Justice, of the same or a different judicial department without the recommendation of a Departmental Screening Committee.

**D. County Judicial Screening Committees**

1. A County Judicial Screening Committee is hereby established in each county of the State, consisting of the members of the Departmental Judicial Screening Committee for the department in which the county is located plus one additional person who shall be resident of, have an office in, or work in the county in which he or she is to serve, to be selected by the chief executive officer of the county. The Chairman of the Departmental Judicial Screening Committee shall also serve as Chairman of the County Judicial Screening Committee. As used herein, the term "chief executive officer" for the county shall mean the appointed or elected county executive, as the case may be, or if there be no such office, the chairman of the governing body of the county; provided, however, that for counties within the City of New York, the term "chief executive officer" for the county shall mean the Mayor of the City of New York.

2. Each County Judicial Screening Committee shall have jurisdiction to consider the qualifications of candidates for appointment to the offices of Judge of the County Court, Judge of the Surrogate"s Court, and Judge of the Family Court outside of the City of New York, for such county, and to recommend to the Governor all persons whom it finds highly qualified for those judicial offices. When exercising the power of appointment to fill a vacancy in the office of Judge of the County Court, Judge of the Surrogate's Court, or of Judge of the Family Court outside of the City of New York, pursuant to section 21(a) of Article VI of the Constitution, the Governor shall appoint only persons who have been recommended by the appropriate County Judicial Screening Committee as highly qualified for the judicial office to which the appointment is to be made.

**E. General Provisions**

1. The terms of office of the members of the Judicial Screening Committees established by this Executive Order shall be for a term of three years.

2. The terms of office of the members of the Judicial Screening Committees established by this Executive Order are subject to the provisions of section 5 of the Public Officers Law.

3. Committee vacancies shall be filled in the same manner as initial appointments, and a person appointed to fill a vacancy shall serve for the remainder of the unexpired term. No member shall be removed during his or her term by the Governor except for cause.

4. No member of a Judicial Screening Committee shall hold any judicial or elected public office for which he shall receive compensation during his period of service, nor shall he hold any office in any political party. No member of a Judicial Screening Committee shall be eligible for appointment to any judicial office within the jurisdiction of the Judicial Screening Committee on which the member serves during the member's period of service or within one year thereafter.

5. Members of Judicial Screening Committees shall receive no compensation for their service, but shall be entitled to reimbursement for any necessary expenses incurred by them in connection with the performance of their duties. Each judicial screening committee shall have a paid staff available to it sufficient to enable the committee to carry out properly its responsibilities including adequate investigations into all matters relevant to the qualifications of candidates for appointment to judicial office.

6. Executive Order No. 8, issued June 18, 2008, is hereby revoked and superseded by this Executive Order as of the date hereof.

G I V E N under my hand and the Privy Seal of the State in the City of Albany this twenty-seventh day of April in the year two thousand eleven.

BY THE GOVERNOR

Secretary to the Governor

APPENDIX 4[118]

**Select Provisions of Political Parties**

BRONX DEMOCRATS (dated 9/20/12)
  Art. 4, Sec. 4-1.3  **Independent Judicial Screening Panel**
        An independent judicial screening panel is established for the
designation/nomination of all judicial candidates seeking the support of the Party for
election to judicial office. There shall be a panel administrator who organizes and
conducts the screening panel. The panel administrator shall provide notice of the
judicial screening panel questionnaire's availability in the New York Law Journal.
There shall be a minimum of seven (7) participants comprising the independent
screening panel, consisting of bar and community groups and these groups shall be
solely responsible for the election of the participating member on the panel without
any direction of the Party. Only those candidates deemed qualified by the panel shall
be considered for designation or nomination for the respective judicial office.

BRONX REPUBLICANS (undated)
  No specific provision on file.

BROOKLYN DEMOCRATS (dated 9/19/12) (states unchanged from rules as amended
1/27/09)
  No specific provision on file.

BROOKLYN REPUBLICANS (9/30/09)
  No specific provision on file.

MANHATTAN DEMOCRATS (9/26/11)
  Art. 3, Sec. 7 (ii)   **Committee on the Judiciary**
    (1) The Committee on the Judiciary shall consist of at least five members of the
Executive Committee appointed by the County Leader, additional members to be
appointed in the discretion of the County Leader and the Chairperson or Chairpersons
of the Law Committee, ex-officio. It shall, by majority vote, select organizations (or
heads of organizations acting in their individual capacity) which shall each designate
one member of an independent panel for screening judicial candidates, and the
Committee on the Judiciary shall report its selections to the Executive Committee. In
selecting such organizations, the Committee on the Judiciary shall insure broad
representation of all elements of the community.
    (2) The Committee on the Judiciary shall also designate a person, not a member
of the Executive Committee, who shall act as Administrator of the independent panel,

---

[118]The Committee wishes to thank Lawrence A. Mandelker for his assistance in
obtaining copies of the rules.

without being a voting member thereof. The Committee shall cooperate with the independent panel by establishing timetables and procedures for the operation of the panel, and shall establish guidelines for the qualifications and method of selection of members designated to serve on the independent panel and for the conduct of the panel. The Committee shall also provide for adequate publicity in advance of the first meeting of the panel with respect to each judicial position. The Committee shall meet with the Administrator and with the independent panel at the first meeting to review the guidelines and timetables set by the Committee. At such meeting the Administrator shall inquire as to the availability and qualifications of each panel member, and in a proper case may request the designation of a substitute for a particular member of the independent panel, such request to be made to the organization (or head of organization) which had originally designated such member. No person shall be proposed or approved as a member of the independent panel who shall not have agreed to follow the guidelines established by the Committee. No person may serve as a voting member of an independent screening panel for more than one year in any consecutive three year period. Any member of a panel who is or was a relative, partner, associate, employer or employee of any person who appears before said panel for the purpose of being screened shall disclose such relationship to the Administrator and shall be disqualified form voting with respect to such person; the Committee on the Judiciary may establish guidelines which are more restrictive in order to prevent conflicts of interest.

(3) Neither the Executive Committee nor the County Leader shall designate, nominate or propose any candidate for judicial offices which are to be elected county-wide in New York County, or which are to be proposed for appointment by the Mayor of the City of New York or by the Governor of the State of New York, exclusive of recommendations for interim appointment by the Mayor or the Governor, unless such candidate shall have been approved in that calendar year for such office by the independent panel, except that once a candidate for the office of Justice of the Supreme Court has been reported as highly qualified by at least two of the last four independent screening panels for that office, that candidate shall be considered as having been approved by the panel for such office during each of the four calendar years after the year in which the candidate shall have last achieved such status…..and such candidate shall not make application to the panel during any of such years unless the Committee on the Judiciary shall require the candidate to make such an application.

(4) The independent panel shall report as approved for each judicial position all highly qualified persons who make application to the panel, provided that if the number of highly qualified applicants exceeds three times the number of existing vacancies to be filled in such position…the independent panel shall report as approved the most highly qualified applicants in a number equal to three times the number of vacancies to be filled in such position, provided further that if the number of highly qualified applicants is less than three times the number of vacancies to be filled in such position the independent panel shall report as approved the most highly qualified applicants in a number equal to not less than two times the number of such vacancies, provided further that the following categories of applicants who are eligible

for reelection or reappointment shall be reported as approved if their performance during their term of office merits continuation in office, and no other applicants shall be reported as approved for their vacancies: (a) a judge or justice completing a full term of office seeking re-election to that office, or (b) an interim Supreme Court justice who has been appointed by the Governor to fill an existing vacancy no later than the previous June 1 after approval of the Governor's screening panel, who has been confirmed by the State Senate and has assumed office no later than the date the panel renders its report, …[remainder omitted]

(5)  The report of the independent panel shall be delivered to the chairperson of the Committee on the Judiciary and the chairperson of the Law Committee immediately upon its  adoption. The chairperson of the Committee on the Judiciary shall immediately confer with the members of the Committee on the Judiciary to determine whether the report complies with these Rules and the guidelines established by the Committee…[remainder omitted]

(6) The independent panel shall have no power to make any change in its report after the final meeting. The Committee shall release the report to all members of the Executive Committee within 24 hours after the close of such final meeting.

MANHATTAN REPUBLICANS (9/19/11)
  No specific provision

QUEENS DEMOCRATS (9/21/12)
  No specific provision

QUEENS REPUBLICANS (9/28/11)
  No specific provision

STATEN ISLAND DEMOCRATS (9/16/11)
  Article VII, Section 6(d)   **Committee on Law and the Judiciary**
    (I) …there shall also be a Committee on Law and the Judiciary. This Committee, through its chair, shall advise the County Committee and the Executive Committee and all other bodies and officers of the County Committee on any question of law relating to the discharge of any duty and report on matters of a legal nature.

(ii) The Committee…shall be chaired by the Chair of the Committee on Law and the Judiciary…and said committee shall consist of the Chair…and it shall also consist of at least six additional members of the bar…, residing in Richmond County, five of whom shall be appointed by County Chair and the Chair of the Committee…and serve at the discretion of the County Chair. The Committee on Law and the Judiciary shall, either as composed, or by the inclusion of other members as it shall designate, as the Judicial Screening Panel, by majority vote, arrange and conduct the screening of candidates for judicial office and delegates for judicial convention.

(iii) Two of the seven members of the Committee on Law and the Judiciary shall be the Chair of the Committee…and a Deputy Chair. The Deputy Chair shall be appointed by the County Chair and serve at said Chairs discretion and the Deputy shall also serve as an additional member of the Executive Committee. The Committee

Chair shall be charged with developing and promulgating rules and procedures under which Judicial Screening will take place and shall act as Administrator of the Judicial and Delegate Screening Panel. The deputy chair shall yield and defer to the chair of the committee.

(iv) The Judicial Screening Panel, through the Chair of the Committee on Law and the Judiciary shall report to the County Chair and the Executive Committee on all qualified applicants for Judicial Office and as delegates. Provided that if the number of qualified applicants, at the time the committee issues its report,  exceeds three times the number of vacancies, the Screening Panel shall report as approved only a number of the most qualified applicants, not less than two times the number of said vacancies.

(v) The Screening Panel shall also be charged with the screening of incumbent judges and justices completing terms, and eligible for reelection or reappointment. However, by majority vote, the Panel may choose to deem as approved only the said incumbent seeking a new term and the Chair of the Law Committee or his designee shall report to the County Chair or Executive Committee.

STATEN ISLAND REPUBLICANS (undated)
  No specific provision

APPENDIX 5

**Kings County Democratic County Committee Report on Judicial Selection
Procedures as amended on December 14, 2011**

1.    A newly-constituted screening panel shall be established, effective October 1, 2003.  The panel shall review and interview all legally qualified candidates for Judicial Office who request such a review.  They shall judge each candidate as either "Qualified" or "Not Qualified at this time."  The panel may, in its discretion, publish explanatory language in any determination finding a candidate "Not Qualified at this time."  Prior to the publication of any list of Committee findings, candidates shall be permitted to withdraw their candidacies, unequivocally and with prejudice.  Of the Qualified Candidates the Panel shall report out a limited pool of recommended candidates based on the total number of vacancies for that judicial office (i.e., civil, supreme).  The total pool shall be 5 individuals per vacancy for each type of judicial office.  For the purposes of determining the size of the Pool, incumbent's seats shall be included.

a] The panel may waive the submission of an application and the formal interview of any candidate who has been screened and adjudged "Qualified" in each of two (2) successive years for a period not to exceed three years, provided however, that such candidate submits a form affidavit (as prepared by the panel) to the effect that no material change to their background, qualification or fitness has occurred.  Upon the grant of such waiver to any such candidate, the panel shall report such candidate as "Qualified" in the same manner as those candidates who have been subject to screening in the current year.

b] The panel is authorized to impose absolute deadlines for the submission of applications, affidavits and required documentation by putative candidates.  The panel may reject, as untimely, any documentary submission received aft.er a published deadline.

2.    The panel"s determination for each and every person interviewed shall be shared with all members of the Executive Committee prior to an endorsement vote.  In the case of candidates for the Civil Court, this should be at least four weeks prior to the first day to circulate petitions or as soon as practical.  In the case of Supreme or Surrogates Court, these findings should be published sixty (60) days before the first day to convene the Judicial Convention or as soon as practical and made available to all Delegates and Alternate Delegates attending the Judicial Convention and to all members of the Executive Committee.

