UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
LAURA LEE JACOBSON,

                            Plaintiff,

                            **MEMORANDUM AND ORDER**
            -against-                  16-CV-04809 (LDH) (RML)

KINGS COUNTY DEMOCRATIC COUNTY
COMMITTEE; JUDICIAL SCREENING
COMMITTEE FOR THE DEMOCRATIC PARTY
IN AND FOR KINGS COUNTY; Hon. FRANK R.
SEDDIO Individually and in His Official and
Representative Capacity as County Chair of the
Kings County Democratic County Committee;
MARTIN W. EDELMAN Individually and in His
Official and Representative Capacity as Chairperson
of the Judicial Screening Committee for the
Democratic Party in and for Kings County; STEVEN
R. FINKELSTEIN; STEVE DECKER; ABAYOMI
O. AJAIYEOBA; and, JOHN AND JANE DOES
## 1-20, so named as their identities are not yet known,
intended to represent persons who had access to
confidential information and/or records of candidate-
Jacobson's screening and results by Judicial Screening
Committee for the Democratic Party in and for Kings
County pertaining to plaintiff, who disclosed such
materials outside of the Judicial Screening Committee
for the Democratic Party in and for Kings County to
Seddio, Kings County Democratic County Committee,
Kings County Democratic County Committee's media
consultant George Artz, and *inter alia*, members of the
public and the media, including, the *New York Post*,

                            Defendants.
-------------------------------------------------------------------x

LASHANN DEARCY HALL, United States District Judge:

       Plaintiff Laura Lee Jacobson brings the instant action against Defendants Kings County

Democratic County Committee (the "KCDCC"), the Judicial Screening Committee for the

Democratic Party in and for Kings County (the "Screening Committee"), Frank Seddio, Martin

1

Edelman, Steven Finkelstein, Steve Decker, Abayomi Ajaiyeoba, and John/Jane Does[1] for an alleged violation of her right to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, § 11 of the New York State Constitution, breach of contract, libel and slander, and conspiracy to violate her rights under the Fourteenth Amendment as against the individual Defendants. Plaintiff seeks equitable relief as well as compensatory and punitive damages. Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the amended complaint.

## BACKGROUND[2]

Generally, in the state of New York, political committees, such as the KCDCC, select their own candidates to appear on the general election ballot for Supreme Court Justice vacancies. (Am. Compl. ¶¶ 97, 100, ECF No. 26.) The Screening Committee aids the KCDCC in this process. (*See generally id.* ¶ 25.) As outlined in the Screening Committee Rules (the "Rules"), the Screening Committee reviews, and if necessary, investigates the qualifications of candidates, categorizes each candidate as either "Qualified" or "Not qualified as this time," and recommends candidates to the Executive Committee of the KCDCC. (*Id.* ¶ 25.) After the completion of the screening process, the KCDCC holds a judicial district convention, also known as a "closed primary election," at which time the KCDCC selects individuals from the list of qualified candidates to appear on the general election ballot. (*Id.* ¶¶ 10–11, 32.)

Plaintiff was elected to serve a 14-year term as a Supreme Court Justice in 2002. (*Id.* ¶¶ 9, 61.) On February 23, 2016, as part of the re-nomination process, Plaintiff sent her application to Defendant Martin Edelman, the chair of the Screening Committee. (*Id.* ¶¶ 40, 76.)

---

[1] Plaintiff defines the John/Jane Does as persons associated with the Screening Committee and believed to have had access to Plaintiff's "confidential information."
[2] The following facts are taken from the amended complaint and are assumed to be true for purposes of deciding the instant motion.

On May 4, 2016, Plaintiff was interviewed by a two-person sub-committee of the Screening Committee, which Plaintiff alleges "went very nicely," evidenced by not receiving any oral or written "areas of concern." (*Id.* ¶ 41.) By letter dated May 26, 2016, Plaintiff was informed that the Screening Committee found her to be "Not qualified" and was not recommending her to the Executive Committee of the KCDCC for another term. (*Id.* ¶ 202.) The letter also advised Plaintiff of her rights to appeal the determination and to withdraw her application in order to avoid negative publication. (*Id.*) On June 1, 2016, Plaintiff appealed the Screening Committee's findings. (*Id.* ¶ 49.) By letter dated June 8, 2016, Plaintiff was informed that her appeal was denied. (*Id.* ¶ 51.) In addition, the letter again informed Plaintiff that she could withdraw her application to prevent the Screening Committee's negative findings from being reported to the Executive Committee of the KCDCC. (*Id.*) Plaintiff withdrew her candidacy on June 10, 2016. (*Id.* ¶ 52.)

Following Plaintiff's withdrawal, on July 13 and 15, 2016, the New York Post published articles reporting the Screening Committee's finding that Plaintiff was "Not qualified." (*Id.* ¶ 57.) The articles included statements from various sources, stating, *inter alia*, that Plaintiff was "not the brightest bulb in the courthouse" and that Plaintiff was "so disliked and considered so judicially mediocre that the committee found her unqualified, and then rejected her appeal." (*Id.*)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a

3

"reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id.* (internal citations omitted).