3.    In addition to any existing and/or additional requirements of the panel, any person who wishes to be interviewed must disclose any and all action taken against them by any bar disciplinary committee, including private admonitions.  In

addition, any such person who is or has been a sitting judge must disclose any and all action taken against them by The Commission on Judicial Conduct., including private admonitions.

Additionally, all open and pending inquiries must be disclosed as well. Any candidate who asserts that no such action has ever been taken against them must affirm so in writing.

4. The Executive Committee may not endorse any candidate for Judicial Office that is not recommended by the Screening Panel. The Executive Committee may not endorse for nomination by the Judicial Convention any candidate for Supreme Court that is not found to be "recommended" by the Screening Panel. Incumbent Judges seeking re-election to the same office shall be deemed Recommended unless seventy-five percent (75%) of the quorum determines that the Judge should not be reported out as Recommended. For the purposes of these rules Judges appointed to fill interim vacancies shall not be deemed Incumbent Judges.

5. No member of the Screening Panel may be a candidate nor may they be related to any candidate. "Related" shall be defined to include relation by marriage, and shall be limited to relationships that are "first cousin" or closer. Refusal is not sufficient protection. Anyone who is related to any candidate in a given year may not serve at all on the panel.

6. The panel shall consist of the following:

a] Two members selected by the Brooklyn Bar Association;

b] One member selected by the Brooklyn Women's Bar Association;

c] One member selected by the Kings County Criminal Bar Association;

d] One member selected by the Association of the Bar of the City of New York;

e] One member selected by the Columbian Lawyer"s Association of Brooklyn;

f] One member selected, annually on a rotating basis by one of the following four (4): Legal Aid Society of New York City; Brooklyn Legal Services, Corporation A; and South Brooklyn Legal Services; Bushwick Housing and Legal Services.

g] One member selected by the Chairman of the Board of Trustees of the Brooklyn Law School;

h] One member selected by the Metropolitan Black Bar Association:

i]      One member selected by the Puerto Rican Bar Association;

j]      Each year, on a rotating basis, three of these groups shall be invited to participate and shall select their own member of the panel, provided such member meets the other criteria specified in this rule for membership: Lesbian & Gay Law Association of Greater New York (LEGAL), Lawyers Torah Club, Catholic Lawyers Guild of Kings County, Association of Black Women Attorneys, Brehon Law Society, Dominican Bar Association, Hispanic National Bar Association, Jewish Lawyers Guild, Judicial Friends, Metropolitan Women's Bar Association, New York State Women's Bar Association, Protestant Lawyers Association, and Asian American Bar Association of the City of New York, **United Jewish Organizations of Williamsburg, Inc., New York State Court Officers Association, Kings Bay YM-YWHA, Kings County Conference of the Knights of Columbus and the Federation of Italian-American Organizations of Brooklyn, Ltd.**;

k]      Each year, on a rotating basis, one of these groups shall be invited to participate and shall select their own member of the panel, provided such member meets the other criteria specified in this rule for membership: Brooklyn-Manhattan Trial Lawyers Association, Association of Trial Lawyers of the City of New York, New York Criminal Bar Association, New York State Association of Criminal Defense Lawyers, and the New York State Bar Association;

l]      [Two] **Three** members selected by the Chairperson of the Executive Committee of the Kings County Democratic Party, one of whom shall serve as the Chairperson of the Panel.

m]      One member selected by the New York State Trial Lawyers Association.

n]      Four Attorneys and Three Community Organization members selected by the Chairperson of the Executive Committee of the Kings County Democratic Party from a list nominated by a majority of the Executive Committee members from each of seven groups of Assembly Districts referenced in Provision 8 below.  In selecting from such list, the Chairperson may not select nominees from a particular group in consecutive years.  Members in this category may not hold any public office or party position or seek such office or position during their tenure on the Committee.

7.      Every member of the Screening Panel [who is an attorney] must be an admitted member of the Bar of the State of New York in good standing and all members must maintain a residence or employment/practice in the Second Judicial District and be an enrolled member of the Democratic Party.

8.     The Assembly District Groups shall be as follows:

    a]40, 42, 58

    b]41, 45, 59

    c]46, 47, 48

    d]44, 52,60

    e]50, 53, 54

    f]49, 5 I, 55

    g]43, 56, 57

9.     In the event that any of the groups specified in Section 6 ["a" through "m" inclusive] shall decline to participate, then additional groups shall be invited from those listed in Section 6 [j] to compensate therefore, thus endeavoring that the panel retains a ratio of members that are independent of the political party process as intended by these procedures.

10.     Invitations to groups shall be delivered on or before February 15th of each year. Responses from each group and nominees from the Assembly District Groups shall be received on or before March 1st of each year. The fully-constituted panel shall be designated on or before March 1st of each year and shall meet, if at all possible, within the first two weeks of March of each year.

11.     No candidate or Member of the Executive Committee may communicate with a member of the Screening Committee regarding the candidacy of any individual proposed for screening.

12.     The Executive Committee and the Chairman, thereof, shall exercise due diligence in requiring the composition of the Screening Committee to reflect the racial, ethnic, religious, gender, and sexual preference diversity of the County of Kings.

13.     Before undertaking any candidate evaluations, the Screening Committee shall adopt formal written criteria, upon which all such evaluations shall be based.

14.     The Screening Committee shall be guided by and adopt Rules of Procedure, not inconsistent with the Blue Ribbon Advisory Panel to the Chairman of the Executive Committee of the Kings County Democratic County Committee with the exception of Recommendation IX. The Panel shall not treat a pending grievance as an automatic bar to a Recommendation.

15.   Should the Screening Committee recommend fewer than five times the number of "Qualified" candidates for the total number of vacancies for the judicial offices to be nominated in any year, then the Committee shall continue to accept additional applications, from new applicants, until such threshold has been met.

16.   The Chairman of the Committee shall be a voting member of the Screening Committee, should be chosen by the Chairman of the Executive Committee and serve for a two-year renewable term.  Notwithstanding this, the Chairman shall serve at the pleasure of the Chairman of the Executive Committee and may be dismissed by the Chairman of the Executive Committee at any time.

17.   The Screening Panel shall not be discriminatory in its decisions and should consider diversity when making determinations.  The Screening Committee should consider the residence of the Candidate.  The Screening Panel should consider the Community involvement of the candidate and his or her standing in their respective community.

18.   The Panel shall make use of subcommittees and pre-interviews.  The Panel shall institute an expeditious process allowing candidates to appeal screening panel decisions.

19.   A quorum shall consist of at least two-thirds of the current members in good standing.  A sixty percent (60%) vote of the quorum should be required for all decisions, except for the case of incumbent judges as stated heretofore **and further excepting that any candidate having been found "Qualified" in any year may only be found "Not Qualified at this time" in the following year upon a majority vote of a quorum**.  Attendance of panel members shall be mandatory, and a member who fails to attend two (2) consecutive meetings without a satisfactory explanation should be dismissed.

new matter is underlined in Bold, matter to be deleted is in [brackets].

APPENDIX 6

**Chart of Courts and their Selection Methods**

**Federal Courts**

| Court | Method of Selection |
|---|---|
| United States Court of Appeals | Judges are appointed by the President, with the advice and consent of the United States Senate |
| Federal District Court - Judges | Judges are appointed by the President, with the advice and consent of the United States Senate |
| Federal District Court - Magistrate Judges | Magistrate Judges are appointed by a majority of the judges in the District for which the appointment is made, or by the Chief Judge of the District |
| United States Bankruptcy Court | Bankruptcy Judges are appointed by a majority of the judges of the Court of Appeals in the Circuit, or by the Chief Judge of the Court of Appeals |

**State Courts**

| | |
|---|---|
| New York Court of Appeals | Judges are appointed by the Governor, with the advice and consent of the State Senate. |
| Appellate Division | Justices are appointed by the Governor; only elected Supreme Court Justices are eligible for appointment to the Appellate Division |
| Appellate Term | Justices are appointed by the Chief Administrator of the Courts, with the approval of the Presiding Justice of the appropriate Appellate Division; only elected Supreme Court Justices are eligible for appointment to the Appellate Term |

| | |
|---|---|
| Supreme Court | Justice are elected by judicial district; Interim Justices are appointed by the Governor, with the advice and consent of the State Senate.<br>Acting Justices are appointed by the Chief Administrator of the Courts |
| Court of Claims | Judges are appointed by the Governor, with the advice and consent of the State Senate. |
| Surrogate"s Court | Surrogates are elected by county |
| Criminal Court of the City of New York | Judges are appointed by the Mayor. Judges elected or appointed to other courts may be designated by the Chief Administrator of the Courts to sit in Criminal Court |
| Family Court (within the City of New York) | Judges are appointed by the Mayor. Judges elected or appointed to other courts may be designated by the Chief Administrator of the Courts to sit in Family Court |
| Civil Court of the City of New York | Judges are elected by county or by smaller judicial districts |
| Housing Part of the Civil Court | Judges are appointed by the Administrative Judge |

APPENDIX 7

**Relevant City Bar Reports and Comments [119]**

Council on Judicial Administration (hereafter "CJA") report, 1998, "The Chief Judge's Court Restructuring Plan, with certain modifications, Should Be Adopted"

Joint report of Committee on Criminal Advocacy and Committee on Criminal Courts, "Assignment of Judges in the Criminal Term of Supreme Court in New York County," May 1998

Judicial Selection Task Force report, October 2003, "Recommendations on the Selection of Judges and the Improvement of the Judicial System in New York"

Comments, 12/22/04, on proposed rule changes based on the reports of the Commission to Promote Public Confidence in Judicial Elections

Testimony of Alan Rothstein, March 9, 2005, before State Senate Judiciary Committee, recommending that political parties set up judicial screening committees

*Amicus* brief to the 2nd Circuit Court of Appeals in Lopez-Torres v. New York State Board of Elections, May 17, 2006

Judicial Selection Task Force report, December 2006, "Recommendations on the Selection of Judges and the Improvement of the Judicial System in New York State"

*Amicus* brief to the Supreme Court in New York State Board of Elections v. Lopez-Torres case, July 2007

Letter of CJA Chair Jay G. Safer, 9/21/09, commenting on proposed revisions to the rules of the New York State Commission on Judicial Nominations

Report, February 2011, opposing A. 309, which would have directed the Commission on Judicial Nominations to forward to the Governor all "well qualified" candidates for Associate Judge and/or Chief Judge

CJA Report, March 2011, in support of Ten-Year Renewal Terms for Housing Court Judges

CJA Report, July 2011, supporting S.4878-A, which would have allowed Housing Court Judges to be reappointed for ten years after the initial five-year appointment

_____
[119] These reports are available in the City Bar website http://www2.nycbar.org/Publications/reports/index_new.php?type=subject&alpha=A.

# Members of the Council on Judicial Administration 2012-2014

Chair – Steven Kayman

Chair – Roger Maldonado (2010-13)

Secretary – Milton Otto

| | | |
|---|---|---|
| Hon. Rolando Acosta | Peter Goodman | Shannon Nagle |
| Hon. Harold Baer | Fran Hoffinger | Robert Newman* |
| Rebecca Berkebile | Katherine Huang | Elizabeth Newton |
| Hon. Lucy Billings | Janet Kalson | Robert O'Hare |
| Hon. Eileen Bransten | Hon. Michael Katz* | Kate Paek |
| Robert Calinoff | Steven Kayman | Maria Park* |
| Partha Chattoraj | Sharon Klein | Ashwani Prabhakar |
| James Chou* | Peter Kougasian | Cynthia Rubin* |
| David Cooperstein | Sabita Krishnan | Michael Ryan |
| Robert Dean | Hon. William Kuntz | Cary Samowitz |
| Hon. Carolyn Demarest | Marilyn Kunstler | David Sculnick |
| Sylvia DiPietro | Mark Leider | Malaika Scott-McLaughlin |
| Elizabeth Donoghue | Jennifer Levy | Steven Shapiro* |
| Dennis Doyle | Hon. Frank Maas | Hon. Jacqueline Silbermann |
| Leslie Dubeck | Lawrence Mandelker | |
| Jeremy Feinberg | Hon. Andrea Masley* | Hon. Leslie Stroth* |
| R. Nadine Fontaine | Glen McGorty | Raymond Vandenberg |
| Hon. Helen E. Freedman | Ronald C. Minkoff | |
| Dora Galacatos | Janet Mishkin | |

* Members of the subcommittee chaired by Hon. Andrea Masley responsible for writing this report.