## DISCUSSION

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. Amend. I. These First Amendment rights, "among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967), guarantee, among other things, "the freedom to join together in furtherance of common political beliefs," *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986), and to "limit the association to those" who share similar political views, *Democratic Party of U. S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981). Courts have long recognized the importance of such private political association rights in the functioning of political parties, including the candidate selection process. As explained by the Supreme Court:

> In no area is the political association's right to exclude more important than in its candidate-selection process. That process often determines the party's positions on significant public policy issues, and it is the nominee who is the party's ambassador charged with winning the general electorate over to its views. The First Amendment reserves a special place, and accords a special protection, for that process because the moment of choosing the party's nominee is the crucial juncture

4

> at which the appeal to common principles may be translated into concerted action, and hence to political power.

*California Democratic Party v. Jones*, 530 U.S. 567, 568 (2000) (internal citations omitted).  For this reason, the Supreme Court has routinely rejected impermissible state intrusion into a party's candidate selection process.  For instance, in *California Democratic Party v. Jones*, the Supreme Court found unconstitutional a state law that "force[d] [a political party] to adulterate their candidate-selection process—the 'basic function of a political party'—by opening it up to persons wholly unaffiliated with the party." 530 U.S. 567, 581 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973).  In so finding, the Supreme Court stated that it could not "think of [any] heavier burden on a political party's associational freedom" than the "forced association" imposed by the state's law. *Id.* at 581–82.  Similarly, in *Seergy v. Kings Cty. Republican Cty. Comm.*, the Court refused to disturb a political party's voting process related to "the promotion of Republican candidates" as it was an "internal affair[]" of the party as opposed to one implicating a "public electoral function." 459 F.2d 308, 310, 315 (2d Cir. 1972).  In sum, the Supreme Court has made clear that a political party is generally empowered to govern its candidate selection process as it wishes without state or judicial interference.

This is not to say that there are no circumstances under which a political party's selection of its nominees is subject to state scrutiny.  Indeed, the Supreme Court has made plain that "when the State gives [a political] party a role in the election process," the political parties' "First Amendment right to limit its membership as it wishes" is "circumscribed." *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202–03 (2008).  For example, "when the state grants political parties the right to nominate candidates and then gives those nominees special access to the ballot, the parties' procedures constitute state action." *Montano v. Lefkowitz*, 575 F.2d 378, 383 n.7 (2d Cir. 1978) (internal citations omitted).  In other words, it is

only in those rarest of cases where a political party's processes bear a direct impact on the electoral process, such as access to the ballot, that the otherwise private activity of a political party implicates the public affairs of the state warranting intrusion. *Seergy*, 459 F.2d at 314 (explaining that only "[i]n those rare instances where [a political party] perform[s] public electoral functions (e.g., the nomination of candidates to fill vacancies or to run in special elections, or the giving or consent to candidacies by non-members of the party)" does the political party's actions "unquestionably play[] an integral part in the state scheme").

Against this backdrop, Plaintiff presses a § 1983 claim against Defendants on the theory that Defendants' breach of their internal rules[3] governing the candidate-selection process violated her Fourteenth Amendment rights. (Am. Compl. ¶¶ 1, 201–44.) It is long-settled that to successfully prosecute a claim under § 1983, the alleged constitutional deprivation must have been "committed by a person acting under the color of state law." *Harrison v. New York*, 95 F.

---

[3] Plaintiff alleges that Defendants failed to abide by the following rules: (1) Rule 9: "The panel shall judge each candidate as either 'Qualified' or 'Not qualified at this time.' Of the Qualified Candidates the Panel shall report out a limited pool of recommended candidates based on the total number of vacancies for that judicial office (i.e., Civil, Supreme). The total pool shall be five (5) individuals per vacancy for each type of judicial office. For the purposes of determining the size of the pool, incumbent's seats shall be included."; (2) Rule 10: "A quorum shall consist of a least two-thirds (66 2/3%) of the current members in good standing. A sixty percent (60%) vote of the quorum is required for all decisions, except for the case of incumbent judges. Incumbent Judges seeking reelection to the same office shall be deemed qualified unless seventy-five (75%) of the quorum determines that the Judge should not be reported out as 'Recommended.' For the purposes of these rules Judges appointed to fill interim vacancies shall be deemed incumbent Judges. If a candidate is found qualified in any year, the candidate to be found qualified in any successive year need only be found qualified by a majority vote of the quorum."; (3) Rule 20: "*In the event that the sub-committee determines that there are particular areas of concern, the candidate will be orally apprised either by the Chair or a designated member of the sub-committee prior to being interviewed by the full Committee*. The candidate will be requested to be prepared to address before the full Committee the areas of concern detailed in the written communication. The candidate shall be informed that he or she may bring to the interview of the full committee any materials that the candidate believes may be relevant to the issues. In the event, the candidate desires to provide additional written materials; the candidate must provide 24 copies of such materials to be distributed to the Committee at the interview of the full Committee."; and (4) Rule 31.b: "If a candidate who has been found 'Not qualified at this time' decides to appeal, the candidate shall notify the Chair in writing within *five* business days of being informed of the Committee's decision, the 'appeal notice'. The appeal process consists of the following: . . . . The appeal shall be heard within two (2) weeks of the candidate's notice of appeal. The candidate shall be informed within *four* business days of the appearance before the panel. The candidate shall then be given an additional two business days to withdraw his/her candidacy unequivocally and with prejudice to avoid publication of the Committee's findings." (Committee Rules, Ex. 9 (emphasis in original), ECF No. 26-9.)