# EXHIBIT 10

<u>Revision One – Revised as of January 28, 2016</u>

# Judicial Screening Committee Kings County Democratic Party

**2016 Questionnaire for Justice of the Civil/Supreme Court**

This questionnaire must be completed by all candidates before consideration of their candidacy can commence. Unless otherwise indicated, every question must be answered, even if the answer is negative or an indication that the question is inapplicable.

At the candidate's request, this questionnaire will also be provided in an electronic form formatted in Word or WordPerfect to facilitate completion without resorting to supplying answers on separate sheets where the space provided is insufficient. If the candidate chooses not to avail him or herself of the electronic format and the space provided is insufficient for a complete answer, please complete the answer on a separate sheet(s) attached to the questionnaire.

The Committee requires that if you change your address or telephone number, or if anything occurs which would affect your answers to this questionnaire, the Committee should be promptly notified. Please attach the following:

1. In the event you are a sitting Judge, please provide copies of all financial disclosure forms or statements filed with any Federal, State or City entity, including but not limited to financial disclosures filed with the OCA, New York State Ethics Commission or any other governmental entity.

2. Copies of any applications submitted to any Judicial Screening Selection Committee for the last 3 years, *other than your previous submissions to this committee*. <u>Only the applications and answers are required</u>, exhibits need not be provided. Scanned copies on CD are acceptable.

3. Please indicate whether you are applying for **Civil Court, Supreme Court, or both**?

    **PLEASE EXECUTE THE WAIVERS ON THE LAST TWO PAGES OF QUESTIONNAIRE**.

Please be advised that <u>all</u> information provided will be kept strictly confidential. You must provide **one original** and **25 copies** of the completed questionnaire to:

Martin Edelman, Chairman
Kings County Democratic Party
Judicial Screening Committee
61 Broadway, Suite 2220
New York, New York 10006
212-943-1200

1.    Please indicate whether you are applying for the Civil Court, the Supreme
      Court or both:

      _____

      _____


2.    Full name: _____

      (If you have ever used or been known by any other name,
      State that name):_____

3.    Office address:

      _____
      _____
      _____
      _____


4.    Present residence:

      _____
      _____
      _____


5.    List other residences you have had within the past five years,   including
      temporary residences, and dates:

      _____
      _____
      _____
      _____
      _____
      _____
      _____
      _____


6.    Telephone numbers and email address where you may be reached:

      _____
      _____
      _____


7.    Date and place of birth:

      _____
      _____
      _____

(In the event you were not born in the United States, please submit evidence of United States citizenship)_____

8.      Present position or occupation:

_____

_____

_____

9.      Have you been engaged in any occupation, business or profession other than the practice of law, since the date you were admitted to the Bar?

(a)      If so, give details, including dates, and the circumstances under which you ceased to be so engaged:

_____

_____

_____

(b)      In the event that the occupation, business or profession in which you were engaged was owned by you alone, or owned by you with others, directly or indirectly, state the names and present addresses of any of those who shared the ownership, and state whether or not there are unpaid debts or claims with respect to the conduct of that occupation, business or profession:

_____

_____

_____

_____

_____

_____

_____

_____

10.      If you are married, in a civil union or a domestic partnership whether formalized or not, state the date when this was entered into and the full name and occupation of your spouse:

_____

_____

_____

11.      List all colleges and professional schools (other than law schools) ever attended; include degrees received, class standing if known, honors, and

indicate the month and year of beginning and ending of periods of attendance. If a degree was not received, state the reason, and state the nature of the course of study pursued:

_____
_____
_____
_____
_____
_____
_____
_____
_____

12.　A.　List all law schools attended, giving the same information requested above:_____

_____
_____
_____
_____
_____

　　B.　Date you were admitted to the Bar in New York

_____

　　C.　List any other jurisdictions you are admitted to including all Federal and State Courts and the dates of admission

_____
_____
_____
_____

13.　A.　List any post-law school education and the degrees if any awarded

| Description of Course | Date | Sponsor |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |

　　B.　List all continuing legal education courses which you have participated in either by lecturing or attending within the past four years

_____
_____
_____
_____
_____

Number of Hours

_____

14.     Have you been in continuous compliance with the registration requirements for
        Attorneys in the State of New York since your admission to the bar?
        YES_____ NO_____ if no please describe the circumstances.

        _____
        _____
        _____

15.     Have you been in continuous compliance for the registration requirements for
        the other jurisdictions you have been admitted to since your admission to that
        Bar. Yes_____ No _____ if no, please describe the circumstances.

        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____

16.     Are you registered to vote?
                Yes _____
                No  _____

17.     If yes, in what county? _____

18.     What, if any, is your party enrollment?
        _____

19.     Over the past five years have you consistently voted in primary (Y) (N) and general (Y) (N) elections?  If no, please explain.

_____
_____
_____

20.     Are you a member of any political club, association or organization?
        A.  If so, please identify and list any offices held during the past five years?

_____
_____
_____
_____
_____

21.     During the past five years have you been elected (including election as a result of an uncontested primary election) to any party position and if so please identify?

_____

22.     If you have served in the Armed Forces, including the Reserves or the National Guard, state the date of entry into and discharge from the service, nature and type of discharge, rank at the time of entry and discharge, and state any award or citations you received:

_____
_____
_____
_____
_____

23.     Are you now an officer or director or otherwise engaged in the management of any enterprise or charitable organization?

        (a) If so, give details, including name, dates, nature of business and description:

_____
_____
_____

        (b) Is it your intention to resign each such position and withdraw from participation in the management of any such enterprise, if you are nominated and confirmed?

Yes \_\_\_\_
No \_\_\_\_

If not, state the reasons:

_____
_____
_____
_____
_____
_____
_____
_____

24.    List in chronological order the time and location of every place you have
       practiced law, and the nature of your practice since your first admission to the
       Bar.  If you have practiced in partnership with others, include the partnership
       name(s) and address (es):

_____
_____
_____
_____
_____
_____
_____
_____

25.    List areas of the law in which you have specialized, and the periods during
       which you have conducted each specialty:

_____
_____
_____
_____
_____

26.    If you have been a practicing lawyer at any time within the last five years,
       annex a list of ten recent cases in which you have participated for the purpose
       of trial or appeal in any Court.  For each case, state the name and present
       address of your adversary, the Court, and the Judge or Judges before whom
       you appeared for the purpose of a hearing or trial.

_____
_____
_____

_____
_____
_____
_____
_____

27.     a.)  State the number of cases you have tried to conclusion in courts of record
        in the past five (5) years, indicating whether you were sole, associate, or chief
        counsel, or a Judge. Provide the name, a brief description of each case listed,
        and the court in which the case was tried.  Give the citations of any reported
        cases.

        If you presided as a **judge** over any listed case,  include for your ten (10) most
        recent trials within the past five (5) years, the names of all lawyers and contact
        information and two (2) recent written opinions whether published or not and
        (2) published in Supreme/Civil Court if possible. (copies of all opinions should
        be annexed)

        If you participated in the trials noted above as an **attorney,** provide the names,
        current addresses and telephone numbers of your adversaries, the name of the
        judge, and the approximate date the trial ended for all cases within the past five
        (5) years. If you have participated in more than 15 trials over the past five (5)
        years, list only the 10 most recent trials.

        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____

b.)   State the number of appeals you have been involved with in the past five (5) years, indicating whether you were sole, associate, or chief counsel, or whether you presided as a judge.  Provide the name, a brief description of each appeal listed, and the court to which the appeal was taken.  Give the citations of any reported opinions. If you preside as a judge over any listed appeal, provide the names, current addresses and telephone numbers of the attorneys appearing who argued the appeal.  If you participated in the appeals as an attorney provide the name, current addresses and telephone numbers of your adversaries.

_____
_____
_____
_____
_____
_____
_____
_____
_____

28.     In the event that you have been a practicing lawyer at any time within the last five years, answer the following:

(a)     Did you appear in Court regularly, occasionally or not at all?

_____
_____

If the frequency of your appearances in Court varied during this period, explain the variance.

_____
_____
_____
_____
_____
_____
_____
_____

(b)     Describe your litigation practice during the last five years, indicating what percentage was civil or criminal, or attributable to a more specific type of case, such as Personal Injury, Landlord and Tenant, Securities, and the like.  Give as much detail as is necessary for an understanding of the nature of your litigation practice during the said five-year period:

_____
_____
_____
_____
_____
_____
_____
_____

(c)    What percentage of your appearances in the last five (5) years were
in:
New York Court of Appeals,
Supreme Court of the State of New York and/or Civil Court of the City of
New York (Including Appellate Divisions)  %_____  other courts of record
%_____    Administrative bodies  %_____  Federal Court  %_____
Other  %_____

29.    Summarize your experience in Court prior to the last five years, in comparison
to your answer with respect to the last five years:

_____
_____
_____
_____
_____
_____
_____
_____

In the event you have not appeared in court within the last five years, please
provide us with a detailed answer as to your work history within that five-year
period (e.g.:  managing partner, supervising associates, etc.).  Kindly list your
prior litigation experience in detail.

_____
_____
_____
_____
_____
_____
_____
_____

30.     If  you have been a practicing lawyer within the last five years, but only a transactional lawyer whose practice did not require or need you to appear in Court on a regular basis or at all,  on a separate sheet  please list the 10 most important matters that you worked on and a brief description of them  and please include the names and contact information of the attorneys you worked with on these matters including any and all supervising attorneys and the attorneys who represented the other parties involved.

_____
_____
_____
_____
_____
_____
_____
_____
_____

31.     If your practice within the last five years was mainly a transactional practice as described above and you do not work for a government agency, with your client's permission the committee may wish to contact some clients if that permission is granted.
        Please list  the  names  and  contact  information  of  any  client  whom  the committee may contact.

_____
_____
_____
_____
_____
_____
_____
_____

32.     If you have worked for any organization in the past 10 years and your legal duties consisted of either being a legal advisor or compliance officer, please list all positions you have held and the names and current contact information of your immediate supervisor(s) who is/are intimately familiar with your work. If applicable, please provide at the names of at least three supervisors and current contact information.

_____
_____
_____
_____
_____
_____
_____

33.     List each judicial office you have held, including dates in office, and any
        specific functions you had been assigned within the particular Court:

        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____

34.     List other experience or positions of a judicial nature, such as arbitrator,
        mediator, law clerk, and the like, giving dates and explanatory details:

        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____

35.     This question is now BLANK, as the questionnaire has been revised on
        1/28/16 and the previous #35 has been combined with question # 27.

36.     List each public position you have held, other than a judicial nature, giving
        dates and explanatory detail:

        _____
        _____
        _____
        _____
        _____
        _____
        _____
        _____

37.     List any teaching position you have held, including part-time or occasional,
        with dates and a description of the subject matter and educational institution or
        sponsor:

        _____
        _____
        _____

_____
_____
_____
_____
_____

38.     List all bar associations, other professional societies and community organizations of any kind of which you are or have been a member, and give the titles and dates of any office, chairmanship or committee membership which you have held:

_____
_____
_____
_____
_____
_____
_____
_____
_____

39.     List any other organizations of which you are or have been a member, including social or fraternal, and give the titles and dates of any office, chairmanship or committee membership which you have held:

_____
_____
_____
_____
_____
_____
_____
_____
_____

40.     If you have answered the previous question in the affirmative, do any of these organizations, associations, or clubs restrict their membership on the basis of gender, race, religion, national origin, sexual orientation, or physical limitations. If the answer is yes, please describe the restrictions.

_____
_____
_____
_____
_____
_____

_____
_____

41.     Describe any executive or administrative experience you have had, whether through your occupation or otherwise, giving details and dates:

_____
_____
_____
_____
_____
_____
_____
_____
_____

42.     Annex copies of at least five examples of any legal writings be it legal decisions, articles, books, briefs, or memorandums which are representative of your legal abilities.

_____
_____
_____
_____
_____
_____
_____
_____

43.     If you are a sitting Judge, please list all decisions which have been reversed or modified by a higher Court. Please annex the decisions which were reversed or modified as well as the decision from the higher Court. If none have been reversed, please so indicate and provide copies of the decisions which have been affirmed. If none of your decisions have been appealed, please so indicate.