Supp. 3d 293, 321 (E.D.N.Y. 2015) (quoting *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010); *see also Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that [her] constitutional rights have been violated must first establish that the challenged conduct constitutes state action."). Plaintiff fails to make such a showing.

In urging this Court to find that Defendants acted under color of state law, Plaintiff relies principally on *Yassky v. Kings Cty. Democratic Cty. Comm.*, 259 F. Supp. 2d 210 (E.D.N.Y. 2003). (*See* Pl.'s Opp. to Defs.' Mot. to Dismiss ("Pl.'s Opp.") at 15–16, ECF No. 40.) In *Yassky*, the plaintiffs, candidates who sought ballot access, brought a § 1983 claim alleging that a political party's rule providing that "party members may witness petitions only in the district where they are enrolled to vote and reside" violated their rights under the First and Fourteenth Amendments. 259 F. Supp. 2d at 212–13. In opposing the plaintiffs' claims, the defendants, a political party and its officials, argued that they were not subject to the plaintiffs' § 1983 claim because they were not a state actor. *Id.* at 215–17. The court rejected the defendants' arguments, finding instead that "although political parties themselves have certain First Amendment associational rights . . . those rights do not allow the political parties to engage in conduct, directly related to ballot access, that would be unconstitutional if done by the State." *Id.* at 216 (internal citations omitted). Put differently, because the rule at issue had the "undisputed effect of . . . mak[ing] it significantly more difficult for many Democratic Party candidates to gain access to the primary ballot" judicial intrusion was permissible. *Id.* at 217

Here, Plaintiff has conceded that her allegations do not implicate a ballot access claim thereby rendering *Yassky* inapposite. (*See* Pl.'s Opp. at 16 (stating "Plaintiff does not make a true ballot access claim").) Instead, Plaintiff's "constitutional grievance is with the denial and

7

disregard of mandatory rules and procedures of process promulgated under color of law." (*Id.* at 15.) However, Plaintiff fails to cite a single case where such grievance constituted a constitutional violation triggering the imposition of a state actor designation upon a political party. Instead, as Defendants aptly note, and despite Plaintiff's bare statements to the contrary, this case is akin to *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196 (2008). There, the plaintiffs alleged that New York state election law "burdened the rights of challengers seeking to run against candidates favored by the party leadership." *Lopez Torres*, 552 U.S. at 201. The Supreme Court noted that the plaintiffs' "real complaint is not that they cannot vote in the election for delegates, nor even that they cannot run in that election, but that the convention process that follows the delegate election does not give them a realistic chance to secure the party's nomination." *Id.* at 205. In denying the plaintiffs' claims, the Supreme Court reasoned:

> None of our cases establishes an individual's constitutional right to have a "fair shot" at winning the party's nomination. And with good reason. What constitutes a "fair shot" is a reasonable enough question for legislative judgment, which we will accept so long as it does not too much infringe upon the party's associational rights. But it is hardly a manageable constitutional question for judges—especially for judges in our legal system, where traditional electoral practice gives no hint of even the existence, much less the content, of a constitutional requirement for a "fair shot" at party nomination. Party conventions, with their attendant "smoke-filled rooms" and domination by party leaders, have long been an accepted manner of selecting party candidates.

*Id.* at 205–06. The same reasoning applies here. Assuming that Defendants failed to adhere to their internal rules governing the candidate selection process, this failure, as Plaintiff concedes, did not implicate ballot access. Rather, Plaintiff's grievance is parallel to her not getting a "fair shot" at being nominated. *Id.* This is insufficient to deem Defendants' actions as state actions. Therefore, Plaintiff's constitutional claims fail.[4]

---

[4] Having determined that, as a gating issue, Defendants did not act under color of state law, the Court need not reach Defendants' remaining arguments for dismissal. *Fabrikant*, 691 F.3d at 206 ("Because the United States

8

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the amended complaint are GRANTED.[5]

SO ORDERED:

      /s/ LDH      
L<small>A</small>SHANN D<small>E</small>ARCY HALL
United States District Judge

Dated: Brooklyn, New York
       September 29, 2018

---

Constitution regulates only the Government, not private parties, a litigant claiming that [her] constitutional rights have been violated must first establish that the challenged conduct constitutes state action."). In addition, Plaintiff's remaining counts are grounded in state law. As such, having dismissed Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over these remaining claims pursuant to 28 U.S.C. § 1367(c)(3). Thus, these claims are dismissed for lack of subject matter jurisdiction.

[5] Plaintiff's request to file a Second Amended Complaint is denied as repleading would be futile. *See Roth v. CitiMortgage Inc.*, 756 F.3d 178, 183 (2d Cir. 2014) ("Leave to amend need not be granted where the proposed amendment would be futile."); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it.").