_____
_____
_____
_____
_____
_____
_____
_____

44.     If you are a sitting Judge, list all cases that have come before you in which a litigant has requested that you recuse yourself or which you have recused yourself sua sponte, and explain the circumstances of the request or sua sponte recusal.

_____
_____
_____
_____
_____
_____
_____
_____

45.     It is expected that a judge and other public officials shall not, by words or conduct, manifest or appear to condone bias or prejudice, including but not limited to bias or prejudice based upon age, race, creed, color, sex, sexual orientation, religion, national origin, disability, marital status, socioeconomic status, alienage or citizenship status and shall require staff, court officials and others subject to his or her direction and control to refrain from such words or conduct.  Will you be able to meet this expectation?

Yes____ No____

46.     Has any complaint been filed or otherwise brought to your attention which involved issues concerning insensitivity to issues involving any of the above in question 48c?

Yes____ No____

If you answered yes, please describe in detail the circumstances and any resolution that may have been reached.

_____
_____
_____
_____
_____
_____
_____
_____

47.     If you are a sitting Judge in any Court, have you ever held a lawyer in contempt?

Yes_____ No_____

If yes, please list the number of times you have done so, the names and the addresses of the lawyers involved, the circumstances of the contempt, the fines you levied or imposed and the outcome of any appeal taken by the lawyer.

_____
_____
_____
_____
_____
_____
_____
_____
_____

48.     A judge may be required to handle emergency applications, cope with media scrutiny, issue quick decisions, deal with fractious litigants, recall significant amounts of information, and otherwise respond to extremely stressful situations.  Can you describe briefly how you would handle such situations .

_____
_____
_____
_____
_____
_____
_____
_____

49.     Has an employer or supervisor or Administrative Judge ever counseled you regarding, or expressed concern about, your absenteeism or failure to meet expected deadlines or other productivity expectations?

Yes_____ No_____

If yes, please describe:

_____
_____
_____
_____
_____
_____

50.   If you are presently a Judge, can you detail whether or not your decisions on motions have been issued within the time frame set by either OCA or your administrative Judge and if not please detail the percentage of motions that are not in compliance and detail the circumstances that have prevented you from complying with the set time frames.

_____
_____
_____
_____

51.   If  you are presently a Judge who handles trials, can you detail how many trials resulted in motions being made to set aside a jury verdict and how long  it takes you on the average to issue a post-trial decision.

_____
_____
_____
_____
_____
_____
_____
_____

52.   List all interviews you have given to newspapers, magazines, or other publications, radio, or television stations or programs broadcasted over the internet and provide the dates of and subject matter of such interviews

_____
_____
_____
_____
_____
_____
_____
_____

53.   Do you engage in TWITTER, LINKEDIN, FACEBOOK, INSTAGRAM or other similar public communication platforms?

_____
_____
_____

_____
_____

54.     What is the name(s) that you use when you use any of these platforms?
_____
_____
_____
_____
_____
_____

55.     What subjects have you Tweeted, Instagrammed, or Facebooked about?
_____
_____
_____
_____
_____
_____
_____
_____

56.     Do you have a following on any of these platforms?
_____
_____
_____
_____

57.     Do you give permission to member(s) of the committee to view/investigate the "public" aspect of your social media platform?

_____
_____
_____
_____

58.     Are you now, or have you ever been, the subject of any formal complaint or charge filed with any disciplinary committee court, government agency or bar association arising out of your official or professional responsibilities during the course of your:

        (a)     law practice? Yes_____ No ____

        (b)     public or judicial service? Yes _____No____

(c)     If yes, please describe each complaint or charge

(d)     If the complaint or charge has been resolved please detail its outcome, including whether the governmental agency or other entity, with whom such complaint or charge was filed, censured you, issued a caution, imposed a sanction or took any other action whatsoever criticizing your conduct, even if the complaint or charge was dismissed:

(e)     If the complaint is not resolved as of today and it is still pending please include a detailed statement of what proceedings have taken place so far, if at all, and when if you know you expect a decision on the complaint or charge.

_____
_____
_____
_____
_____
_____
_____
_____

59.     Have you ever been investigated , disciplined, cited, admonished or cautioned for a breach of ethics or unprofessional conduct by any court, administrative agency, bar association, or other professional group, or without regard to the outcome, to your knowledge, has there ever been a complaint preferred against you with or by any court, administrative agency, bar association, or other professional group?

        Yes___  No___  If so, give the particulars.

_____
_____
_____
_____
_____
_____
_____
_____

60.     To your knowledge, have you ever been the subject of an investigation by any person or private or public entity concerning any possible misconduct, incompetence, unsatisfactory performance of duty, or violation of law?

        Yes___  No____  If yes, give particulars.

_____
_____
_____
_____
_____
_____
_____
_____

61.     Have you, to your knowledge, ever been found not qualified for any public position by any court, administrative agency, bar association or other professional group?

        Yes___  No___   If yes, give particulars.

_____
_____
_____
_____
_____
_____
_____

62.     Have you ever been disciplined or terminated by or because of possible termination resigned from any public or private employer, law firm or any other entity because of any misconduct, incompetence or unsatisfactory performance in any respect?

        Yes___  No___  If yes, give particulars.

_____
_____
_____
_____
_____
_____
_____
_____

63.   Have you ever resigned from, or for other reasons, ceased to be a member of the bar or bench of any state or court in any jurisdiction, a member of any governmental body, a hearing officer or an occupant of any similar position?

Yes___ No____ If so, give particulars.

_____
_____
_____
_____
_____
_____
_____
_____
_____

64.   Have you filed appropriate tax returns as required by Federal, State, Local, and other Government authorities in a timely fashion whether by April 15 or by timely filed extensions

Yes___   No____ If no, explain

_____
_____
_____
_____
_____
_____
_____
_____

65.   State whether you have ever:

a)   been summoned, arrested, or taken into custody, indicted, or convicted,      tried or charged with or pleaded guilty to the violation of any law, ordinance or in the commission of any felony, misdemeanor, or contempt of court, or been requested to appear before any prosecuting or investigative agency in any matter, other than traffic offenses?

Yes___ No_____ If yes, please give the particulars:

_____
_____
_____
_____
_____

_____
_____
_____

b) Failed to answer on the return date any ticket, summons or other legal                    process served upon you personally at any time?

Yes ___ No_____

If so, was any warrant, subpoena, or further process issued against you as a result of your failure to respond to legal process?

Yes _____
No _____

If yes, please give the particulars:

_____
_____
_____
_____
_____
_____
_____
_____

c) As a member of any armed forces, been the subject of any charges or complaints, formal or informal, or have any proceedings been instituted against you, or have you been a defendant in any Court Martial proceeding or otherwise disciplined?

Yes___
No____

Not applicable_____

If yes, Please give the particulars:

_____
_____
_____
_____
_____
_____
_____

d)  Been declared a ward of any Court, or adjudged an incompetent, or have any proceedings been brought to have you declared a ward of any Court or been adjudged incompetent in the past?

Yes _____
No _____

If the answer is yes, please provide the details:

_____
_____
_____
_____
_____
_____
_____
_____

e)  Have you received treatment for or in the past been committed to any institution for the care of persons suffering from mental or nervous disorders or drug addiction or alcoholism?

Yes ____
No____

If yes, please provide the details:

_____
_____
_____
_____
_____
_____
_____
_____

f)  Been a Plaintiff or Defendant in a lawsuit of any kind?

If your answer is Yes to any subdivision above, on a separate sheet, state all facts in full detail and in each case, give name and locality of any court or agency, dates of beginning and termination of action or proceeding, and the judgment or other disposition.

_____
_____
_____
_____

66.  (a)  Are there any unsatisfied judgments against you?

If so, list the same giving name and address of the judgment creditor and the court by which judgment was rendered, together with the date(s) and the amount(s) thereof and the nature of the claim upon which it was based:

_____

_____

_____

_____

_____

_____

_____

_____

(b)  Are you in default in the performance or discharge of any duty or obligation imposed upon you by any governmental agency or decree or order of any court including alimony and support Orders and Decrees?

Yes_____  No_____

If so, state the facts in detail:

_____

_____

_____

_____

_____

(c)  Have you ever made an assignment for the benefit of any creditors?
Yes_____
No_____

(d)  Has any petition for bankruptcy ever been filed by or against you?
Yes_____
No _____

If so, state the facts in detail:

_____

_____

_____

_____
_____
_____
_____
_____
_____

67.    (a)    What is the present state of your health?

_____
_____
_____
_____
_____
_____
_____
_____

       (b)    Have you in the past ten years:

              (i)    been hospitalized due to injury or illness:

                     Yes_____
                     No_____

              (ii)    been prevented from working due to injury or illness or
                      otherwise incapacitated for a period in excess of ten days?

                     Yes_____
                     No_____

                     If so, give the particulars, including the causes, the dates, the
                     places of confinement, and the present status of the condition
                     which caused the confinement or the incapacitation:

_____
_____
_____
_____
_____
_____
_____
_____

(iii)   Have you had any hospital confinement, mental illness, serious physical illness, or drug or alcohol addiction during the past ten (10) years?

Yes____   No____

If yes, explain and provide the name, address and telephone number of your attending physician(s), and all hospitals and other institutions to which you were admitted and the date(s) of each hospitalization.

_____
_____
_____
_____
_____
_____
_____
_____

(iv)   Are you presently receiving or contemplating receiving treatment for a physical or mental illness or condition, or for drug or alcohol addiction? Yes ____ No____ If so, please give details.

_____
_____
_____
_____
_____
_____
_____
_____

(c)   Do you suffer from any physical or mental impairment or other physical handicap that would impede your performance as a Judge, or if you would need any aides or additional help to properly perform your job.

Yes_____
No_____

If so, give details:

_____

_____
_____
_____
_____
_____
_____
_____
_____

(d)     Are you currently under treatment for an illness or physical condition which may impede your ability to carry out your judicial functions?

Yes _____
No _____

If so, give details:

_____
_____
_____
_____
_____
_____
_____
_____

68.   Do you currently use or have in the past used any illegal drugs, abused alcohol, or abused any prescription drugs?

Yes _____ No _____

If yes, please describe the circumstances and any treatment or counseling you may have received:

_____
_____
_____
_____
_____
_____
_____
_____

69 .  Are you presently, or have been in the past, an officer or director or acted in any capacity or have or had any relationship whatsoever including but not limited to providing legal services for or to any corporation or institution be it a profit or not for profit corporation, hospital, or professional association?

Yes _____ No _____

If yes, please supply complete details including all dates of service or association:

_____

_____

_____

_____

_____

_____

_____

_____

(a)  Have you ever been issued a license other than a marriage license, license to practice law, license as a notary public, a driver's license or a realtor's license

Yes_____ No_____

If yes, please describe the license, and list the dates of its initial issuance and its last renewal:

_____

_____

_____

_____

_____

_____

_____

_____

70.  Has any license, including a license to practice law, a license as a notary public,  a driver's license or a realtor's  ever been revoked or suspended?  Yes___ No___ If yes, please describe the circumstances:

_____

_____

_____

_____

_____
_____
_____
_____

71.     Have you ever resigned from a position as, or for other reasons,  ceased to be      a
        member of a governmental body, a hearing officer or magistrate or any similar
        position?

                    Yes_____ No_____

                    If yes, please describe the circumstances:


                    _____
                    _____
                    _____
                    _____
                    _____
                    _____
                    _____
                    _____

72.     Are you now, or have you ever been the subject of any claim of malpractice, in
        an action or otherwise?

                    Yes_____ No_____

                    If so, please describe the circumstances:


                    _____
                    _____
                    _____
                    _____
                    _____
                    _____

73.     Have you, your firm, your employer or any of your clients ever been cited for
        contempt or otherwise had sanctions imposed upon you or them as a result of
        your conduct in any judicial or administrative proceeding?

                    Yes_____ No_____

If yes, please describe, even if the citation or sanction was later withdrawn, suspended or modified.

_____
_____
_____
_____
_____
_____

74.     A judge is expected to be on the bench or otherwise handling legal matters by about 9:30 A.M. for at least seven hours per day, five days per week, and at times, a judge's responsibilities may require him or her to be on the bench or at work into the evenings and on weekends.  Are you able to perform these tasks on your own or with reasonable accommodation?

Yes____   No_____

If no, please describe the circumstances:

_____
_____
_____
_____
_____
_____

75.     Describe any significant community activities in which you have engaged:

_____
_____
_____
_____
_____
_____

76.     Have you written articles for publication? Yes___ No_____

If yes, please give the name and date of the publication and the title of each article:

_____
_____
_____
_____
_____
_____

77.     Have you had any teaching experience in law or related fields?
        Yes_____
        No_____

        If yes, please describe:

        _____
        _____
        _____
        _____
        _____
        _____

78.     Have your qualifications been reviewed by this committee?
        Yes_____
        No_____

        If yes, please list the years and determination of the committee even if you have
        withdrawn your application to avoid publication.

        _____
        _____
        _____
        _____
        _____
        _____

79.     Have your qualifications for public office previously been reviewed by any other
        committee or other professional association?
        Yes___ No___

        If yes, please identify the organization, state the date of the review, and detail all
        findings by the organization:

        _____
        _____
        _____
        _____
        _____

80. (a)   If you are seeking elective office, do you subscribe, and have adhered to the campaign guidelines established for judicial candidates by the New York State Bar Association (published in the New York State Bar Association Journal; Committee on Professional Ethics Opinion No. 289, dated April 27, 1973?

Yes____
No____
Not Applicable._____

If you answered this question in the negative, please explain:

_____
_____
_____
_____
_____

(b)   If you are seeking elective office, have you, or anyone on your behalf, issued any campaign literature concerning the election in which you are a candidate?
Yes_____ No____   If yes, please attach copies.

(c)   If you are seeking elective office, have you read the rules of the Chief Administrative Judge relating to inappropriate political activity by a judge or a candidate for public election to judicial office(22 NYCRR 100.5)?
Yes_____ No_____

(d)   Have you complied with the rules mentioned in (c) above?
Yes_____ No____

(e)   If you are seeking elective office, please provide copies of campaign expenditure reports, if available.

81.   Are you related by blood, marriage or other partnership or civil union relationship to any member of the Committee who will review this application?

Yes_____ No _____

If so, give their names.

_____
_____
_____
_____
_____

82.   Has any member of the Committee ever represented you or any family member?

Yes_____ No_____

If yes please give details of such representation.

_____
_____
_____
_____
_____

83.   List any office, trusteeship, directorship, partnership or position of any nature, whether compensated or not, held by the reporting individual with any firm, corporation, association, partnership, or other organization other than the State of New York.  Include compensated honorary positions; do NOT list membership or uncompensated honorary positions.  If the listed entity was licensed by any state or local agency, was regulated by any state regulatory agency or local agency, or, as a regular and significant part of the business or activity of said entity, did business with, or had matters other than ministerial before, any state or local agency, list the name of any such agency.

___ None


Position                Organization                State or Local Agency
_____
_____
_____
_____
_____

84.   If you, your spouse, domestic partner or unemancipated child was engaged in any occupation, employment, trade, business or profession which activity was licensed by any state or local agency, was regulated by any state regulatory agency or local agency, or as a regular and significant part of the business or activity of said entity, did business with, or had matters other than ministerial matters before, any state or local agency, list the name, address and description of such occupation, employment, trade, business or profession and the name of any such agency.
___ None

| Self, Spouse/Partner,Child | Entity which Held Interest in Contract | Relationship to Entity and Interest in Contract | Contracting State or Local Agency |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

85. List any interest, in EXCESS of $1,000, held by the reporting individual, such as individual's spouse, domestic partner or unemancipated child of which any such person is a member, or corporation, 10% or more of the stock of which is owned or controlled by any such person, whether vested or contingent, in any contract made or executed by a state or local agency and include the name of the entity and the interest in such contract. Do NOT include bonds and notes. Do NOT list any interest in any such contract on which final payment has been made and all obligations under the contract except for guarantees and warranties have been performed, provided, however, that such an interest must be listed if there has been an ongoing dispute during the calendar year for which this statement is filed with respect to any such guarantees or warranties. Do NOT list any interest in a contract made or executed by a local agency after public notice and pursuant to a process for competitive bidding or a process for competitive requests for proposals. _____None

| Self, Spouse/Partner,Child | Entity which Held Interest in Contract | Relationship to Entity and Interest in Contract | Contracting State or Local Agency |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

86.    State any additional education or other experiences you believe would assist you in holding judicial office:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

87.    (a)    Set forth any information not otherwise elicited by this application   which would effect favorably or unfavorably, your eligibility for the office for which you are a candidate or in any way may bear upon consideration of your candidacy:

_____
_____
_____
_____

        (b)    State any pertinent information reflecting positively or adversely on you which you believe should be disclosed to this Committee in connection with your possible nomination by the 2016 Judicial Screening Committee.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

(c)     Is there anything in your personal or professional background that, if publicly known, could be viewed as embarrassing either to you personally or this committee or to the judiciary?   Yes_____ No _____
If yes, give particulars.

_____
_____
_____
_____

88.     State any achievements or actions you have accomplished, demonstrating your professional abilities and or your commitment to equal justice under the law:

_____
_____
_____
_____
_____
_____
_____
_____

99.     Briefly state why you believe you are qualified for the Judicial position you seek.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

<u>WAIVER</u>

STATE OF NEW YORK       )

                         ss.

COUNTY OF NEW YORK )

     I,                         hereby waive the privilege or privacy and confidentiality including, without limitation, any confidentiality under Section 90 of the Judiciary Law, with respect to any information which concerns me and is known, recorded with, on file with, or in the custody and possession of any person or organization including, without limitation, any governmental, judicial, investigate or other official agency, and grievance or disciplinary committees, body or court, any bar associations or other professional associations, and any educational institution, doctor or hospital;   I hereby consent to the release of all such information to the Judicial Screening Committee and consent to the issuance, without notice, of any Order necessary or appropriate to obtain such information; I hereby authorize a representative of the Judicial Screening Committee to request and to receive any such information; and I hereby request any such organization or person in possession of such information to deliver it to a representative of the Judicial Screening Committee, forthwith.

     I specifically consent to the release of any such information in the possession of the New York State Commission on Judicial Conduct and Office of Court Administration and request that the same be delivered to a representative of the Judicial Screening Committee, forthwith.

Sworn to before me this
     Day of         2016

Notary Public

<u>INFORMATION AND PRIVACY WAIVER</u>

I,                          am informed that as a part of a routine check of my background in connection with my possible appointment to a position with the New York State Supreme Court / Civil Court of the City of New York, the Judicial Screening Committee may wish to make inquiries concerning me to various agencies of the Federal or State Government.  Having been advised that information from the files of federal or state agencies may be unavailable to the Judicial Screening Committee without my written consent, due to the Privacy Act of 1974, 5 United States Code Section 552 (a), and the Freedom of Information Act, 5 U.S.C. Section 552, I hereby consent to inquiries concerning me by the Judicial Screening Committee to any Federal or State agency, and to the disclosure to the Judicial Screening Committee by such federal or state agency.

_____

Sworn to before me this

            day of           2016

_____

Notary Public

_____

# EXHIBIT 11

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------X
Accounting by PUBLIC ADMINISTRATOR OF KINGS
COUNTY as the Administrator d. b. n. of the Estate of

RICHARD R. MOSS, III a/k/a RICHARD MOSS,

Deceased.
------------------------------------------------------------------X

**INTERIM ORDER**

File No. 2279/A-1995

J A C O B S O N ,    Acting Surrogate and JSC

In this uncontested accounting proceeding, the Public Administrator

of Kings County (Public Administrator) seeks judicial settlement of his

account consisting of the proceeds from the settlement of a cause of action

arising from the decedent's wrongful death and conscious pain and

suffering in the sum of $50,000[1]. The outstanding issue requiring the

court's attention is the applications for compensation for the attorneys

serving as counsel for the Public Administrator of Kings County (Public

Administrator).

It is well settled that the Surrogate bears the ultimate responsibility to

decide what constitutes reasonable legal compensation (*Stortecky v*

*Mazzone*, 85 NY2d 518 [1995]; *Matter of Phelan*, 173AD2d 621 [2d Dept

1991]; *Matter of Verplanck*, 151AD2d 767 [2d Dept 1989]), even where there

are no objections to the requested compensation. SCPA 1108 (2) (c)

provides that in fixing the legal fees for counsel to the Public Administrator,

the court must consider

---

[1] Inasmuch as counsel previously indicated that the distributees were
in need of funds, the court expedited review of this proceeding and issued
an interim order dated May 22, 2014 directing the distributions to the
distributees.

"the time and labor required, the difficulty of the questions involved, the skill required to handle the problems presented, the lawyer's experience, ability and reputation, the amount involved and benefit resulting to the estate from the services, the customary fee charged by the bar for similar service, the contingency or certainty of compensation, the results obtained, and the responsibility involved."

After an initial review of the record, the Court found that the file lacked affidavits of legal services from Louis R. Rosenthal, Esq. (Rosenthal) and Salzman & Winer, LLP (Salzman & Winer) and in an Interim Order dated May 22, 2014, directed the attorneys to file same within 45 days of the date of said Order. The court has received affidavits of legal services from Steven R. Finkelstein, Esq. (Finkelstein) and Rosenthal dated November 22, 2013 and June 27, 2014 respectively. The court has not received an affidavit of legal services from Salzman & Winer.

The record reveals that the court appointed the Public Administrator as temporary administrator in this estate after the removal of the prior administrator. After petitioning the court, the Public Administrator received letters of administration d. b. n. and proceeded to settle the personal injury action, collect the proceeds and file this formal accounting. The affidavits of legal services allege that approximately 75 hours were expended by the former and current estate counsel's offices in this estate.

While the court is mindful of its duty to consider the requisite factors in making a determination of reasonable attorneys fees in this matter, it is well settled that it is not appropriate to base a legal fee in this area of the law solely on a "time-clock" approach and, in some instances regarding

3

estate work, time might be the least important factor to be considered (*Matter of Brehm*, 37 AD2d 95 [4th Dept 1971]; *Matter of Snell*, 17 AD2d 490 [3d Dept 1961]; *Matter of Kentana*, 170 Misc 663 [Sur Ct, Kings County 1939]). The statute sets forth a number of factors that the court is required to consider in setting an appropriate and reasonable fee for counsel to the Public Administrator. The number of hours is simply one factor.

The court takes its duties herein very seriously and understands the importance of taking into consideration all of the statutory factors (*see Matter of Hai*, 25 Misc3d 236 [Sur Ct, Kings County 2009]). After consideration of the guidelines and all of the factors enumerated in SCPA 1108 (2) (c) as well as the circumstances of this proceeding, counsel to the Public Administrator shall receive the sum of 1,585.40 for all legal services through distribution as full and fair compensation for its services in this estate to be allocated between former estate counsel, Rosenthal and current estate counsel, Finkelstein. The issue of fixing and determining the fair and reasonable compensation to which former and current estate counsel for the Public Administrator may be entitled is held in abeyance pending final determination by the court, the matter to appear on the court's calendar on such date and at such time as the court may determine.

The court notes that the accounting reflects that the sum of $12,273.57 in attorneys fees and $9,429.29 in disbursements has been paid to tort counsel, Salzman & Winer, in attorneys fees and disbursements and $1,250 has been paid to former estate counsel, Rosenthal in attorneys' fees. This

4

Court is statutorily mandated to procure the affidavit of legal services in order to fulfill its responsibilities in the determination of legal fees for counsel to the Public Administrator (*Matter of Feinberg*, 5 NY3d 206 [2005]). Salzman & Winer have failed to provide the required affidavits after having been directed to do so and thus, failed to meet their burden of establishing the reasonable value of their services. Therefore, any claim of Salzman & Winer for compensation for legal services performed in this estate is hereby denied and Salzman & Winer are directed to refund the sums paid for legal services in the sum of $12,273.57 (*see Matter of Middagh*, 267 AD2d 593 [3d Dept 1999]). The disbursements listed in the accounting are allowed in the sum of $8,384.59 and any sums paid over that amount to Salzman & Winer must be refunded. Accordingly, the sum of $1,044.70 shall be refunded by Salzman & Winer as unidentified disbursments for a total of $13,318.27 to be refunded by Salzman & Winer in overpaid legal fees and disbursements. Any refunds, if appropriate, of monies already paid to Rosenthal shall be determined after a hearing, as stated above.

     Settle decree.

                                      HON. LAURA L. JACOBSON
                        Acting Surrogate and Justice of the
                              Supreme Court

Dated:      Brooklyn, New York
            August 25 , 2014

SURROGATE'S COURT: KINGS COUNTY
-------------------------------------------------------------X
Accounting of the Public Administrator of
Kings County, as the Administrator d.b.n.
of the Estate of

     RICHARD R MOSS, III, a/k/a
     RICHARD MOSS,

             Deceased.
-------------------------------------------------------------X

**DECISION**

File No. 2279/A - 1995

JACOBSON, J. S. C. AND ACTING SURROGATE

     There remain two issues to be determined in winding up this estate. The first is the motion of Salzman & Winer, LLP, to renew their motion to vacate their default in submitting an affidavit of legal services as directed by the Court on May 22, 2014.

     The Public Administrator was appointed administrator d.b.n. in this estate on January 1, 2000. The only asset of the estate was an action for wrongful death and conscious pain and suffering. The law firm of Salzman & Winer was retained to prosecute the actions. The actions were settled for $50,000 and, on March 2, 2014, the Public Administrator filed his petition to allocate the proceeds to the wrongful death cause of action and settle his account.

     On May 22, 2012, the Court entered an interim order directing that all counsel requesting legal fees, including Salzman & Winer, submit affidavits of legal services in support of their legal fees within 45 days. Louis R. Rosenthal, Esq., prior counsel to the Public Administrator, and Steven R. Finkelstein, Esq., then counsel to the Public Administrator, submitted their affidavits of legal services. Salzman & Winer did not.

On August 25, 2014, the Court allowed disbursements in the reduced amount of $8,384.59. Since Salzman & Winer had been paid $9,429.29 in disbursements, the Court directed that Salzman & Winer refund to the estate the $1,044.70 for the overpayment of disbursements. The Court also directed a refund of all legal fees paid Salzman & Winer for failure to supply an affirmation of legal services. The total amount to be refunded totaled $13,318.27 ($1,044.70 in disbursements and $12,273.57 in legal fees). On September 4, 2014, Salzman & Winer was given notice of settlement of the proposed decree settling the account. The decree was signed on December 5, 2014, and Salzman & Winer was given notice of entry of the decree on December 19, 2014.

Salzman & Winer moved to vacate its default and submit an affidavit of legal services to support their legal fees. On May 22, 2015, the motion was denied for failure to attach a signed affirmation of legal services to its motion papers. Denial was without prejudice to renewal supported by proper papers.

<u>Motion to Renew</u>

Salzman & Winer now moves to renew its motion to vacate its default and submit an affirmation of legal services. In the interests of justice, the motion to renew is granted. On a motion to vacate a default, the movant is required to show both (1) a reasonable excuse for his or her default and the absence of wilfulness and (2) a meritorious claim (*see* CPLR 5015[a][1]; *Henry v Kuveke*, 9 AD3d 476 [2d Dept 2004]; *Katsnelson v ELRAC, Inc.*, 304 AD2d 619 [2d Dept 2003]). While the court can accept law office failure

to establish a reasonable excuse for a default, such defense should be supported by detailed and credible explanation of the default (*Lugauer v Forest City Ratner Co.*, 44 AD3d 829 [2d Dept 2007]).

In the instant case, the affirmation of Alan Salzman, Esq. ("Salzman"), states that he prepared an affirmation of legal services to comply with the Court's May 22, 2014 order but it was not signed and filed due to law office failure. Salzman states that he thought the affirmation was filed, but he failed to follow up and did not notice the failure to comply with the Court's direction. Based on the record, the motion of Salman & Winer to vacate its default is granted.

On the merits, Salzman's affirmation of legal services details the legal services provided by his firm as trial counsel to the Public Administrator. After careful review of the papers submitted in support of the request for counsel fees, as well as the factors to be considered in the fixation of such fees (*Matter of Freeman*, 34 NY2d 1 [1973]; *Matter of Potts, supra*), the court fixes the fair and reasonable value of the legal services and disbursements of Salzman & Winer in the amount of $11,903.86. Since Salzman & Winer has been paid $12,273.57, in legal fees, it has been overpaid $369.71. The Court has already directed that Salzman & Winer return $1,044.70 for overpayment of disbursements. Accordingly, the firm of Salzman & Winer is directed to return $1,414.41 ($1,044.70 plus $369.71) to the estate within thirty days of receipt of notice of entry of this decision and order.

This leaves the issue of the allocation of the legal fee due the counsel

3

to the Public Administrator between prior counsel.

<u>Fee Allocation</u>

On December 5, 2014, this Court signed the decree in the final accounting submitted by the Public Administrator as Administrator d.b.n. of this estate. In the decree the Court set and fixed the amount of legal fees for counsel to the Public Administrator in conformity with the guidelines and fee schedule promulgated by Administrative Board for Offices of Public Administrators, applying the criteria set forth in SCPA 1108 (2) (c). In this estate, the legal fee for counsel to the Public Administrator was determined to be $1,585.40, of which $1,250 had been paid to the former counsel on account. The apportionment of this fee, however, as between the former counsel and succeeding counsel for the Public Administrator was reserved for a future hearing.

The hearing was held on March 16, 2015 before a Court Attorney Referee. At the hearing, by testimony and affidavit, the Court was provided with the details concerning the former counsel and succeeding counsel's experience and reputation, the services rendered, the time spent for each service rendered, and the method or basis by which requested compensation was determined.

Based upon the proof submitted at a hearing, the Court allocates 25% of the fee set for the legal services provided the Public Administrator to Louis Rosenthal, Esq. ($396.35), all of which has been paid, and the balance, 75% ($1,189.05) to Steven Finkelstein, Esq.

The record shows that Louis Rosenthal, Esq., received $1,250 on

account of his legal services in advance of filing the final account.  Based on the above, Louis Rosenthal is directed to remit to the Public Administrator the amount in excess of the fee allowed, $853.65, plus interest at the rate of 9% from the date the over-payments were paid to the date they are repaid.

The Public Administrator is directed to supplement his account in accordance with this decision and order and, as so supplemented, the Public Administrator's petition to settle his account is granted.


_____
HON. LAURA L. JACOBSON
Supreme Court Justice and Acting
Surrogate

Dated: August 28, 2015

5

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------X
Accounting of the PUBLIC ADMINISTRATOR OF
KINGS COUNTY as the Administrator of the Estate of

      RICHARD JOSEPH,

            Deceased.
-------------------------------------------------------------------X

**DECISION AND ORDER**

File No. 453/A-2007

J A C O B S O N, Acting Surrogate and JSC

      In this accounting proceeding, this Court issued a Decision dated May 22, 2014, *inter alia*, setting attorneys fees for counsel to the Public Administrator of Kings County (Public Administrator). Upon further review, this Court, *inter alia*, vacated that portion of the aforementioned Decision that fixed the compensation of Steven Finkelstein, Esq. (Finkelstein) in the sum of $47,397.64, ordered that said sum be held in reserve pending a further review and ordered Finkelstein to file a detailed affidavit of legal services (including time to task records) in a Decision and Order dated August 20, 2014.

      This Court has reviewed the record. After consideration of all of the factors specified in SCPA 1108 (2) (c), the guidelines, the affirmations of legal services of all counsel and the circumstances in this proceeding, counsel for the Public Administrator shall receive the sum of $393,542.73 in legal fees and disbursements through distribution of the proceeds to be paid as follows: The Cochran Firm (tort counsel) shall receive the sum of $361,542.73 (which has already been paid) in legal fees and disbursements (which were allowed in sum in $12,078.53). The remaining sum of $32,000 is allocated as the portion of the fee to be paid to estate counsel, Finkelstein.

2

The court notes and the record reflects that the majority of the work to obtain the settlement proceeds was performed by tort counsel who are entitled to the larger portion of the fee awarded.

Settle decree in conformance with this Decision and all prior Decisions and Orders issued herein.

_____

HON. LAURA L. JACOBSON
Acting Surrogate and Justice of the
Supreme Court

Dated:      Brooklyn, New York
            November   18      , 2015

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
--------------------------------------------------------------------X
Accounting by PUBLIC ADMINISTRATOR OF KINGS
COUNTY, as Administrator of the Estate of

      SU-CHANG CHEN,

             Deceased.
--------------------------------------------------------------------X

**D E C I S I O N**

File No. 2510/A-2005

J A C O B S O N, Acting Surrogate and JSC

    This is an accounting proceeding wherein the Public Administrator of Kings County (Public Administrator) requests judicial settlement of his account. The Public Administrator has settled a cause of action for the decedent's wrongful death and conscious pain and suffering in the sum of $50,000 and collected a death benefit in the sum of $2,000. In his petition, the Public Administrator has requested, *inter alia*, 1) that the proceeds of the settlement be allocated to the cause of action for wrongful death, 2) that any possible claims from the New York State Department of Taxation and Finance, the New York City Human Resources Administration and the claim of the Public Service Mutual Insurance Co. in the sum of $38,687.82 be disallowed, 3) that attorneys fees be determined, 4) that the claim of Ze-Qiang Chen for reimbursement of funeral expenses be allowed and 5) that the court make a determination regarding the distributees of this estate.

    Jurisdiction has been obtained over all interested parties and a guardian ad litem has been appointed for the decedent's spouse, Joseph Hieu Diep, whose whereabouts are unknown. No objections or opposition have been interposed except in the report of the guardian ad litem with

regards to the request that the decedent's spouse, Joseph Hieu Diep, be disqualified as a distributee.

Upon review of the record, the petition is granted.  The settlement proceeds in the sum of $50,000 shall be allocated to the cause of action for the decedent's wrongful death.

Inasmuch as the creditors have failed to interpose any objections or appear in this proceeding to prove their claims (see Estate of Fee, 151 Misc 410 [Sur Ct, Westchester County 1938]), any claims of the New York State Department of Taxation and Finance and the New York City Human Resources Administration as well as the claim of the Public Service Mutual Insurance Co. in the sum of $38,687.82 are disallowed.

The claim of Ze-Qiang Chen for funeral expenses in the sum of $2,000 is hereby allowed and shall be paid to Ze-Qiang Chen in full reimbursement of all funeral expenses.

The court has reviewed the record, including the affidavits of legal services submitted in support of the requests for fees from the attorneys for the Public Administrator.  After consideration of all of the factors specified in SCPA 1108 (2) (c), the guidelines, the affidavits of legal services of trial counsel and estate counsel and the circumstances herein, the attorneys for the Public Administrator (trial counsel and estate counsel) shall receive the total sum of $13,381.46 for all legal services inclusive of disbursements through distribution  (see Estate of Hai, 25 Misc 3d 236 [Sur Ct, Kings County 2009]) to be allocated between counsel as follows.  Caesar & Napoli,

3

Esqs. (trial counsel) shall receive the sum of $10,762.18 in legal fees and $1,081 in disbursements. Steven R. Finkelstein, Esq. is allocated the sum of $1,475.28 in legal fees.

The guardian ad litem has submitted her report with no objections to the accounting, except to the request to disqualify her ward as a distributee. She has also submitted her affirmation of legal services requesting compensation for the services rendered. After a careful review of the papers submitted in support of the request for counsel fees, as well as the factors to be considered in the fixation of such fees (*Matter of Morris*, 57 AD3d 674 [2d Dept 2008]), the Court fixes the fair and reasonable value of the legal services of the guardian ad litem in the amount of $2250.⁰⁰⁄₁₀₀ .

Finally, the court has come to the request for a determination regarding the distributees of this estate. The Public Administrator has requested that the decedent's husband, Joseph Hieu Diep, be disqualified as a distributee on the ground of abandonment and nonsupport pursuant to EPTL 5-1.2 (a) (5) and (6).

After a hearing before a court attorney-referee, the record reflects that the decedent's parents were Yuee Huang and Jing Yi Chen. The decedent married Joseph Hieu Diep on July 21, 2000 in China. Shortly thereafter, Joseph Hieu Diep returned to the United States where he resided. The decedent eventually gained entry to the United States, but did not join her husband. Instead, the decedent lived with her brother until her

4

death. None of the witnesses observed the decedent communicating with her husband, nor did anyone have any knowledge of her even visiting or seeing him once she arrived in the United States. The record further reflects that the decedent received no financial support from her husband either in China or in the United States. The decedent had no children.

A "husband or wife is a surviving spouse . . . unless it is established satisfactorily to the court . . . [t]hat the spouse abandoned the deceased spouse and such abandonment continued until the time of death" (EPTL 5-1.2 (a) (5)). A spouse may also be disqualified from inheriting from a decedent when he or she has failed or refused to provide financial support for the deceased spouse (EPTL 5-1.2 (a) (6)).

The record herein shows that Joseph Hieu Diep abandoned the decedent and failed to provide any financial support. The decedent's family had very little knowledge of Joseph Hieu Diep. While the decedent lived with her brother and sister-in-law in the United States, Joseph Hieu Diep never visited the decedent or provided her with any financial support. The decedent's sister-in-law testified that she never met Joseph Hieu Diep.

Based upon the uncontroverted record, the decedent's spouse, Joseph Hieu Diep, is disqualified as a distributee in the decedent's estate upon the grounds of abandonment and nonsupport. Accordingly, the net estate shall be distributed to the decedent's parents, Yuee Huang and Jing Yi Chen in equal shares as requested in the petition (EPTL 4-1.4 and 5-4.4).

5

Settle decree.

_____

HON. LAURA L. JACOBSON
Acting Surrogate and Justice of the
Supreme Court

Dated:      Brooklyn, New York
            4 | 4            , 2013

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------------X
In the Matter of the Final Accounting of Public
Administrator of Kings County as the Administrator of
the Estate of

     HAROLD WAGNER,

            Deceased.
-----------------------------------------------------------------------X

**DECISION AND ORDER**

File No. 5309/A-2000

J A C O B S O N,   Acting Surrogate and JSC

     In this uncontested accounting proceeding, the court has been called

upon to set the attorneys' fees for counsel to the Public Administrator.

After consideration of all of the factors specified in SCPA 1108 (2) (c), the

guidelines, the affidavit of legal services of counsel and the circumstances in

this proceeding, the attorneys for the Public Administrator shall receive the

sum of  $8,000 inclusive of disbursements for all legal fees through

distribution.

     Settle decree.

                            _____

                            HON. LAURA L. JACOBSON
                    Acting Surrogate and Justice of the
                            Supreme Court

Dated:     Brooklyn, New York
            August   28    , 2013

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------------X
Accounting of the PUBLIC ADMINISTRATOR OF
KINGS COUNTY, As Administrator of the Estate of

    SUSAN JONES
    a/k/a SUSAN CHARLES TAYLOR JONES,

            Deceased.
-----------------------------------------------------------------------X

**D E C I S I O N**

File No. 395/A-2007

J A C O B S O N,   Acting Surrogate and JSC

     In this accounting proceeding, the court has been called upon to fix, determine and allocate the attorneys' fees for all counsel to the Public Administrator. After consideration of all of the factors specified in SCPA 1108 (2) (c), the sliding scale enumerated in Judiciary Law 474-a, the guidelines, the affidavits of legal services of trial counsel and estate counsel and the circumstances in this proceeding, the attorneys in this estate shall receive the sum of $42,560.09 inclusive of disbursements through distribution. The attorneys fee shall be allocated between counsel as follows. Sullivan Papain Block McGrath & Cannavo P.C. (trial counsel) shall receive the sum of $31,798.25 in legal fees along with the sum of $7,228.70 in disbursements. The remaining sum of $3,533.14 is allocated as the portion of the fee for estate counsel, Steven R. Finkelstein, Esq. (see *Estate of Singh*, 25 Misc.3d 1227[A], 2009 NY Slip Op 52312[U] [Sur Ct, Kings County 2009]).

     Settle decree.

                           _____
                           HON. LAURA L. JACOBSON
                  Acting Surrogate and Justice of the
                         Supreme Court

Dated:     Brooklyn, New York
            December   19   , 2013

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
--------------------------------------------------------------X
Accounting by the PUBLIC ADMINISTRATOR OF
KINGS COUNTY as the Administrator of the Estate of

    MARVIN F. CHAPMAN,

                    Deceased.
--------------------------------------------------------------X

**D E C I S I O N**

File No. 2983/A-2007

J A C O B S O N ,  Acting Surrogate and JSC

In this accounting proceeding, the Public Administrator of Kings County (Public Administrator) seeks judicial settlement of his account consisting of the proceeds from the settlement of a cause of action arising from the decedent's wrongful death and conscious pain and suffering in the sum of $30,000 along with accrued interest. The entire sum is allocated to the cause of action for wrongful death.

The counsel to the Public Administrator has requested that the court fix attorneys fees for the legal services rendered in this estate. After consideration of all of the factors specified in SCPA 1108 (2) (c), the guidelines, the affidavits of legal services of trial counsel and estate counsel as amended and supplemented and the circumstances in this proceeding, the attorneys for the Public Administrator (trial counsel and estate counsel) shall receive the sum of $8,993.09 inclusive of disbursements for all legal services through distribution (*see Estate of Hai*, 25 Misc3d 236 [Sur Ct, Kings County 2009]) to be paid to counsel as follows: Falk & Klebanoff, P.C. (trial counsel) shall receive the sum of $7,294.07 in legal fees and $823.73 in disbursements as requested and the sum of $875.29 is allocated as the

2

portion of the fee to be paid to estate counsel, Steven R. Finkelstein, Esq.

Settle decree.

_____
HON. LAURA L. JACOBSON
Acting Surrogate and Justice of the
Supreme Court

Dated:    Brooklyn, New York
           March  13    , 2013

# EXHIBIT 12

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 23, 2016.

Selected Entity Name: SEDDIO & CARONE PLLC
Selected Entity Status Information

| | |
|---|---|
| **Curr ent Entity Name:** | SEDDIO & CARONE PLLC |
| **DOS ID #:** | 3678392 |
| **Initial DOS Filing Date:** | MAY 30, 2008 |
| County: | KINGS |
| Jurisdiction: | NEW YORK |
| **Entity T**ype: | DOMESTIC PROFESSIONAL SERVICE LIMITED LIABILITY COMPANY |
| **Curr ent Entity Status:** | INACTIVE - Dissolution (Dec 10, 2014) |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

SEDDIO & CARONE PLLC
9306 FLATLANDS AVENUE
BROOKLYN, NEW YORK, 11236

Register **ed Agent**

NONE

This office does not require or maintain information
regarding the names and addresses of members or
managers of nonprofessional limited liability
companies. Professional limited liability companies
must include the name(s) and address(es) of the original
members, however this information is not recorded and
only available by viewing the certificate.

**\*Stock Information**

**# of Shar**es          **Type of Stock**          **$ Value per Shar**e

No Information Available


*Stock information is applicable to domestic business corporations.


**Name History**


**Filing Date**   **Name T**ype          **Entity Name**

MAY 30, 2008  Actual          SEDDIO & CARONE PLLC


A Fictitious  name must be used when the Actual  name of a foreign entity is unavailable for use in New York
State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.


<u>Search Results</u>   <u>New Search</u>

<u>Services/Programs</u>   |   <u>Privacy Policy</u>   |   <u>Accessibility Policy</u>   |   <u>Disclaimer</u>   |   <u>Return to DOS
Homepage</u>   |   <u>Contact Us</u>

# EXHIBIT 13

## Certification

**STATE OF NEW YORK, COUNTY OF KINGS, SS:**

I, Nancy T. Sunshine, County Clerk and Clerk of Supreme Court Kings County,

do hereby certify that on August 11, 2016 I have compared

the document attached hereto,

5814/2013 Order dtd 9/29/14 OSC-denied filed 9/29/2014 page(s) 18-19

with the originals filed in my office and the same is a correct transcript

therefrom and of the whole of such original in witness

whereto I have affixed my signature and seal.

NANCY T. SUNSHINE
KINGS COUNTY CLERK

At IAS Part 68 of the Supreme
Court of the State of New York, held
in and for the County of Kings,
at 360 Adams Street, Brooklyn, New
York on the 27th day of August,
2014.

PRESENT: HON. JOHNNY LEE BAYNES
SUPREME COURT OF THE STATE OF NEW YORK
KINGS COUNTY

-------------------------------------------------------------

THE NEW YORK STATE NURSES ASSOCIATION,
1199SEIU UNITED HEALTHCARE WORKERS
EAST, CONCERNED PHYSICIANS OF LICH, LLC
AND CARL BIERS,

       Plaintiffs-Petitioners,

    vs.

NEW YORK STATE DEPARTMENT OF HEALTH,
NIRAV SHAH, MD, in his capacity as Commissioner of
the Department of Health, STATE UNIVERSITY OF
NEW YORK, TRUSTEES OF STATE UNIVERSITY
OF NEW YORK, STATE UNIVERSITY OF NEW
YORK DOWNSTATE MEDICAL CENTER, STATE
UNIVERSITY OF NEW YORK DOWNSTATE
MEDICAL CENTER COUNCIL, AND JOHN F.
WILLIAMS, MD, in his capacity as President of State
University of New York Downstate Medical Center

       Defendants-Respondents.

-------------------------------------------------------------

Index No. 5814-13

ORDER ~~TO SHOW CAUSE~~
WITH TEMPORARY
RESTRAINING ORDER



## ORDER TO SHOW CAUSE

   Upon the annexed Affirmation of Richard M. Seltzer, dated August 25, 2014, and

the Affidavits of Michelle Green, dated August 25, 2014; Eric Smith, dated August 25, 2014;

Julie T. Semente, RN, dated August 22, 2014; Hyacinth Eccles, RN, dated August 25, 2014;

Diane Mapp, RN, dated August 25, 2014; Diane Simpson DaSent, RN, dated August 25, 2014;

and Alicia Vejar, RN, dated August 25, 2014, and the annexed exhibits, all submitted on behalf

of Plaintiff-Petitioner the New York State Nurses Association ("NYSNA"), and the other prior proceedings herein, and good cause having been alleged, it is hereby

ORDERED that Defendant-Respondent State University of New York ("SUNY") and the Trustees of the State University of New York ("Trustees") shall show cause before this Court in courtroom _461_ at the Courthouse at 360 Adams Street, Brooklyn, New York, on the _12th_ day of ~~August~~ _September_ 2014 at _2:00 p_.m., or ~~as soon thereafter as counsel may be heard,~~ _on such earlier date as the Court may direct_ why an order should not be entered granting the relief sought by NYSNA, including by:

1) enjoining SUNY and the Trustees from taking further actions inconsistent with the Court-ordered Settlement Agreement entered on February 25, 2014, including by enjoining SUNY from effectuating the sale of Long Island College Hospital ("LICH") and/or the LICH property to the Fortis Property Group LLC ("Fortis") and/or New York University Langone Medical Center ("NYULMC") and/or Lutheran Family Health Centers ("LFHC"), or transferring operation or management of the LICH Emergency Department or other LICH health care facilities, pending further order of the Court, and

2) Directing SUNY and the Trustees to continue their current operation of LICH until further order of the Court and

3) such other relief as is just and proper

**ORDERED** that pending a hearing by this Court on the motion,

1). SUNY shall be temporarily restrained from closing on the sale of LICH and/or the LICH property to Fortis and/or NYULMC and/or LFHC, and/or transferring operation or management of the LICH Emergency Department or other LICH health care facilities or properties to Fortis, and/or NYULMC, and/or LFHC, and

2) SUNY shall continue its current operation of the LICH Emergency Department. *or* ~~cause~~ *cause the list of nurses currently employed* ~~at~~ *at LICH.* ~~(cause the)~~

SUFFICIENT CAUSE BEING SHOWN, let service by hand delivery of a copy of this Order ~~to Show Cause and the papers on which it is based~~ upon counsel for SUNY and the Trustees no later than the 27th day of August, 2014, be deemed good and sufficient service.

ENTER:

_____
J.S.C.
**HON. LAURA JACOBSON**

Agreed

_____
CMMY &
Richard Seltzer
Counsel for NYSNA

Agreed

_____
Fonk V. Carr
Attorn f SUNY

# Certification

**STATE OF NEW YORK, COUNTY OF KINGS, SS:**

I, Nancy T. Sunshine, County Clerk and Clerk of Supreme Court Kings County,

do hereby certify that on August 11, 2016 I have compared

the document attached hereto,

5814/2013 Order dtd 9/29/14 OSC-denied filed 9/29/2014 page(s) 1-6

with the originals filed in my office and the same is a correct transcript

therefrom and of the whole of such original in witness

whereto I have affixed my signature and seal.

NANCY T. SUNSHINE
KINGS COUNTY CLERK

Enter Forthwith

HON. JOHNNY LEE BAYNES

At a Special Term Part 68 of the
Supreme Court of the State of New
York, held in and for the County of
Kings, at the Courthouse thereof, at
360 Adams St, Brooklyn, New York,
on the 29th day of September, 2014

PRESENT:

          HON. JOHNNY L. BAYNES

                       Justice

------------------------------------------------------------------------x    **Index No. 5814/13**

THE NEW YORK STATE NURSES ASSOCIATION,
1199 SEIU UNITED HEALTHCARE WORKERS EAST,
CONCERNED PHYSICIANS OF LICH, LLC
and CARL BIERS,

                    Plaintiffs-Petitioners,

        -against-                             **INTERIM ORDER**

NEW YORK STATE DEPARTMENT OF HEALTH,
NIRAV SHAH, MD, in his capacity as Commissioner
of the Department of Health, STATE UNIVERSITY OF
NEW YORK, TRUSTEES OF STATE UNIVERSITY OF
NEW YORK, STATE UNIVERSITY OF NEW YORK
DOWNSTATE MEDICAL CENTER, STATE
UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL
CENTER COUNCIL, and JOHN F. WILLIAMS, in his
capacity as President of State University of New York
Downstate Medical Center,

                  Defendants-Respondents..

------------------------------------------------------------------------x

      Plaintiff-Petitioner, New York State Nurses Association (hereinafter "NYSNA")

moves by Order to Show Cause dated, August 26, 2014, for, inter alia, an Order enjoining

-1-

5814/2013 Order

Defendants-Respondents State University of New York and Trustees of the State University of New York (hereinafter "SUNY") from taking action "inconsistent with the Court-Ordered Settlement Agreement in this matter entered into on February 25, 2014, including, the effectuation of the sale of Long Island College Hospital (hereinafter "LICH") to the Fortis Property Group LLC (hereinafter "Fortis") and/or New York University Langone Medical Center (hereinafter "NYU") or any other entity.

The matter came before the Court for oral argument on September 18, 2014. During the course of Oral Argument, it became clear that counsel for the NYSNA petitioners no longer seeks an injunction, but rather seeks to compel the SUNY defendants-respondents to force non-parties to this proceeding, Fortis and NYU to take certain actions not provided for in the Settlement Agreement between the parties, but in accordance with their response to the Request for Proposal (hereinafter "RFP") which was the result of the aforesaid settlement of the within action.

Thereafter, an interim Order was issued directing service of all papers upon non-parties. This was done to allow NYU and Fortis the opportunity to state their positions with respect to NYSNA's application, on the record. The Court has been advised that neither NYU nor Fortis wish to submit papers on this matter. Therefore, the Court now renders decision on NYSNA's Motion, having advanced the return date from October 6, 2014, to September 23, 2014, at which time the parties once again appeared.

It is the Court's finding that the relief sought by NYSNA was never contemplated by the Settlement Agreement between the parties. Nor is NYSNA now seeking either injunctive relief, as stated by counsel for NYSNA on the record on September 18, 2014. NYSNA also does not

Printed: 8/11/2016

claim, ~~nor~~ ~~that~~ it is a ~~signatory~~ to any ~~contract~~ between SUNY and Fortis nor a third-party beneficiary of any such contract. Frankly, it is unclear what it is that NYSNA seeks, and the instant application must fail procedurally and substantively.

WHEREFORE, it is hereby

ORDERED and ADJUDGED, that Petitioner-Plaintiff's Order to Show Cause is denied in all respects.

ENTER

_____
JOHNNY L. BAYNES, JSC

-3-

| From: | Richard M. Seltzer [rseltzer@cwsny.com] |
| Sent: | Friday, September 05, 2014 10:48 AM |
| To: | Frank Carone; Sarah Lichtenstein; 'Edward M. Spiro (espiro@maglaw.com)' |
| Cc: | Thomas N. Ciantra; Kate M. Swearengen |
| Subject: | RE: LICH_Settlement |

Frank:

Thanks for putting SUNY's position in writing, which we now understand was an offer made only in return for NYSNA withdrawing its pending motion.  In light of all the events of the last eighteen months relating to the future of LICH, SUNY should unilaterally commit to provide continued employment for any potentially displaced nurses currently employed at LICH (it is NYSNA's understanding that there are currently 28 ER nurses and 6 Labor and Delivery nurses at LICH, in addition to 4 School-Based Nurse Practitioners we expect StaffCo to retain), and indeed, to commit to do whatever it can to provide or find employment for any nurses currently laid off from LICH.

Your offer is not a basis to settle NYSNA's pending motion to enforce the Settlement Agreement.  The commitment by Fortis and NYU was not only for the benefit of the nurses at LICH represented by NYSNA to continue work *at LICH*, but, as the Fortis /NYU proposal pointedly stated, to "help preserve the legacy of excellent care provided at LICH."  SUNY should be working to meet its responsibility to insure that Fortis and NYU live up to the commitment relied upon by the evaluators.

Richard



**Richard M. Seltzer**
330 West 42nd Street
New York, NY 10036-6979
Tel: 212.356.0219
Fax: 646.473.8219
Cell: 917.856.5352

rseltzer@cwsny.com | www.cwsny.com

**From:** Frank Carone [mailto:FCarone@Abramslaw.com]
**Sent:** Tuesday, September 02, 2014 1:33 PM
**To:** Richard M. Seltzer; Sarah Lichtenstein; 'Edward M. Spiro (espiro@maglaw.com)'
**Cc:** Thomas N. Ciantra; Kate M. Swearengen
**Subject:** RE: LICH_Settlement

Richard,

As you know, SUNY intends to submit papers in opposition to NYSNA's pending motion for a preliminary injunction. Nonetheless, in order to resolve this matter without further burdening the Court, in furtherance of our conversation, SUNY is prepared to provide continued employment for the potentially displaced nurses at LICH's Emergency Department, which you have indicated to me is no more than 25 nurses.  Such employment would be either at or through Staffco/Downstate, or at another hospital in Brooklyn.

Obviously, by making this proposal, SUNY is not conceding that there is any merit to NYSNA's legal position on the pending motion.  Further, the proposal is without prejudice to SUNY's rights, all of which are reserved.

Printed: 8/11/2016

Please let me know within the next few days if this proposal is acceptable. I am sure the NYSNA nurses at LICH are eager to have their employment status clarified and, on its end, SUNY would like to avoid incurring unnecessary legal fees. Thanks.

Frank


Frank V. Carone, Esq.
Tel: (718) 215-5300 | Fax: (718) 215-5304
1 Metrotech – Suite 1704
Brooklyn, New York  11201
Email: fcarone@abramslaw.com
Website: www.abramslaw.com

| Bio | LinkedIn | Vcard |

# ABRAMS **AF** FENSTERMAN

### Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP

#### Attorneys at Law

**IRS CIRCULAR 230 DISCLOSURE:** To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**CONFIDENTIALITY NOTICE:** This e-mail contains information that is privileged and confidential and subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. You are prohibited from copying, distributing or otherwise using this information if you are not the intended recipient.

**From:** Richard M. Seltzer [mailto:rseltzer@cwsny.com]
**Sent:** Tuesday, August 26, 2014 5:57 PM
**To:** Frank Carone
**Cc:** Thomas N. Ciantra; Kate M. Swearengen
**Subject:** LICH

Frank – sorry for the delay. Here is a draft of a revised OSC and TRO. The TRO would presumably go through a hearing next week before Baynes. If you have proposed changes it would probably be best if you send a marked version back over with any proposed changes so I can immediately send to my clients.



**Richard M. Seltzer**
330 West 42nd Street
New York, NY 10036-6979
Tel: 212.356.0219
Fax: 646.473.8219
Cell: 917.856.5352

rseltzer@cwsny.com | www.cwsny.com


Under applicable Treasury Regulations, we are required to inform you that no U.S. tax advice in this email or an attachment to this email is intended or written to be used, nor can it be used, to avoid a penalty under the Internal Revenue Code, or to promote, market or recommend to another party a transaction or matter addressed in this email or attachment.

Approval by the 25-member committee, comprising members of the county Bar Association and other lawyers, is usually a routine a rubber stamp for sitting judges such as Jacobson, who has spent the past 13 years handling civil cases.

But Jacobson is so disliked and considered so judicially mediocre that the committee found her unqualified, and then rejected her subsequent appeal.

Records show Jacobson's decisions from the bench in her ninth-floor courtroom at 350 Adams St. have been reversed on appeal at least 57 times in the past decade.

Most recently, the Appellate Division took her to task for not granting a default judgment in a foreclosure case against AWOL tenants and for improperly holding a company responsible for a construction accident although it completed its work four months earlier.

Jacobson's husband, Peter Weiss — suspended from practicing law in 1994 after mishandling a medical-malpractice suit — is a political consultant who has locked horns with Democratic leaders, sources said.

Lawyers and litigants also find Jacobson brusque and rude, according to multiple lawyers and court sources.

"She fell out of favor with the powers that be," said one court source. "It's a clubhouse, and she's not a member in good standing."

Said one lawyer who has appeared before her: "She's not a hard worker; she wastes everybody's time."

Jacobson does have fans — among them former NYCLU head Norman Siegel, who was on the losing side of her most prominent case, a 2008 battle for the FDNY pension of a firefighter who died on 9/11.

"I thought she was smart," Siegel said. "She really tried to resolve the case . . . and then when we finally went to trial, she was steadfast, measured and fair."

Brooklyn Democratic judicial delegates will meet in September to select their candidates for the November ballot. The rules say they can't vote for anyone found disqualified by the screening panel.

Jacobson declined to comment.

FILED UNDER   **BROOKLYN SUPREME COURT**, **JUDGES**

Recommended by

METRO

# Brooklyn judge blows off work amid being deemed 'unqualified'

By Rich Calder, Emily Saul and Laura Italiano                    July 15, 2016  |  12:37am



Supreme Court Judge Laura Jacobson leaves her home Thursday in Whitestone, NY.
Photo: Dennis A. Clark

**SEE ALSO**



**City judge deemed incompetent in 'unheard of' move**

She's lazy, too.

Brooklyn Supreme Court Justice Laura Jacobson shut down her courtroom and kept out of the public eye Thursday — the day that The Post revealed she'd been deemed "unqualified" by a panel of Democratic Party lawyers considering whether to back her for re-election.

Jacobson only had three cases on her docket for the day but adjourned everything, sending out alerts to all the parties telling them not to bother showing up.

Her courtroom won't reopen until Monday. "Zero explanation," complained one of the lawyers who was to appear before her.

It's that kind of work ethic — or lack thereof — that helped convince the county Democratic Party's Judicial Screening Committee last month that Jacobson is unqualified to run on the party line in November, two sources told The Post on Thursday.

The rare rebuke — court veterans said they'd never heard of the committee finding a sitting judge unqualified — will likely doom her chances for re-election.

As reported in The Post, committee members gave Jacobson the thumbs-down after determining that she had an inordinately high number of cases reversed on appeal — at least 57 in the past 10 years, according to court records. But the committee was also turned off by her lackadaisical attitude in filling out a required questionnaire and during an in-person interview, sources said Thursday.

The 39-page questionnaire asks for detailed lists of previous trials, written opinions and cases reversed or modified.

But Jacobson's was filled with vague answers, one court source said.

The judge was also "very cocky" when she met with committee members, as if she assumed that her judgeship was a done deal, sources said.

And indeed, the committee does typically "rubber stamp" sitting judges — just not in her case.

"She figured that since she was a judge for so long, she did not have to spend a lot of time completing a lot of the questions," said another source.

Jacobson declined for a second day to comment on the committee's finding.

FILED UNDER   **BROOKLYN SUPREME COURT**, **JUDGES**

Recommended by

<u>INFORMATION AND PRIVACY WAIVER</u>

I, _____ am informed that as a part of a routine check of my background in connection with my possible appointment to a position with the New York State Supreme Court / Civil Court of the City of New York, the Judicial Screening Committee may wish to make inquiries concerning me to various agencies of the Federal or State Government.  Having been advised that information from the files of federal or state agencies may be unavailable to the Judicial Screening Committee without my written consent, due to the Privacy Act of 1974, 5 United States Code Section 552 (a), and the Freedom of Information Act, 5 U.S.C. Section 552, I hereby consent to inquiries concerning me by the Judicial Screening Committee to any Federal or State agency, and to the disclosure to the Judicial Screening Committee by such federal or state agency.

_____

Sworn to before me this

_____ day of _____ 2016

_____

Notary Public

_____